

## IN THE CHANCERY COURT OF ROBERTSON COUNTY, TENNESSEE

**MELISSA DAVIS and CHRIS DAVIS,**
**Individually and as Next Friend of their minor son,**
**ARLIS "BUCK" DAVIS,**

Plaintiffs,

v.

**ROBERTSON COUNTY SCHOOL BOARD**
**OF EDUCATION, and CHRIS CAUSEY, Individually,**
**and in his capacity as Director of Schools for**
**Robertson County Schools,**

Defendants.

FILED
CLERK & MASTER ROBERTSON CO. TN

MAY 04 2022
AT 3:29 O'CLOCK P M
ROSEMARY A. SPRAGUE
BY

NO. CH22-CV-220

### VERIFIED COMPLAINT AND MOTION FOR INJUNCTIVE RELIEF

COME NOW the Plaintiffs, Melissa Davis and Chris Davis, Individually and as Next Friends of their minor son, Arlis "Buck" Davis ("Plaintiffs"), through the undersigned counsel, and file this Verified Complaint and Motion for Injunctive Relief against Defendants Robertson County School Board of Education, and Chris Causey, Individually and in his official capacity as Director of Schools for Robertson County Schools. In support thereof, Plaintiffs would state to the Court the following:

### SUMMARY OF THE CASE

The minor Plaintiff, Buck Davis, is a junior at Greenbrier High School. On February 8, 2022, Buck was accused of, investigated for, charged with, and punished for a zero-tolerance policy violation of a zero-tolerance policy that does not exist. Buck was sentenced by the Disciplinary Hearing Authority as a zero-tolerance defendant to a one-year term at Robertson

1

EXHIBIT 1

County's alternative school, The Phoenix Academy. Buck's case is also marred by a series of errors in the investigation and prosecution of his case that further eroded Buck's constitutional rights to due process. On February 17, 2022, Buck's appeal to the Robertson County Director of School, Chris Causey, was denied. On April 25, 2022, Buck exhausted his administrative remedies by appealing his suspension to the Robertson County School Board. That appeal was likewise denied.

Having been tried, convicted, and sentenced for violating a Robertson County School Board policy that does not even exist, and having had every appeal of that wrongful conviction denied, Buck Davis and his family have no choice but to resort to the power of this Honorable Court to restore his rights and grant his remedies before more harm occurs to him.

## PARTIES

1. Plaintiff Melissa Davis is the mother and next friend of Arlis "Buck" Davis, a minor. She is an adult resident citizen of Robertson County, Tennessee, residing therein at 3112 Lights Chapel Road, Greenbrier, Tennessee 37073.

2. Plaintiff Chris Davis is the father and next friend of Arlis "Buck" Davis, a minor. He is an adult resident citizen of Robertson County, Tennessee, residing therein at 3112 Lights Chapel Road, Greenbrier, Tennessee 37073.

3. Arlis "Buck" Davis is a minor who resides with his parents, Melissa and Chris Davis, at 3112 Lights Chapel Road, Greenbrier, Tennessee 37073.

4. Defendant Robertson County School Board ("RCSB") is a public entity entitled to sue and be sued under the laws of the State of Tennessee. RCBS operates the public school system in Robertson County, Tennessee, consisting of 21 schools plus a virtual school. RCSB operates Greenbrier High School. RCSB may be served through its Director of Schools, Chris Causey at

2

Robertson County School Board, Central Office, 800 M. S. Couts Blvd. Springfield, TN 37172, or through counsel for the parties by previously agreement.

5.     Chris Causey is the Director of Schools for Robertson County. The Director of Schools is the chief executive officer of the school system and has, under the direction of the RCSB, general supervision of all the public schools, personnel and departments of the school system. The Director of Schools is responsible for the management of the schools under the RCSB's policies and is accountable to the RCSB. Dr. Causey can be served at Robertson County School Board, Central Office, 800 M. S. Couts Blvd., Springfield, TN 37172, or through counsel for the parties by previously agreement.

6.     Venue is correct, and this Court has jurisdiction to hear all claims alleged herein.

## FACTS

7.     Buck Davis is a junior at Greenbrier High School.

8.     On February 8, 2022, Buck was observed with chewing tobacco while on the Greenbrier High School campus. The school resource officer brought Buck to the office of the assistant principal, Tracey Raines.

9.     Buck voluntarily agreed to a search of his truck that was parked on campus.

10.    At the truck, Assistant Principal Tracey Raines and the school resource officer found more cans of tobacco, and in the passenger console, a vape pen.

11.    There was also a backpack in the truck with the name "C.B." (Student B) embroidered on it. In the backpack was allegedly a can of "40 Loco" and an empty container of Twisted Delta 8 Hemp. Buck had no knowledge of the contents of the backpack belonging to "C.B." (Student B), including specifically any alcohol. The backpack had been placed in Buck's normal truck by another student without Buck's knowledge, and when Buck's normal truck

3

broke down, Buck transferred the contents of that truck to the family's farm truck, including the backpack belonging to "C.B." (Student B). Buck never looked inside the backpack to examine its contents before driving to school.

12. After returning to the office, J.W. (Student A) came by and asked about getting his keys out of Buck's truck. Assistant Principal Raines asked J.W. (Student A) about the other items in the truck, and J.W. (Student A) confessed to owning the vape pen. Buck was not cited for possession of this item.

13. Buck was cited, however, for "possession of alcohol on campus" by Assistant Principal Tracey Raines and referred to the Disciplinary Hearing Authority ("DHA") with the following recommendation, "zero tolerance one calendar year at Phoenix Academy." (Exhibit A.)

14. Since Buck's case involved a suspension exceeding ten days, the Principal of Greenbrier High School, Katie Osborne, was required to make the referral to the DHA.

15. Tracey Raines is not the Principal of Greenbrier High School.

16. On February 11, 2022, the DHA met to hear Buck's case. The DHA considered the infraction against Buck to be "Possession of alcohol (ZT)." The DHA's recommendation was "the student assigned to RCPA for 1 calendar year for a ZT. The student may return to GHS on 2.12.2023." (Exhibit B.) Notably, this document fails to include "a summary of the facts and the reasons supporting the decision" of the DHA a required by Tenn. Code Ann. § 49-6-3401(6). For this reason, it was not until the hearing before the RCSB discussed below that Buck and his parents learned for the first time that the DHA's position was that its members simply chose not to believe Buck's story. This document (Exhibit B) and the subsequent declarations of the DHA members are inconsistent with each other.

4

17.     At the DHA hearing, Buck's parents were advised by the DHA panel that Buck's
guilt or innocence of the alleged offense was not to be discussed, nor were the names of any
other students involved. According to the DHA panel at the hearing, because the charge
involved a zero-tolerance offense, the only topic for discussion was whether to suspend Buck for
one calendar year, or to expel him.

18.     On February 11, 2023, the Plaintiffs appealed the DHA's decision to the Director
of Robertson County Schools, Chris Causey. (Exhibit C.)

19.     On February 17, 2022, Dr. Causey refused to overturn the decision of the DHA,
finding that Buck had "committed a zero tolerance offense." (Exhibit D.)

20.     On April 6, 2022, through counsel, Buck appealed Dr. Causey's decision to
uphold the DHA decision that suspended Buck for an alleged zero-tolerance violation to the
Robertson County School Board. These materials alleged a number of substantive and
procedural defects in the investigation and hearing of charges against Buck, including the
argument that the Robertson County School Board has not made possession of alcohol on school
property a zero-tolerance offense. (Exhibit E.)

21.     On April 7, 2022, counsel for the Plaintiffs submitted additional information to
the Robertson County School Board for consideration at the final administrative appeal. These
materials reminded the RCSB that knowledge and intent are critical components to any
procedural due process analysis related to school discipline investigations. (Exhibit F.)

22.     On April 19, 2022, ostensibly on behalf of itself, counsel for the Robertson
County School Board submitted written materials for the Board's consideration.

23.     On April 25, 2022, the Robertson County School Board met for a specially called
meeting to consider Buck's appeal. With one abstention, the Board voted unanimously to uphold

5

the DHA and Dr. Causey's decisions to suspend Buck for a zero-tolerance violation for possession of alcohol on campus. The Board did modify the one calendar year suspension and provided that on "good behavior" he would be allowed to return to Greenbrier High School on the first day of the 2022-2023 school year. (Exhibit G.)

## THE ROBERTSON COUNTY SCHOOL BOARD HAS NOT MADE "POSSESSION OF ALCOHOL ON CAMPUS" A ZERO TOLERANCE OFFENSE

24.     Zero tolerance offenses are created by State law, Tenn. Code Ann. § 49-6-3401(g); and additionally, as in the case of the RCSB, by specific school board policy, Board Policy § 6.309.

25.     The three types of offenses mandated as "Zero tolerance" offenses under Tennessee statute are those involving guns, assaults and drugs. Tenn. Code Ann. § 49-6-3401(g)(2)(A-C).

26.     "Zero tolerance offense" means an offense committed by a student requiring the student to be expelled from school for at least one (1) calendar year that can only be modified on a case-by-case basis by the director of schools or the head of a charter school.

27.     Disciplinary policies and procedures for all other student offenses, including terms of suspensions and expulsions, must be determined by local board of education policy.

28.     The RCSB has broadened the scope of "Zero Tolerance Offenses" by developing a policy that includes both the state law mandated offenses of guns, assaults, and drugs, and which goes further by adding sections covering "ELECTRONIC THREATS" and "NOTIFICATION." *See*, Board Policy § 6.309. (Exhibit H.)

29.     Robertson County School Board Policy § 6.309 on "Zero Tolerance Offenses" does not make possession of alcohol on campus a zero-tolerance offense.

6

30.     Buck has not been accused of an offense involving guns, assaults, drugs, or

electronic threats.

31.     Buck has not been accused of violating a State law or RCSB policy that makes

possession of alcohol on campus a zero-tolerance offense.

32.     The Director of Schools prepared a Student Handbook for Robertson County

Schools for 2021-2022. (Exhibit I.)

33.     The Student Handbook has the following statement regarding alcohol and drug

use:

> **Alcohol and Drug Use**
> Students will not possess, distribute, or be under the influence of illegal
> drugs or alcoholic beverages in school buildings or on schools grounds,
> school vehicles, or at any school-sponsored activity at any time whether on
> or off school campus.
>
> Students will not market or distribute any substance that is represented to
> be or is substantially similar in color, shape, size or markings to a controlled
> substance.
>
> Upon information that a student is suspected of violating this policy, the
> principal/designee shall be notified immediately. If it is determined that the
> policy has been violated the principal/designee shall notify the parent and
> appropriate law enforcement officials. The student shall be suspended to
> the Disciplinary Hearing Authority and be subject to a one calendar year
> suspension.

34.     The statement contained in the Student Handbook regarding "Alcohol and Drug

Use" is not a statement of board policy as required by Tenn. Code Ann. § 49-6-3401(g)(4), nor is

this statement regarding alcohol and drug use contained in any official policy adopted by the

RCSB.

35.     Even if the statement contained in the Student Handbook regarding alcohol and

drug use can be interpreted as being a board policy, it does not make possession of alcohol on

school property a zero-tolerance offense because it simply describes punishment as, "The student

7

shall be suspended to the Disciplinary Authority and be subject to a one calendar year

suspension." By statute, "Zero tolerance offense" means an offense committed by a student

requiring the student to be expelled from school for at least one (1) calendar year that can only be

modified on a case-by-case basis by the director of schools or the head of a charter school.

      36.     The Student Handbook also purports to include alcohol among a list of items that

if possessed are "Zero-tolerance acts as defined by Law or Board of Education Policy."

However, alcohol is not included in Tenn. Code Ann. § 49-6-3401(g)(2)(A-C), Board Policy §

6.309, or any other "Board of Education Policy."

      37.     The Student Handbook purports to define zero-tolerance behavior as:

### Zero-Tolerance Behavior

In order to ensure a safe and secure learning environment free of drugs, drug paraphernalia,
violence and dangerous weapons, any student who engages in the following behaviors will be
subject to a suspension for a period of not less than one calendar year. The Director of Schools
shall have the authority to modify the suspension requirement on a case-by-case basis.

Zero-tolerance acts as defined by Law or Board of Education Policy:

- ❖ Possession/use/transfer of illegal substances, including alcohol, marijuana, stimulant
  drugs, prescription medication not prescribed to the student, or drug paraphernalia.
- ❖ Assault, threatening to assault, or committing aggravated assault upon any student, teacher,
  or system employee.
- ❖ Possession/use/transfer of dangerous weapons.
- ❖ Unauthorized possession of a firearm as defined in 18 USC 921.
- ❖ Who transmits by an electronic device any communication containing a credible threat to
  cause bodily injury or death to another student or school employee and the transmission of
  such threat creates actual disruptive activity at the school that requires administrative
  intervention.

      38.     The statement contained in the Student Handbook regarding "Zero Tolerance

Behavior" is different than and inconsistent with Robertson County School Board Policy § 6.309

on "Zero Tolerance Offenses."

8

39.     The statement contained in the Student Handbook regarding "Zero Tolerance Behavior" is not a statement of board policy as required by Tenn. Code Ann. § 49-6-3401(g)(4).

40.     The statement contained in the Student Handbook regarding "Zero Tolerance Behavior" does not provide a link to Robertson County School Board Policy § 6.309 on "Zero Tolerance Offenses" so that a student or parent could refer to the actual policy.

41.     Robertson County School Board Policy § 6.309 on "Zero Tolerance Offenses" does not contain the full text of Robertson County School Board Policy § 6.309 on "Zero Tolerance Offenses."

42.     The Student Handbook does not serve as the RCSB's policy handbook.

43.     The RCSB maintains its policies separately from the Student Handbook in a policy manual on a website. (See, https://tsba.net/robertson-county-board-of-education-policy-manual/)

44.     The Student Handbook does not contain an accurate summary of the Robertson County School Board Policy § 6.309 on "Zero Tolerance Offenses."

45.     The Student Handbook does not contain an accurate summary of the Robertson County School Board Policy § 6.309 on "Zero Tolerance Offenses" with a link to the text of the full policy.

46.     The Robertson County School Board has not made the possession of alcohol on campus a zero-tolerance offense by policy.

47.     The Robertson County School Board has not made the possession of alcohol on campus a zero-tolerance offense by proper use of the Student Handbook.

48.     Because Buck was accused of, investigated for, charged with, and punished for a zero-tolerance policy violation for a zero-tolerance policy that does not exist, the entire process

9

was tainted from the beginning and resulted in the violation of Buck's procedural and substantive due process rights, and other rights secured by law.

## REQUEST FOR TEMPORARY AND PERMANENT INJUNCTIVE RELIEF
## (FIRST REQUEST)

49.      Plaintiffs hereby incorporate each and every paragraph contained in this Complaint verbatim as if fully set forth herein.

50.      Pursuant to Rule 65 of the Tennessee Rules of Civil Procedure, this Court may grant a restraining order in this matter requiring the RCSB and/or Dr. Causey to return to the pre-investigation status quo by returning Buck Davis to his normal class schedule at Greenbrier High School immediately, and enjoining the Defendants from taking any action against Buck Davis as a result of RCBS's flawed zero-tolerance policy, should the Plaintiffs demonstrate, through affidavit or through verified complaint, that they will suffer immediate and irreparable harm, loss or damage if the Court does not grant the requested relief. Plaintiffs also request that the Court enter a temporary injunction on the same basis following the initial hearing of this matter.

51.      Plaintiffs request that a restraining order should be issued prior to the adverse party being heard in opposition as Buck Davis continues to be wrongfully deprived of his education by being forced to sit at a desk for hours straight at The Phoenix Academy and use a remote learning system that the RCSB already determined was ineffective during the interruptions caused by COVID-19. In addition, Buck has an Individualized Education Plan ("IEP") that is not being met at The Phoenix Academy. Like every other student, Buck also missed most of the past two years of in-person school due to COVID-19 and taking away half of his junior year for this non-infraction will simply exacerbate this learning deficit. Buck Davis will continue to be wrongfully deprived of his constitutional right to a free public education until this matter is final, unless the Court restores him to the pre-deprivation status quo.

10

52.     Plaintiffs have put Defendants on notice of this filing as best as possible under the circumstances and their request for an immediate restraining order/temporary injunction, both orally and in writing.

53.     Plaintiffs submit that there is a strong likelihood that they will succeed on the merits of the claims asserted herein and that Defendants will not suffer any harm, loss, or damage, should the Court grant the injunctive relief sought in this matter.

## COUNT I – PROCEDURAL DUE PROCESS

54.     Plaintiffs hereby incorporate each and every paragraph contained in this Complaint verbatim as if fully set forth herein.

55.     Defendants violated the Plaintiffs' procedural due process rights guaranteed by the United States Constitution and the Constitution of the State of Tennessee in multiple ways, including but not limited to the following:

a.     Failing to adhere to its own policies and procedures in the investigation and prosecution of zero-tolerance charges;

b.     Failing to provide a meaningful and accurate description of the alleged zero-tolerance charges at issue;

c.     Failing to give the Plaintiffs the opportunity to discuss guilt or innocence at the DHA hearing, and instead instructing that the only issues for discussion were suspension or expulsion under the RCSB zero-tolerance policy;

d.     Sentencing Buck pursuant to the zero-tolerance policy when it was not authorized;

e.     Failing to perform a reasonable investigation into Buck's guilt or innocence, including the unauthorized use of a school resource officer to search Buck's truck; and

11

f.      The failure of Dr. Causey to conduct any reasonable investigation before denying Buck's appeal to him;

g.      The DHA's failure to follow State law and RCBS policy by not including a summary of the facts and reasons supporting the decision to sentence Buck to the Phoenix Academy; and

g.      Other additional violations of RCBS's own rules, regulations, and policies regarding student discipline.

56.     The Defendants actions proximately caused harm to the Plaintiffs for which they are entitled to recover damages.

## COUNT II – SUBSTANTIVE DUE PROCESS

57.     Plaintiffs hereby incorporate each and every paragraph contained in this Complaint verbatim as if fully set forth herein.

58.     Defendants' actions in disciplining Buck were arbitrary, capricious, and illegal, so as to shock the conscience, and they displayed a deliberate indifference to and a conscious disregard of Buck's constitutional rights, in violation of his substantive due process rights under the United States Constitution and the Constitution of the State of Tennessee. Defendants have violated Buck's substantive due process rights in multiple ways, including but not limited to the following:

a.      Defendants arbitrarily, capriciously, and illegally charged Buck with and found him guilty of a zero-tolerance violation for alleged conduct that was not included among the list of zero-tolerance offenses enacted by State law or Board policy;

b.      Defendants arbitrarily, capriciously, and illegally charged Buck with and found him guilty of a zero-tolerance violation without the requisite factual support for the finding;

12

c.      Defendants arbitrarily, capriciously, and illegally imposed and upheld a punishment that is grossly disproportionate to the offense charged and specifically not authorized by State law or Board policy; and

d.      The disciplinary actions Defendants undertook against Buck were arbitrarily, capriciously, and illegally driven by improper motives unrelated to the maintenance of school discipline.

59.      The Defendants actions proximately caused harm to the Plaintiffs for which they are entitled to recover damages.

## COUNT III – FAILUIRE TO TRAIN/SUPERVISE

60.      Plaintiffs hereby incorporate each and every paragraph contained in this Complaint verbatim as if fully set forth herein.

61.      Defendants have failed to adequately train and supervise their employees with regard to student discipline.

62.      These failures exhibit a deliberate indifference to Buck's constitutional rights.

63.      Defendants' inadequate training and supervision of its employees proximately caused a deprivation of Buck's constitutional rights, for which Plaintiffs are entitled to damages.

## COUNT IV – NEGLIGENCE

64.      Plaintiffs hereby incorporate each and every paragraph contained in this Complaint verbatim as if fully set forth herein.

65.      The Defendants were negligent in the investigation, consideration and administration of their duties, including the duty to follow their own policies and procedures relative to student discipline which led to the wrongful conviction of Buck Davis under the RCSB zero-tolerance policy.

66.      The Defendants' negligence was a proximate cause of harm and damage to Plaintiffs.

13

## RELIEF SOUGHT

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray:

1. That proper process issue upon Defendants, compelling each to answer this Verified Complaint;

2. That this Court grant a restraining order/temporary injunction pursuant to Rule 65 of the Tennessee Rules of Civil Procedure, requiring the RCSB and/or Dr. Causey to return to the pre-investigation status quo by returning Buck Davis to his normal class schedule and status at Greenbrier High School immediately, and enjoining the Defendants from taking any action against Buck Davis as a result of RCBS's flawed zero-tolerance policy, as the Plaintiffs have demonstrated, through this Verified Complaint, that they will suffer immediate and irreparable harm, loss or damage if the Court does not grant the requested relief;

3. That Defendants be held jointly and severally liable for depriving Plaintiffs of their procedural due process rights and substantive due process rights secured by the United States Constitution and Constitution of the State of Tennessee;

4. That this Court enter a declaratory judgment exonerating Buck Davis and clearing his student record of the charge of possession of alcohol on school property of which he was arbitrarily, capriciously, and illegally convicted;

5. That this Court enter a judgment in favor of Plaintiffs in a sum sufficient to compensate them for the damages they have suffered as a result of Defendants' violations of Buck's constitutional rights;

6. That Plaintiffs be awarded their reasonable attorneys' fees jointly and severally against the Defendants;

7. That the costs of this action be awarded to Plaintiffs;

8. That a jury be impaneled to try all legal issues presented in this lawsuit; and

14

9.      Plaintiffs be provided leave to subsequently amend this Verified Complaint to allow

the pleading to conform to the facts and evidence as such may develop during discovery and at the

trial of this cause.

Respectfully Submitted,

SHUTTLEWORTH PLLC

Robert W. Briley, BPR #18560
rbriley@swlawpllc.com
Mathew K. Eggleston, BPR #18641
meggleston@swlawpllc.com
7984 Coley Davis Road, Suite 101
Nashville, Tennessee 37221
(615) 833-3390
*Attorneys for Plaintiffs*

15

## **AFFIDAVIT**

STATE OF TENNESSEE       )
                              )
COUNTY OF DAVIDSON     )

      Before me personally appeared Melissa Davis, being first duly sworn according to law, and who makes oath under penalty of law or perjury that she has read the foregoing document and that the facts set forth herein are true and accurate to the best of her knowledge, information and belief, that the Verified Complaint is not made out of levity or by collusion with the Defendants, but in sincerity and truth for the causes alleged herein.

                                      Melissa Davis, Individually and as Next Friend of
                                      Arlis "Buck" Davis

Sworn to and subscribed before me this ___4ᵗʰ___ day of ___May___, 2022.

                                   Notary Public

My Commission Expires: 09/08/25

**AFFIDAVIT**

STATE OF TENNESSEE        )
                          )
COUNTY OF DAVIDSON        )

       Before me personally appeared Chris Davis, being first duly sworn according to law, and who makes oath under penalty of law or perjury that he has read the foregoing document and that the facts set forth herein are true and accurate to the best of his knowledge, information and belief, that the Verified Complaint is not made out of levity or by collusion with the Defendants, but in sincerity and truth for the causes alleged herein.

                                _____

                                  Chris Davis, Individually and as Next Friend of
                                  Arlis "Buck" Davis

Sworn to and subscribed before me this _____ 4th _____ day of _____ May _____, 2022.

                              _____
                              Notary Public

My Commission Expires: 09/08/25

BEVERLY BRILEY
STATE
OF
TENNESSEE
NOTARY
PUBLIC
COUNTY OF DAVIDSON

## FIAT

TO THE CLERK OF THIS COURT:

Issue the Temporary Restraining Order as prayed for in this Complaint upon bond being given in the amount of $_____ and issue Notice setting this matter for hearing on _____, the _____ day of _____, _____ at _____ o'clock _____.m.

_____

CHANCELLOR

Date: _____

FILED
CLERK & MASTER ROBERTSON CO. TN

MAY 0 4 2022

AT 3.29 O'CLOCK P M
ROSEMARY L SPRAGUE
BY

# Robertson County Schools

Teresa Leavitt, Students Services Supervisor
800 M. S. Couts Blvd
Springfield, Tennessee 37172
Telephone (615) 384-5588 Fax (615) 384-9749

REFERRAL TO THE DISCIPLINARY HEARING AUTHORITY

Student: **Arlis Davis** School: **GHS**

Address: **3112 Lights Chapel Road Greenbrier 37073**

Grade: **11** Date of Birth: **4/6/2005**

Parent/Guardian Name:
**Chris and Melissa Davis**

Home Phone: **615-574-5384** Work Phone: **615-394-6868**

Behavior that resulted in referral to the DHA:

**possession of alcohol on campus**

*Attach copies of the following: (Five (5) copies should be brought to the hearing. One for each member of the DHA and one for the parent/guardian.

___ Administrator's Summary of the Case (Narrative)

___ Transcript (copies from cumulative folder and current high school transcript).

___ Attendance Record.

___ Discipline record.

___ Statements from witnesses (students, staff, etc.)

___ Current class schedule with current grades.

___ Special Education? (yes / no ) [bring file with IEP] 504? (yes / no)

___ RTI Program? (yes / no) _____

___ Manifestation IEP meeting

___ Evidence of behavioral intervention plan / FBA

___ A signed copy of the acknowledgement form

___ References from teachers

___ Other relevant information

Principals' Recommendation: _____

**Zero tolerance**
**one calendar year at Phoenix Academy**

EXHIBIT
A

SDHA 12.21.2020

Buck Davis

Student was seen by SRO Rippy coming out of the restroom with a can of Skoal. He was brought to the front office and searched by Admin Raines and Officer Rippy. The student was just caught the week before with a tobacco product. When student was asked if anything was on him or his backpack, he stated no but when asked if there was anything in his vehicle he stated not sure

Admin and SRO searched vehicle. In a truck that Buck does not drive every day, we found a backpack ~bring~ with a can of 40 Loco, a can of hemp flower and a lighter. He stated he picked up the backpack to bring it back to school for Student A. Student B's name was on the front of the backpack. The backpack had also been moved from his regular truck to the work truck.

In the glove compartment, we found a large glass vape which contained nicotine and another lighter.

The student was brought into the office and told of his suspension. Admin Raines contacted his parent.

Within 5 minutes, Student A came into office and stated he would need to get his keys out of Buck's glove compartment because Buck got caught. I asked him how he knew, and he held up his cell phone indicating that Buck had texted him. I asked him if along with those keys found in the glove compartment was that his vape. I asked him if the vape was his and at first, he denied it and then stated he wasn't going to let his boy take the fall.

The work truck was tidy so the backpack being in there was not anything random. Student A (whose name was embroidered on the front) has not been at GHS for 2 weeks.

Buck has been reminded by Mr. Freeland in the parking lot to get out of his truck and come into the building. Many students have been known to crowd around his truck before school and need reminding to come into the building.

Student was cited by Officer Rippy.

A pattern is developing with Buck bringing unlawful items to school. He was caught in January and again in February for tobacco and vape products on campus.

The alcohol possession is a zero-tolerance offense so one calendar school year at Phoenix Academy is recommended by GHS Administration.

*Tracey Raines*

FILED
CLERK & MASTER ROBERTSON CO. TN
MAY 04 2022
AT 3:29 O'CLOCK P M
ROSEMARY T SPRAGUE

## Robertson County Schools

Teresa Leavitt, Supervisor of Student Services
800 M. S. Couts Blvd
Springfield, TN 37172
Phone (615) 384-5588　　　Fax (615) 384-9749

## DISCIPLINARY HEARING AUTHORITY

"Buck"

Student: Arlis Cameron Davis　　　School: GHS

Parent / Guardian: Chris and Melissa Davis　　Grade: 11th　D.O.B 4.6.2005

Sp. Ed./504　Yes　　Repeated Appearance　N/A　　Race: W　Sex: male

Hearing Date: 2.11.2022　　　　Time 10:30 am

Committee: Teresa Leavitt　　　　Donna Rae Dorris

　　　Lewis Walling　　　　　　　- SW

School Administrator: Tracy Raines

Infraction: Possession of alcohol (ZT)　　　　　　　Code: 23

Administrator's Recommendation: Placement at RCPA for 1 calendar year

Committee's recommendation the student is assigned to RCPA for 1 calendar year for a ZT. The student may return to GHS on 2.12.2023.

By signing below, you are acknowledging that you understand the recommendations as set forth by the Robertson County Board of Education's Disciplinary Hearing Authority, and do not necessarily indicate agreement. You are also acknowledging that you had the opportunity to ask questions, and to have them answered. It is your right to appeal the decision of this DHA. The request for an appeal must be made within five (5) days of the decision and must be made in writing to the Director of Schools.

Student Arlis C DAN?　　　Date

Parent/Guardian Melissa Davis　　Date

Parent/Guardian　　　　Date

DHA Teresa Scarlett　　Date 2.11.2022

EXHIBIT
B

## External E-mail -Arlis "Buck" Davis Appeal

Melissa Davis <melissadavis0405@gmail.com>
Fri 2/11/2022 1:01 PM
To: Chris Causey <chris.causey@rcstn.net>
Cc: Teresa Leavitt <teresa.leavitt@rcstn.net>


FILED
CLERK & MASTER ROBERTSON CO. TN

MAY 0 4 2022
AT 3:29 O'CLOCK P M
ROSEMARY L BERAGUE
BY

**WARNING: This message originated outside of Robertson County Schools!! DO NOT CLICK any links or attachments unless the sender is known and content is deemed safe.**

Dr. Causey,

I would like to file an appeal to the decision to send my son, Arlis Davis, to Phoenix Academy.

I would like the opportunity to fill you in on what led to this event.

On Tuesday, February 7, Arlis "Buck" Davis was caught by Officer Rippy at Greenbrier High School with a can of dip in the bathroom. He was caught the week before with dip as well. I am aware that he has an addiction to this product and he has taken ownership of these offenses. I have contacted authorities on many occasions alerting to the market off of Central Ave that has been selling it to him. He has been reprimanded at home for this as well.

When he was caught on Tuesday, the officer searched Buck's truck. In the truck, they found a backpack with the name Cole Birdwell embroidered on the front. Inside the backpack was a can of Four loco alcohol, some type of hemp product, a lighter and school papers and books belonging to Cole Birdwell. My wife was called to school. When asking Buck about the backpack, he said he had no idea how it got in his truck. Buck also had no knowledge of the hemp product or even what to do with the hemp product. He didn't know if it was smoked or snorted or what.

He was not driving his regular truck on this day. His truck broke down the night before. His truck would have to go to the shop so he cleaned it out at 8:30 pm on Monday night. His friend, Jesse, stayed at our house the weekend before and left his backpack in Buck's truck. In the dark, Buck grabbed the backpack he thought belonged to Jesse and put it in our farm truck. He drove the farm truck to school on Tuesday. Jesse comes to the farm truck and to get his backpack before school. Jesse said it wasn't his backpack. Then Jesse and Buck try to figure out who Cole Birdwell was. They never looked inside the backpack. Buck has no idea how long it had been in the back seat of his regular truck as he has never ridden in the back seat of his truck and it was covered up with fast food bags, hoodies and jackets. Buck has had a problem in the afternoons at school with people crowding around his truck. Buck stated that he didn't lock his doors but he never imagined someone would put something in his truck, only that people might steal something.

After investigating, we learned that Cole Birdwell has not been at the school for a little over two weeks. He was sent to Phoenix Academy for the 2nd time. This backpack clearly belonged to Cole Birdwell and it was rumored that he handed it off to another student to avoid getting in trouble. Buck does not know Cole. Buck finally figured out how to contact Cole through Snapchat. My wife watched the conversation. Cole stated that he had not seen the backpack in weeks and "why don't you ask Damien Hayes, he's the one who has had it." Damien Hayes is the only link between Buck and Cole. Buck has not gotten an answer from Damien regarding the backpack. On Wednesday after school, Jesse came to our house and got his real backpack out of Buck's truck. It was also under the back seat. I think that video footage needs to be pulled to be fair because whoever put the backpack in Buck's truck was the one in possession of the alcohol. They ditched the backpack under the seat of Buck's truck and Buck is getting the punishment. I understand that there is zero tolerance but please take into consideration these unusual circumstances. He is guilty of the tobacco product(dip), not locking his truck and not cleaning his truck. His friends, teachers , relatives and all would agree that Buck is well-mannered, friendly and courteous. Please reach out to me if you have any questions.

Thank you for your time,
Chris and Melissa Davis
615-394-6868


EXHIBIT
C



# Robertson County Schools

800 M. S. Couts Boulevard • Springfield, Tennessee 37172 • Phone (615) 384-5588 • Fax (615) 384-5749
*Dr. Chris J. Causey, Director of Schools*

CLERK & MASTER ROBERTSON CO. TN

MAY 04 2022

AT 3:29 O'CLOCK P M
ROSEMARY L SPRAGUE

BY

February 17, 2022

Chris and Melissa Davis
3112 Lights Chapel Road
Greenbrier, Tennessee 37073

Mr. and Mrs. Davis,

Thank you for your letter appealing the DHA decision for Arlis Davis. I have researched the case extensively. In this particular situation, the student was given due process and correct procedures were followed. With all the evidence presented to me, it has been shown that Arlis committed a zero-tolerance offense. Because of this, it has been decided to uphold the DHA decision of assignment to the Robertson County Phoenix Academy for a calendar year. I wish Arlis well in his placement and look forward to his return to Greenbrier High School on February 12, 2023. Please remember, however, that Arlis does qualify for early release from RCPA determined by his attendance, grades, and discipline while a student there. He could return to GHS before the end of the 22-23 school year depending on these factors.

Sincerely,

Dr. Chris Causey, Director
Robertson County Schools

c:    Mr. Cody Capps, Principal, RCPA
      Dr. Katie Osborne – Principal, GHS
      Teresa Leavitt, DHA Coordinator

**EXHIBIT**

**D**

SCHOOL BOARD
MARK REID * ALLAN HEARD * CONNIE HOGAN * STEPHEN AYRES * SCOTT RICE * JEFF WHITE
The Robertson County School System does not discriminate on the basis of race, color, national origin, sex, disability, age, religion or marital status.

Robert W. Briley

# Shuttleworth PLLC

7984 Coley Davis Road
Suite 101
Nashville, TN 37221
Telephone: (615)833-3390
Facsimile: (615)902-3094

E-mail: rbriley@swlawpllc.com
Direct Dial: (615)499-5128

FILED
CLERK & MASTER ROBERTSON CO. TN

MAY 0 4 2022

AT 3:29 O'CLOCK P M
ROSEMARY T. SPRAGUE
BY

April 6, 2022

Mr. Sam Jackson
Spencer Fane Bone McAllester
511 Union Street, Suite 1000
Nashville, TN 37219

## RE: Buck Davis Appeal to Robertson County School Board

Dear Sam:

Thank you for the chance to present some information through you to the Robertson County School Board ("Board") regarding our clients, Buck Davis and his parents, Chris and Melissa Davis, and Buck's recent suspension from Greenbrier High School ("GHS") and assignment to Robertson County Phoenix Academy ("RCPA"). As you know, Buck and his parents have appealed the decision of the Director of Schools, Dr. Chris Causey, that upheld the decision of the Disciplinary Hearing Authority to suspend Buck for one year from GHS for a zero-tolerance offense involving the alleged possession of alcohol on school property.

This letter will also confirm that Dr. Causey has already agreed to modify the one-year suspension and commute Buck's sentence such that he can return in the Fall to GHS provided he completes the remainder of this year at RCPA without incident. While considering whether or not to accept this modification, Buck and his parents are compelled to present these issues to the Board directly via this appeal because they strongly believe that the investigation and trial of this matter were fundamentally flawed both in procedure and substance. The Davis family is requesting that this matter be placed on the April 11, 2022 Board agenda for review and to determine the time and manner in which the appeal will be heard. Further, they are requesting that the hearing be in-person before the Board, and that it be conducted openly.

On February 8, 2022, Buck was observed with chewing tobacco while on the Greenbrier High School campus. Buck voluntarily agreed to a search of his vehicle that was parked on campus.[1] At the truck, Assistant Principal Tracey Raines and SRO Rippy found more cans of

---

[1] According to Board Policy § 6.303, only "The principal" is authorized to "request the assistance of a school resource officer" to search "any student or any motor vehicle on the school premises." This limitation also applies to identifying or disposing of anything found during the course of a search. Limiting this authority to the principal of a school is not by accident because these functions should be and apparently were chosen by Board to be reserved for the administrative head of the school because of their relative seriousness. There is no legal authority for the principal to delegate this function. The Legislature defines the term principal as follows: "the administrative head of a public school, by whatever title the person may be known." Tenn. Code Ann. § 49-6-4202(5). While investigations using a SRO at GHS may have evolved into the use of a lower level administrative official like an assistant principal for convenience, such use was specifically not authorized by written Board or school policy. Any investigation conducted in this manner would be, therefore, void as a matter of law.

EXHIBIT
E

Shuttleworth PLLC
Page 2

tobacco, and in the passenger console, a vape pen and empty container of Twisted Delta 8 Hemp. There was also a backpack in the truck with the name Cole Birdwell (Student B) embroidered on it. In the backpack the was allegedly a can of "40 Loco." After returning to the office, Jesse Whitaker (Student A) came by and asked about getting his keys out of Buck's truck. Assistant Principal Raines asked Jesse Whitaker (Student A) about the other items in the truck, and he confessed to owning the vape pen and empty container of Twisted Delta 8 Hemp. There is no indication that Jesse Whitaker (Student A) was cited by Assistant Principal Raines for the possession of banned products on school property, but Buck was not cited for these items.

In direct violation Board and GHS written policy and procedure, Assistant Principal Raines investigated the matter using SRO Rippy, immediately suspended Buck, and recommended a suspension of more than 10 days to the DHA panel. On February 9, 2022, a Manifestation Determination hearing was held to determine if Buck's IEP contributed to or played a part in his behavior that led to the proposed suspension. On February 11, 2022, the DHA hearing was held. After the DHA panel concluded that Buck was to be suspended and sent to the alternative school for a one-year period, Melissa and Chris were advised they had 5 days in which to appeal the DHA ruling to Dr. Chris Causey. When they requested the appeal form and inquired as to how to appeal, they were given two pieces of blank loose-leaf paper and made to leave. Melissa immediately emailed Dr. Causey. Dr. Causey failed to reply. As a result of the failure on Dr. Causey's part to timely reply, Melissa and Chris obtained counsel. It should be noted that a timely reply and a discussion of this case by Dr. Causey with the Davis family may have prevented this matter from escalating. On February 17, 2022, our office emailed Dr. Causey to ascertain why he had not replied to Melissa's emails and to preserve the Davis' family's right to appeal. In response to our office's email, Dr. Causey mailed a letter dated February 17, 2022 to the Davis family that advised he would not modify the DHA ruling. The letter from Dr. Causey contained only a general statement that he "researched the case extensively." As a result of a meandering application of the Board's policies, the lack of appropriate communication by Dr. Causey and the casual manner in which school and DHA representatives handled the request for assistance to appeal, the Davis family felt no alternative but to obtain counsel.

It is also important to note that the DHA hearing was itself flawed. The DHA chair instructed the Davis family that the only decision to be discussed was whether or not to send Buck to alternative school, or to expel him. That was a misrepresentation of the Board's Rule establishing the Student Disciplinary Hearing Authority (Board Policy § 6.317) which lists seven options for the DHA to consider. More harmful to the process, however, was the DHA's refusal to hear Buck's side of the story. The DHA simply took Assistant Principal Raines' description of what happened as being true, even though she was not cloaked with the authority to conduct the subject investigation or render the conclusion she did. (*See*, Board Policy §§ 6.302, 6.303, 3.16, 3.309; and Robertson County Schools Student Handbook, p. 9.) At the hearing, Buck's parents were denied the right to speak or ask questions, and they were told that in order to appeal the decision to Dr. Causey they needed to sign the DHA form. They did so based on that instruction. They were then ushered from the room because the DHA had another case to hear. One member

MEMPHIS: 6077 Primacy Parkway, Suite 200; Memphis, TN 38119    Telephone: (901) 526-7399    Facsimile: (901) 526-5056
NASHVILLE: 401 Church Street, Suite 2700; Nashville, TN 37219    Telephone: (615) 833-3390    Facsimile: (615) 833-3767
KNOXVILLE: 800 South Gay Street, Suite 2031; Knoxville, TN 37929    Telephone: (865) 622-7118    Facsimile: (865) 622-7119

Case 3:22-cv-00408    Document 1-3    Filed 06/03/22    Page 25 of 140 PageID #: 32

Shuttleworth PLLC
Page 3

of the DHA, Lewis Walling, followed the Davis family into the hallway and advised them that they should definitely appeal the decision.

As you know, *Heyne v. Metropolitan Board of Public Education*, 380 S.W. 3d 715 (Tenn. 2012) describes in detail many of the constitutional questions that arise in cases of challenges to student discipline.[2] As the Tennessee Supreme Court observed in *Heyne*, "students do not shed their constitutional rights at the school house door." *Heyne*, quoting *Goss v. Lopez*, 419 U.S. 565, 574 (1975). That being said, however, the *Heyne* decision also makes clear that school administrators are presumed to act in good faith, and that not every student discipline issue rises to the level of a constitutional inquiry.

The *Heyne* Court also acknowledged, however, that Tennessee's Constitution provides more rights to a free public education than does the United States Constitution. *See*, Tennessee Constitution, Article XI, § 12. While this fact alone may not tip the scales one way or the other when performing a procedural due process analysis, the fact that the *Heyne* Court chose to include this authority in its analysis cannot be overlooked. Moreover, the Tennessee Supreme Court in *Heyne* and the United States Supreme Court in *Goss* were dealing with ten-day suspensions. It is only fair to conclude that any scrutiny applied to the procedure resulting in a one-year suspension would be even greater. As noted by both Courts, a ten-day suspension is 'a serious event in the life of the suspended child.'" *Heyne*, 380 S.W. 3d at 733 (quoting *Goss*, 419 U.S. at 576). A one-year suspension raises the stakes for all sides. Ultimately, the *Heyne* Court concluded:

> After balancing the competing interests of the student and the school, the United States Supreme Court held that in order to guard against unfair or mistaken findings of misconduct or arbitrary exclusion from school, "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Heyne*, 380 S.W. 3d at 733 (quoting *Goss*, 419 U.S. at 581).

Using this basic framework for analysis, but with a view towards heightened scrutiny because of the one-year suspension involved, the decision to suspend Buck Davis from GHS was fundamentally flawed in its procedure, and the substance of the decision, the Board's zero tolerance policy is flawed as written and is believed, on information and belief, to be arbitrarily applied by GHS based on the status of the student involved (e.g., student athletes and/or race).

---

[2] It is also worth noting that the trial court in *Heyne* awarded almost $400,000 to the plaintiffs in attorney's fees and costs. While ultimately reversed on appeal, the primary reason for the reversal was the trial court's decision to admit and weigh new evidence. We will not ask the trial court to make that same mistake. Moreover, to the extent *Heyne* provides a roadmap for legal challenges to student discipline cases, this case is even more persuasive because the balancing test required will be influence by the nature of the one-year suspension, as opposed to ten-days.

MEMPHIS: 6077 Primacy Parkway, Suite 200; Memphis, TN 38119   Telephone: (901) 526-7399   Facsimile: (901) 526-5056
NASHVILLE: 401 Church Street, Suite 2700; Nashville, TN 37219   Telephone: (615) 833-3390   Facsimile: (615) 833-3767
KNOXVILLE: 800 South Gay Street, Suite 2031; Knoxville, TN 37929   Telephone: (865) 622-7118   Facsimile: (865) 622-7119

## The Investigation and Search was Performed Arbitrarily

There is no argument that Buck was in possession of tobacco products on school property. SRO Rippy observed Buck with a can of tobacco in the bathroom. SRO Rippy took Buck to the assistant principal, Tracy Raines' office. Buck never tried to hide the fact that he had tobacco on him. Assistant Principal Raines asked to search Buck's truck, to which he agreed. At the truck, Assistant Principal Raines and SRO Rippy found more cans of tobacco, and in the passenger console, a vape pen and empty container of Twisted Delta 8 Hemp. There was also a backpack in the truck with the name Cole Birdwell (Student B) embroidered on it. In the backpack the was allegedly a can of "40 Loco." After returning to the office, Jesse Whitaker (Student A) came by and asked about getting his keys out of Buck's truck. Assistant Principal Raines asked Jesse Whitaker (Student A) about the other items in the truck, and he confessed to owning the a vape pen and empty container of Twisted Delta 8 Hemp. There is no indication that Jesse Whitaker (Student A) was cited by Assistant Principal Raines for the possession of banned products on school property, but Buck was not cited for these items.

The point here is that Assistant Principal Raines allowed a student other than Buck to claim ownership of certain items of seized contraband, but she did not allow Buck the same opportunity for items found in a backpack that clearly did not belong to him. Cole Birdwell (Student B)'s name was embroidered on the backpack. Assistant Principal Raines says in her summary that the backpack belonged to Student A, whom she claims was not at GHS for two weeks. But she also identifies Student A as coming into her office to ask for his keys the day of the investigation. Both cannot be true.

Buck has an explanation for how Cole Birdwell (Student B)'s backpack got into his truck, and why Buck would have no reason to know what was in it. When attempting to give this explanation at the DHA hearing, Buck and his parents were denied this opportunity, were repeatedly told to be quiet, and were told that Buck's guilt had already been determined by the assistant principal.

The *Heyne* Court discussed situations where a school administrator serves multiple roles, including investigator, prosecutor, and decision maker. It declined "to adopt a per se rule that a combination of functions, by itself, is contrary to due process." *Heyne*, 380 S.W. 3d at 736. However, the Court left the door open to include this fact in a broader "without more" due process analysis. *Id.* This case presents that opportunity for more robust judicial review of this issue, especially in light of the unauthorized and erroneous actions of the assistant principal.

This is a mark on the balance sheet in favor of reversing Buck's suspension.

## The Suspension and Referral to the Disciplinary Hearing Authority Were Done Illegally and Not In Compliance with Board Policy and State Law

Rather than just rely on the constitutional mandates described the courts, both the written policies of the Board and the applicable student handbook give more details to the procedural due process rights given to Buck Davis in this instance. "Before school authorities administer disciplinary measures, reasonable inquiry shall be made to determine the truth of what happened."

MEMPHIS:  6077 Primacy Parkway, Suite 200; Memphis, TN 38119    Telephone: (901) 526-7399    Facsimile: (901) 526-5056
NASHVILLE: 401 Church Street, Suite 2700; Nashville, TN 37219      Telephone: (615) 833-3390    Facsimile: (615) 833-3767
KNOXVILLE: 800 South Gay Street, Suite 2031; Knoxville, TN 37929   Telephone: (865) 622-7118    Facsimile: (865) 622-7119

Case 3:22-cv-00408    Document 1-3    Filed 06/03/22    Page 27 of 140 PageID #: 34

*See*, Board Policy, § 6.302; Robertson County Schools Student Handbook, p. 9. "In cases of severe offenses where is a possibility of suspension, the student shall be advised of the nature of his/her misconduct, questioned about it, and allowed to give an explanation." Regarding the alleged zero tolerance offense that resulted in Buck's one-year suspension, neither he nor his parents were allowed to give an explanation of what happened. "If the principal determines that the offense is of such nature that the student's continued presence would be detrimental to the school or persons within the school, he/she shall refer the case to the disciplinary hearing authority." *Id.*

In this case, the "principal" did not make any referral to the disciplinary hearing authority regarding Buck's case. Rather, the assistant principal, Tracy Raines, conducted the investigation (along with SRO Rippy), determined Buck's guilt, and referred the case to the disciplinary hearing authority. While this may seem like a distinction without a difference, it is not. For example, Tenn. Code Ann. § 49-6-3401(c)(5) states that "[a]fter the hearing, the board of education or the disciplinary hearing authority may affirm **the decision of the principal**, order removal of the suspension unconditionally or upon such terms and conditions as it deems reasonable, assign the student to an alternative program or night school or suspend the student for a specified time." (emphasis added.)

The point is that it's the principal's decision that is subject to review by the disciplinary hearing authority or the Board, not the assistant principal's decision. The Principal of GHS is Katie Osborne, and there is no evidence that she was involved in the decision to suspend Buck, even though she is required to be by both state law and Board rule. The Legislature and the Board are free to authorize a designee of the principal to take certain actions on her behalf. That simply has not been done in cases where the potential consequences to a student are so profound.

This is another mark on the balance sheet in favor of reversing Buck's suspension.

### The Board's Zero Tolerance Policy Regarding Possession of Alcohol is Void on Its Face

The Board's policy for Zero Tolerance Offenses relies on multiple state and federal statutes for its authority. *See*, Board Policy § 6.309. The point behind having a written policy is both to give notice of its terms to those to whom it applies, and to show any necessary underlying authority for the policy. Here, the policy is a hodgepodge of statutes that have little or no relevance to the subject. For example, the policy makes "DRUGS" a zero-tolerance offense, and it cites to Tenn. Code Ann. § 39-13-101(a)(1) in footnote 3 as statutory authority for this provision. Unfortunately, Tenn. Code Ann. § 39-13-101(a)(1) is the law governing the offense of assault. It has nothing to do with drugs. In addition, footnote 4 cites to Tenn. Code Ann. § 49-6-3042, a statute that does not exist, and footnote 6 that purports to direct the principal of a school to notify a parent when a violation of the policy occurs, but it has no corresponding statutory reference at all.

By common usage the term "DRUGS" does not include alcohol. The term "alcohol" does not appear anywhere in the Board's policy for Zero Tolerance Offenses or in its statutory references. As a result, the policy is itself vague and ambiguous to a degree that favors constitutional review when it involves a student's suspension for one-year.

This is another mark on the balance sheet in favor of reversing Buck's suspension.

MEMPHIS:      6077 Primacy Parkway, Suite 200; Memphis, TN 38119      Telephone: (901) 526-7399      Facsimile: (901) 526-5056
NASHVILLE: 401 Church Street, Suite 2700; Nashville, TN 37219      Telephone: (615) 833-3390      Facsimile: (615) 833-3767
KNOXVILLE: 800 South Gay Street, Suite 2031; Knoxville, TN 37929      Telephone: (865) 622-7118      Facsimile: (865) 622-7119

Shuttleworth PLLC
Page 6

## GHS Did Not Comply with the Disciplinary Hearing Authority

Like the other matters discussed herein, the Board establishes the Student Disciplinary Hearing Authority by rule. *See*, Board Policy § 6.317. This rule requires the Director of Schools/Designee to serve as chairman, who "shall perform the following duties:

1. Identify the member of the DHA assigned to hear each individual case'
2. Prepare and disseminate the minutes of each meeting;
3. Set the time, place and date for each hearing;
4. Notify appropriate persons of each meeting;
5. Sign a copy of minutes of meeting.

Here, the only document that purports to be the minutes of the DHA meeting regarding Buck Davis is a one-page document styled "DISCIPLINARY HEARING AUTHORITY." As discussed previously, the School Administrator is listed as Tracy Raines whose recommendation was "Placement at RCPA for 1 calendar year." There is no indication as to who prepared the minutes of the DHA meeting, if this document in fact constitutes the minutes.

At the DHA hearing, no one was allowed to present Buck's side of the story. They we told to be quiet and the only issue for them to discuss was Buck's punishment. Contrary to what Buck and his parents were told at the DHA meeting, the Student Disciplinary Hearing Authority rule contains no such limiting language. In fact, it lists seven options for the DHA to consider. The policy does provide general language regarding "a review of the hearing by either the student or principal," but it fails to give any information of how a parent can perfect that appeal. The parents of Buck Davis requested that information following the conclusion of the DHA hearing at which they were not allowed to speak. In another act of bad faith, the Davis' were given two blank pieces of notebook paper and made to leave.

Again, the failure of GHS to follow the basic rules of the DHA is another mark on the balance sheet in favor of reversing Buck's suspension.

The Davis family has one simple request at this time, reverse Buck's suspension immediately and return him to GHS based on the multiple procedural and substantive errors committed by GHS and the DHA. Please note that these are only some of the legal issues we have identified due to the limited time we have had to devote to the matter. We only see our case getting stronger as we develop more facts through the public records system and/or discovery. We are available to meet and confer at your convenience. In any event, we look forward to seeing you on April 11.

Very truly yours,

Robert W. Briley

Mathew Eggleston

MEMPHIS:    6077 Primacy Parkway, Suite 200; Memphis, TN 38119      Telephone: (901) 526-7399     Facsimile: (901) 526-5056
NASHVILLE:  401 Church Street, Suite 2700; Nashville, TN 37219       Telephone: (615) 833-3390     Facsimile: (615) 833-3767
KNOXVILLE: 800 South Gay Street, Suite 2031; Knoxville, TN 37929    Telephone: (865) 622-7118     Facsimile: (865) 622-7119

RWB/bb

cc:    Chris and Melissa Davis

Attachments:

1.    Document prepared by Assistant Principal Tracey Raines
2.    DISCIPLINARY HEARING AUTHORITY, February 11, 2022
3.    Letter from Dr. Chris Causey, February 17, 2022

MEMPHIS:   6077 Primacy Parkway, Suite 200; Memphis, TN 38119   Telephone: (901) 526-7399   Facsimile: (901) 526-5056
NASHVILLE: 401 Church Street, Suite 2700; Nashville, TN 37219   Telephone: (615) 833-3390   Facsimile: (615) 833-3767
KNOXVILLE: 800 South Gay Street, Suite 2031; Knoxville, TN 37929   Telephone: (865) 622-7118   Facsimile: (865) 622-7119

Buck Davis

Student was seen by SRO Rippy coming out of the restroom with a can of Skoal. He was brought to the front office and searched by Admin Raines and Officer Rippy. The student was just caught the week before with a tobacco product. When student was asked if anything was on him or his backpack, he stated no but when asked if there was anything in his vehicle he stated not sure

Admin and SRO searched vehicle. In a truck that Buck does not drive every day, we found a backpack ~~bring~~ bring with a can of 4O Loco, a can of hemp flower and a lighter. He stated he picked up the backpack to ~~brin~~ it back to school for Student A. Student B's name was on the front of the backpack. The backpack had also been moved from his regular truck to the work truck.

In the glove compartment, we found a large glass vape which contained nicotine and another lighter.

The student was brought into the office and told of his suspension. Admin Raines contacted his parent.

Within 5 minutes, Student A came into office and stated he would need to get his keys out of Buck's glove compartment because Buck got caught. I asked him how he knew, and he held up his cell phone indicating that Buck had texted him. I asked him if along with those keys found in the glove compartment was that his vape. I asked him if the vape was his and at first, he denied it and then stated he wasn't going to let his boy take the fall.

The work truck was tidy so the backpack being in there was not anything random. Student A (whose name was embroidered on the front) has not been at GHS for 2 weeks.

Buck has been reminded by Mr. Freeland in the parking lot to get out of his truck and come into the building. Many students have been known to crowd around his truck before school and need reminding to come into the building.

Student was cited by Officer Rippy.

A pattern is developing with Buck bringing unlawful items to school. He was caught in January and again in February for tobacco and vape products on campus.

The alcohol possession is a zero-tolerance offense so one calendar school year at Phoenix Academy is recommended by GHS Administration.

Tracey Raines

# Robertson County Schools

Teresa Leavitt, Supervisor of Student Services
800 M. S. Couts Blvd
Springfield, TN 37172
Phone (615) 384-5588          Fax (615) 384-9749

## DISCIPLINARY HEARING AUTHORITY

"Buck"
Student:     Arlis Cameron Davis                    School: GHS

Parent / Guardian:     Chris and Melissa Davis          Grade: 11th     D.O.B 4.6.2005

Sp. Ed./504     Yes     Repeated Appearance     N/A          Race: W     Sex:     male

Hearing Date:     2.11.2022                    Time     10:30 am

Committee:     Teresa Leavitt                    Donna Rae Dorris

          Lewis Walling                         - SW


School Administrator:     Tracy Raines

Infraction: Possession of alcohol (ZT)                              Code: 23

Administrator's Recommendation:     Placement at RCPA for 1 calendar year

Committee's recommendation the student is assigned to RCPA for 1 calendar year for a ZT. The student may return to GHS on 2.12.2023.

By signing below, you are acknowledging that you understand the recommendations as set forth by the Robertson County Board of Education's Disciplinary Hearing Authority, and do not necessarily indicate agreement. You are also acknowledging that you had the opportunity to ask questions, and to have them answered. It is your right to appeal the decision of this DHA. The request for an appeal must be made within five (5) days of the decision and must be made in writing to the Director of Schools.

Student Arlis C.Davis              Date
Parent/Guardian Melissa Davis      Date
Parent/Guardian Chris Davis        Date
DHA Teresa Leavitt                 Date 2.11.2022



# Robertson County Schools

800 M. S. Couts Boulevard • Springfield, Tennessee 37172 • Phone (615) 384-5588 • Fax (615) 384-9749
*Dr. Chris J. Causey, Director of Schools*

February 17, 2022

Chris and Melissa Davis
3112 Lights Chapel Road
Greenbrier, Tennessee 37073

Mr. and Mrs. Davis,

Thank you for your letter appealing the DHA decision for Arlis Davis. I have researched the case extensively. In this particular situation, the student was given due process and correct procedures were followed. With all the evidence presented to me, it has been shown that Arlis committed a zero-tolerance offense. Because of this, it has been decided to uphold the DHA decision of assignment to the Robertson County Phoenix Academy for a calendar year. I wish Arlis well in his placement and look forward to his return to Greenbrier High School on February 12, 2023. Please remember, however, that Arlis does qualify for early release from RCPA determined by his attendance, grades, and discipline while a student there. He could return to GHS before the end of the 22-23 school year depending on these factors.

Sincerely,

Dr. Chris Causey, Director
Robertson County Schools

c:      Mr. Cody Capps, Principal, RCPA
        Dr. Katie Osborne – Principal, GHS
        Teresa Leavitt, DHA Coordinator

SCHOOL BOARD
MARK REID * ALLAN HEARD * CONNIE HOGAN * STEPHEN AYRES * SCOTT RICE * JEFF WHITE
The Robertson County School System does not discriminate on the basis of race, color, national origin, sex, disability, or age in its programs and activities



# Shuttleworth PLLC

Robert W. Briley

7984 Coley Davis Road
Suite 101
Nashville, TN 37221
Telephone: (615)833-3390
Facsimile: (615)902-3094

E-mail: rbriley@swlawpllc.com
Direct Dial: (615)499-5128

April 7, 2022

CLERK & MASTER ROBERTSON CO. TN
FILED
MAY 0 4 2022
AT 3:29 O'CLOCK P M
ROSEMARY H SPRAGUE
BY

**VIA EMAIL ONLY**

Mr. Sam Jackson
Spencer Fane Bone McAllester
511 Union Street, Suite 1000
Nashville, TN 37219

RE:    **Buck Davis Appeal to Robertson County School Board**

Dear Sam:

Please accept this letter as supplemental authority to our letter of yesterday in the above-referenced matter. Again, we look forward to seeing you in April 11 before the Robertson County School Board.

The Tennessee State Board of Education has issued State Board LEA Policy 6317 regarding Disciplinary Hearing Authority ("DHA") Procedures for State Board authorized Charter Schools. While Greenbrier High School ("GHS") is clearly not a State Board authorized Charter School, I cannot fathom how these rules would be any different for students enrolled in regular government run schools like GHS. First, the issues we have raised are rooted in the United States and Tennessee Constitutions. The application of these principles cannot be different between these classes of students. Second, I seriously doubt the Tennessee State Board of Education intended to give more rights to charter school students than to Buck Davis and his family. At a bare minimum, the information contained in State Board LEA Policy 6317 would be persuasive for the Robertson County School Board to consider in this instance.

For example, according to the Tennessee State Board of Education, for a student who is disciplined for a zero-tolerance violation, he is allowed to appeal to the school's DHA with five (5) school days. Contrary to what was done in this case, the appeal to the DHA according to the State Board is specifically to be about guilt or innocence and whether these was adequate due process.

> For a zero-tolerance offense, the student shall only be permitted to appeal regarding guilt or innocence of the zero-tolerance offense and/or whether the student was provided with proper due process.

In Buck's case, not only were he and his parents denied the right to speak about guilt, innocence or due process at the DHA hearing, they were erroneously told that the DHA's authority was limited to considering expulsion or alternative school.

Following the DHA's decision, charter school students may appeal to the Director of Schools and are required to use a form contained in State Board LEA Policy 6317. In stark



EXHIBIT

**F**

contrast, Buck's parents were given two blank pieces of notebook paper and no instructions on how to appeal the DHA's decision.

Finally, a charter school student may appeal to its governing board "regarding the student's guilt/innocence of the zero-tolerance infraction and/or whether the student was provided with proper due process." Again, these same rights have not been afforded to Buck and his parents, and I cannot imagine a system where the State of Tennessee has chosen to give more rights to students attending charter schools than it did to Buck Davis.

Regarding the issue of guilt or innocence, Buck and his parents have been denied the right to present any proof at all regarding that issue. Assistant Principal Raines served as investigator, prosecutor, judge and jury when she immediately expelled Buck, and the DHA was nothing more than a rubber stamp when it erroneously decided that its only option was to consider expulsion or alternative school.

The Tennessee Attorney General opined in 2005 when asked about the application of the State's zero-tolerance statute that "[t]he student's punishment must rationally relate to the offense and thus determination of appropriate punishment must include consideration of the student's intent." Tenn. Op. Att'y Gen., No. 05-094 (citing *Seal v. Morgan*, 229 F.3d. 567, 575-76 (6th Cir. 2000). While the Tennessee statutes dealing with zero-tolerance offenses have changed since then, neither the United States nor Tennessee Constitution has been amended regarding due process analysis on this subject. I have also researched Tennessee's zero-tolerance law since as far back as 1991, and there is no fundamental constitutional difference in them since the *Seal* decision was written. Essentially all the State has done is to add more offenses to the list.

The Sixth Circuit Court of Appeals concluded:

> We would not for a minute minimize the Board's obligation to maintain the safety of its campuses, and its right to mete out appropriate discipline (including expulsion) to students who commit serious violations of its rules. But we cannot accept the Board's argument that because safety is important, and because it is often difficult to determine a student's state of mind, that it need not make any attempt to ascertain whether a student accused of carrying a weapon knew that he was in possession of the weapon before expelling him.
>
> The decision to expel a student from school is a weighty one, carrying with it serious consequences for the student. See **Goss**, 419 U.S. at 576 ("Education is perhaps the most important function of state and local governments, and the total exclusion from the educational process for more than a trivial period . . . is a serious event in the life of the suspended child.") (internal quotation marks and citation omitted). We understand full well that the decision not to expel a potentially dangerous student also carries very serious potential consequences for other students and teachers. Nevertheless, the Board may not absolve itself of its obligation, legal and moral, to determine whether students intentionally committed the acts for which their expulsions are sought by hiding behind a Zero Tolerance Policy that purports to make the students' knowledge a non-issue. We are also not impressed by the Board's argument that if it did not apply its Zero Tolerance Policy

MEMPHIS:   6077 Primacy Parkway, Suite 200; Memphis, TN 38119   Telephone: (901) 526-7399   Facsimile: (901) 526-5056
NASHVILLE: 401 Church Street, Suite 2700; Nashville, TN 37219   Telephone: (615) 833-3390   Facsimile: (615) 833-3767
KNOXVILLE: 800 South Gay Street, Suite 2031; Knoxville, TN 37929   Telephone: (865) 622-7118   Facsimile: (865) 622-7119

Case 3:22-cv-00408   Document 1-3   Filed 06/03/22   Page 35 of 140 PageID #: 42

ruthlessly, and without regard for whether students accused of possessing a forbidden object knowingly possessed the object, this would send an inconsistent message to its students. Consistency is not a substitute for rationality.

*Seal v. Morgan*, 229 F.3d. at 581.

The *Seal* Court even gave two examples where it would find the application of a zero-tolerance policy irrational. First, it described a situation where a school's valedictorian who has a knife planted in his backpack without his knowledge by a vindictive student. The valedictorian is in violation of a zero-tolerance for possession of a weapon. Second, the Court described a situation where a student spikes the punch bowl with alcohol at a school dance and other students drink from the punch bowl with no knowledge that it contained alcohol. They also are in violation of the zero-tolerance policy for consuming alcohol on school property. The Court was suspect that either of these cases would survive constitutional scrutiny under due process. Interestingly, the *Seal* Court analyzed the case using both substantive and procedural due process rules. There is no reason why this same analysis would not apply to Buck's case today.

The point here is that Buck had no knowledge that another student's backpack in his vehicle contained alcohol. Whether Assistant Principal Raines was cloaked with the authority to make the investigation and reach a conclusion in the first instance is only a very small part of the process that was due Buck during the investigation and initial decision, and in his appeals of that decision both to the DHA and to Dr. Causey.

Finally, I would note that Tennessee law identifies three circumstances of zero-tolerance rules, none of which apply to this case. *See*, Tenn. Code Ann. § 49-6-3401(g)(2)(A-C). Possession of alcohol is not listed as a predicate act for a zero-tolerance violation.

Sam, we only represent Buck Davis and his parents, but I cannot imagine how these same mistakes were not made regarding other students in other zero-tolerance cases. Buck has already missed out on a significant number of school days while serving his sentence at the alternative school. Let's not make a bad situation worse.

Very truly yours,

Robert W. Briley

Mathew Eggleston

RWB/bb

cc:     Chris and Melissa Davis

Attachments:

1.      Tennessee State Board of Education – LEA Policy 6317, with procedure guide
2.      Tennessee Attorney General Opinion 05-094
3.      *Seal v. Morgan*, 229 F.3d. 567 (6th Cir. 2000)

MEMPHIS:     6077 Primacy Parkway, Suite 200; Memphis, TN 38119      Telephone: (901) 526-7399     Facsimile: (901) 526-5056
NASHVILLE: 401 Church Street, Suite 2700; Nashville, TN 37219      Telephone: (615) 833-3390     Facsimile: (615) 833-3767
KNOXVILLE: 800 South Gay Street, Suite 2031; Knoxville, TN 37929      Telephone: (865) 622-7118     Facsimile: (865) 622-7119

| TENNESSEE STATE BOARD OF EDUCATION | | |
|---|---|---|
| **ZERO TOLERANCE** | | 6309 |
| ADOPTED:<br>July 28, 2017 | REVISED:<br>February 7, 2020 | MONITORING:<br>Review: Annually |

**Zero Tolerance.** [1] Each authorized charter school shall adopt a zero tolerance policy in accordance with state law to ensure the safety and security of all students and a learning environment that is free of drugs, violence, and firearms. "Zero tolerance policy" means that violations of the policy will not be tolerated, and that violators will receive certain, swift, and reasoned punishment. Reasoned punishment may include a spectrum of disciplinary measures designed to correct student misbehavior and promote student respect and compliance with codes of conduct and policies. The school's policy shall specify the offenses which qualify as zero tolerance offenses and the corresponding punishment. A zero tolerance violation may not necessarily result in a presumptive one (1)-calendar year expulsion, except for the following student misconduct:[2]

1) Bringing to school or being in unauthorized possession on school property of a firearm;[3,4]
2) Commission of aggravated assault[5] upon any teacher, principal, administrator, any other employee of an LEA, or school resource officer; or
3) Unlawfully possessing any drug including any controlled substance,[6] controlled substance analogue,[7] or legend drug.[8]

**Modification and Appeals.** The head of a charter school shall have the ability to modify zero tolerance disciplinary actions on a case-by-case basis.[9] State Board LEA Policy 6317 outlines requirements for modification of zero tolerance expulsions and appeal procedures.

**Notice of Policy.** The school shall annually report their zero tolerance policy and procedures to the State Board. The State Board will annually file each charter school's zero tolerance policy and procedures with the Commissioner of Education. At the beginning of school each year, the school shall provide students and parents with written notification of the school's policies and procedures and post a summary within each school.

Legal References:
[1] T.C.A. § 49-6-4216
[2] T.C.A. § 49-6-3401(g)
[3] 18 U.S.C. § 921
[4] 20 U.S.C.§ 7961
[5] T.C.A. § 39-13-102
[6] T.C.A. §§ 39-17-403 - 415
[7] T.C.A. §39-17-454
[8] T.C.A. §53-10-101
[9] T.C.A. § 49-6-3401(g)

Cross References:
Required Remands and Student Disciplinary
Hearing Authority 6317
Student Discipline 6313
Disciplinary Hearing Authority Procedures

1



### TENNESSEE
STATE BOARD OF EDUCATION

#### Disciplinary Hearing Authority Procedures

State Board LEA Policy 6317 – Required Remands and Student Disciplinary Hearing Authority lays out the broad requirements and expectations for establishing and implementing a discipline appeals process, including the formation of a Disciplinary Hearing Authority ("DHA"). This document provides the standard operating procedures for compliance with state law and State Board LEA policy for State Board authorized charter schools. These procedures cover:

- Charter School Discipline Appeals Process
- Establishing a DHA
- DHA Hearings
- Creating an Official DHA Record
- Special Circumstances Modification of Required Remand
- Required Policies and Procedures
- Forms and Appendices

#### Charter School Discipline Appeals Process

As required by State Board LEA Policy 6313 – Student Discipline, each authorized charter school shall adopt policies and procedures that outline the violations and infractions that may lead to disciplinary action. Specifically, schools shall be clear about infractions that warrant suspension from school and the length of that suspension. The following procedures outline the appeals process for the remand/suspension of a student at an authorized charter school. (See also the Disciplinary Hearing Authority and Appeals Flow Chart contained within these procedures.)

- **Suspensions of Ten (10) Days or Less:** Each school shall develop a policy to handle suspensions of ten (10) days or less that provides written notice to the student but shall not provide the student the right to appeal the suspension decision to a DHA. The State Board will monitor suspension data through the State Board's student information system for compliance, as necessary.

  Pursuant to T.C.A. § 49-6-3401(c)(3) and State Board LEA policy, if a student is suspended for more than five (5) days, the principal of the school shall develop a behavior improvement plan. The principal shall seek input for the behavior improvement plan from people with knowledge of the student's behavior, including but not limited to the student, the student's parent(s)/guardian(s), general education teachers, counselors, behavior interventionists, and special education teachers, if applicable.

- **Suspension of More Than Ten (10) Days (i.e. Expulsion):** If a student commits an infraction that warrants a suspension/expulsion of more than ten (10) days, that student shall be remanded to alternative school for the duration of the suspension/expulsion, except under special

Version: June 10, 2019



TENNESSEE
STATE BOARD OF EDUCATION

circumstances (detailed on page 5). Immediately following the decision to suspend/expel/remand for more than ten (10) days, the student and the student's parent(s)/guardian(s) shall be immediately notified, in writing, of the suspension and the student's right to appeal to a DHA within five (5) school days. The written notification shall be accompanied by copies of all school policies and procedures related to DHA appeals, State Board Policy 6317 - Required Remands and Student Disciplinary Hearing Authority, and this procedure document. The school shall also immediately notify the State Board of a decision to suspend/expel/remand a student for more than ten (10) days.

Within five (5) school days of the suspension/expulsion/remand decision, a student or the student's parent(s)/guardian(s) may appeal the suspension/expulsion/remand, orally or in writing, to the school DHA. The chair of the DHA shall then provide written notification to the parent(s)/ guardian(s) of the student, the student, and any other appropriate person(s), in a language that he or she understands, of the time, location, and date of the hearing. The chair should make every attempt, within reason, to accommodate the schedule and transportation restrictions of the parties involved, particularly those of the student or parent(s)/guardian(s). However, pursuant to T.C.A. § 49-6-3401(c)(4)(A), the hearing shall be held no later than ten (10) days after the beginning of the suspension/expulsion/remand.

The DHA hearing shall be held according to the policies and procedures set forth by the school and shall take one (1) the following disciplinary actions:

- o  Affirm the decision of the school principal;
- o  Order removal of the suspension/expulsion/remand unconditionally;
- o  Order removal of the suspension/expulsion/remand upon such terms and conditions as it deems reasonable; or
- o  Suspend/expel/remand the student for a specified period of time.

However, the DHA may not suspend a student who has been remanded to alternative school unless the Director of Schools has approved a suspension as a special circumstance. Within five (5) school days of the DHA rendering a decision, the student, student's parent(s)/guardian(s), principal, principal-teacher or assistant principal may request, orally or in writing, a review by the governing board, and the governing board shall review the official DHA record.

Each school shall determine how the governing board will conduct a review of the DHA appeal, including the timeline for a decision and attendance at the appeal hearing. As a best practice, schools shall outline in policy how attendance (whether in-person or virtual) shall be addressed for a governing board appeal. If outlined in the adopted by-laws, governing boards may follow the attendance/quorum requirements they have adopted. The deadline for the governing board to make a decision shall be set forth in each school's policy.

Following the review, the governing board, in writing, shall take one (1) of the following actions:



TENNESSEE
STATE BOARD OF EDUCATION

- o Deny the request for a hearing and affirm the decision of the DHA;
- o Deny the request for a hearing and overturn the decision of the DHA; or
- o Grant the request for a hearing, then affirm or overturn the decision of the DHA.

The governing board shall not impose a more severe penalty than that imposed by the DHA without first providing an opportunity for a hearing before the governing board. The notice of the hearing shall include a statement that, unless the student or the student's parent(s)/guardian(s) request an open hearing in writing within five (5) school days of receipt of the notice, the hearing shall be closed to the public. The decision of the governing board shall be final. The school shall immediately notify the State Board of the decision of the governing board.

- Zero-tolerance Offense Requiring Mandatory One Year Expulsion: Certain zero-tolerance offenses as set forth in State Board Policy 6309 – Zero Tolerance and school policy require a mandatory one (1)-year expulsion. Any student committing a zero-tolerance offense that requires a one (1)-year expulsion shall receive a mandatory one (1)-year expulsion from school and shall not be remanded to an alternative school unless the Director of Schools modifies the expulsion as outlined below. A student or parent/guardian may appeal the expulsion decision to the school's DHA within five (5) school days of the student receiving the expulsion. For a zero-tolerance offense, the student shall only be permitted to appeal regarding guilt or innocence of the zero-tolerance offense and/or whether the student was provided with proper due process. The DHA hearing shall follow the procedures set forth by the policy of the school.

  Following the DHA hearing, the student has the right to appeal the decision to the Director of Schools within five (5) school days of the DHA's decision in order to request a modification of the mandatory one (1)-year expulsion. (NOTE: A student who does not wish to contest their guilt/innocence of the zero-tolerance offense or the due process provided to them, shall be allowed to forego an appeal to the DHA and to appeal directly to the Director of Schools for a modification of the mandatory one (1) year expulsion.) The student must notify the Director of Schools, in writing, of his/her appeal to modify the mandatory one (1)-year expulsion using the form contained within these procedures. The Director of Schools may request a written recommendation from the DHA to accompany the official DHA record submitted for review. As part of the review, the Director of Schools shall consider the recommendation from the DHA, if any, regarding a proposed modification of the student's expulsion. The Director of Schools shall not be bound by the recommendation of the DHA, if any, and shall render a decision within seven (7) calendar days.

  Within five (5) school days of the Director of Schools' rendering a decision, the student, student's parent(s)/guardian(s), principal, principal-teacher, or assistant principal may request, in writing, a review of the official DHA record by the governing board regarding the student's guilt/innocence of the zero-tolerance infraction and/or whether the student was provided with proper due process. (NOTE: A student who chooses not to appeal to the DHA and appeals directly to the


TENNESSEE
STATE BOARD OF EDUCATION

Director of Schools for modification of the mandatory expulsion shall not be permitted to appeal to the governing board).

Each school shall determine how the governing board shall conduct a review of the DHA appeal, including the timeline for a decision and attendance at the appeal hearing. As a best practice, schools shall outline in policy how attendance (whether in-person or virtual) shall be addressed for a governing board appeal. If outlined in the adopted by-laws, governing boards may follow the attendance/quorum requirements they have adopted. The deadline for the governing board to make a decision shall be set forth in each school's policy.

Following the review, the governing board, in writing, shall take one (1) of the following actions:

- o  Deny the request for a hearing and affirm the decision of the DHA;
- o  Deny the request for a hearing and overturn the decision of the DHA; or
- o  Grant the request for a hearing, then affirm or overturn the decision of the DHA.

The governing board of the school shall not have the ability to modify the decision of the Director of Schools with regard to modification of the student's expulsion. If the governing board grants a hearing, the notice of the hearing shall include a statement that, unless the student or the student's parent/guardian requests an open hearing in writing within five (5) school days of receipt of the notice, the hearing shall be closed to the public. The decision of the governing board shall be final.

### Establishing a DHA

Annually, each school shall report all members of the DHA to the State Board by July 31st by submitting the form contained within this guidance document via the State Board's reporting calendar.

### DHA Hearings

Each school shall develop a policy for conducting a DHA hearing. The chair of the DHA is responsible for setting the time, location, and date of the DHA hearing and clearly communicating that information to all parties involved in a language that can be understood by the parties. The chair should make every attempt, within reason, to accommodate the schedule and transportation restrictions of the parties involved, particularly those of the student and the student's parent(s)/guardian(s). However, pursuant to T.C.A. § 49-6-3401(c)(4)(A), the hearing shall be held no later than ten (10) days after the beginning of the remand/suspension.

Each school's DHA policy shall state whether a student is allowed to have an attorney present and, if applicable, what role an attorney may play in the DHA hearing. Additionally, an official record shall be created for each DHA hearing.

4

Version: June 10, 2019



**TENNESSEE**
STATE BOARD OF EDUCATION

### Creating an Official DHA Hearing Record

Each school shall create an official record of every DHA hearing. The official record of a DHA hearing shall include minutes and a recorded version of events. The method of recording shall be determined by the school and outlined in the school's DHA policy. Acceptable methods of recording include:

- Transcription
- Audio recording
- Video recording with audio

The official record of a DHA hearing shall be reviewed in the event that a DHA decision is appealed. If an appeal is brought to the Director of Schools or charter school governing board, the chair of the DHA shall immediately provide all documentation (minutes, transcriptions, recordings, etc.) to the appellate body.

### Special Circumstances Modification of Required Remand

If a special circumstance arises that the school believes justifies a disciplinary action other than the required remand to alternative school, the school may submit documentation for a special circumstances modification. Within five (5) school days of the disciplinary decision, the school shall notify the Director of Schools, or designee, in writing of the special circumstance using the form contained within these procedures to outline:

- The disciplinary infraction committed by the student;
- The proposed modification of disciplinary action; and
- A detailed explanation outlining the special circumstances and reasons for requesting a modified disciplinary action.

Following receipt of the form, the Director of Schools, or designee, will consult with the school regarding the special circumstance and will make a decision regarding the proposed modification of the required remand within seven (7) school days. The school shall be responsible for informing all necessary parties of the decision, including, but not limited to, the student, the student's parent(s)/guardian(s), and the student's teachers.

### Required School Policies and Procedures

The following are required to be developed by each school pursuant to these procedures:

- Student Discipline Policy
- Disciplinary Hearing Authority (DHA) Policy and Procedures

Version: June 10, 2019

5



**TENNESSEE**
STATE BOARD OF EDUCATION

### Forms and Appendices

The following forms and appendices are included to supplement these procedures:

- Disciplinary Hearing Authority and Appeals Flow Chart
- Zero Tolerance Modification Appeal Form – *required*
- Request for a Disciplinary Hearing Authority Appeal – *sample template*
- Request for Governing Board Appeal – *sample template*
- Charter School Disciplinary Hearing Authority Membership Form – *required*
- Request for Review of Disciplinary Actions under Special Circumstances – *required*



# TENNESSEE
STATE BOARD OF EDUCATION

## Disciplinary Hearing Authority and Appeals Flow Chart

*The flow chart below outlines the path a disciplinary action may follow and/or be appealed under State Board LEA Policy 6317 – Required Remands and Student Disciplinary Hearing Authority. Answer the questions in the orange boxes to follow the correct course of action.*



Was the infraction a zero tolerance violation?[1]

**YES**

**NO**

Does the violation warrant a suspension of more than 10 days?

Mandatory 1-year expulsion[4]

Right to appeal expulsion to DHA re: guilt/innocence or due process only[2]

Right to appeal to SBE Director of Schools for modification of mandatory expulsion[5]

Director can modify zero tolerance expulsion to lesser period of time OR remand to alternative school for certain period of time

Right to appeal Director's decision to school operator governing board re: guilt/innocence or due process only (decision is final)

**NO**

Suspension of 10 days or less

Basic due process provided to student

No right of appeal to DHA

If suspended more than 5 days, principal must develop behavior improvement plan

SBE tracks suspension data and monitors for compliance, as necessary

**YES**

Required remand of more than 10 days to alternative school (suspension is not an option)[3]

Right to appeal remand to charter school DHA[2]

Right to appeal remand to school operator board (decision is final)

7

Version: June 10, 2019



[1] As defined by State Board LEA policy and Tennessee Code Annotated.

[2] State Board LEA policy would specify the need to have a policy on DHAs and what each policy needs to contain.

[3] If a special circumstance arises that the school believes justifies a disciplinary action other than the required remand to alternative school, the school shall immediately notify the director of schools, or designee, of the special circumstance. The director of schools, or designee, will consult with the school regarding the special circumstance and will come to a decision regarding a proposed modification of the required remand within seven (7) business days.

[4] State Board LEA policy 6309 – Zero Tolerance and the school's discipline policy outline which zero-tolerance offenses require a mandatory one (1)-year expulsion.

[5] As outlined in this procedure document, a student may choose not to appeal to the DHA and to instead appeal directly to the Director of Schools for modification of a mandatory one-year zero-tolerance expulsion. The student shall be advised that by doing this they are choosing not to contest their guilt/innocence or due process provided to them and are seeking only a modification of the mandatory one (1)-year expulsion. Students who choose to forego the initial appeal to the DHA shall not be permitted to appeal to the governing board.

Version: June 10, 2019

8



**TENNESSEE**
STATE BOARD OF EDUCATION

### Zero Tolerance Modification Appeal Form

Pursuant to T.C.A. § 49-6-3401(g), the Director of Schools may modify a mandatory one (1)-year expulsion for a zero tolerance offense on a case-by-case basis. Completion of this form shall serve as official written notice of appeal for modification of the one (1)-year expulsion. This form must be submitted to the Director of Schools of the State Board within five (5) school days of the Disciplinary Hearing Authority decision.

Student Name: _____

Student Phone Number: _____

School Name: _____

Date of Incident: _____      Date of DHA Appeal: _____

Use the space provided below to provide a description of why you believe the mandatory one (1)-year expulsion for a zero tolerance violation should be modified.

---

Signature of Student                                                         Date

Version: June 10, 2019

9



### Request for a Disciplinary Hearing Authority Appeal

Within five (5) school days of the suspension decision, a student or the student's parent(s)/guardian(s) may appeal the suspension/expulsion/remand, orally or in writing, to the school's Disciplinary Hearing Authority ("DHA"). Completion of this form shall serve as official written notice of request for a DHA appeal.

Student Name: _____

Student Phone Number: _____

School Name: _____

Date of Incident: _____

Date Suspension/Expulsion/Remand was Issued: _____

Pursuant to T.C.A. § 49-6-3401(c)(4)(A), the DHA hearing shall be held no later than ten (10) days after the beginning of the suspension/expulsion/remand. Use the space provided below to identify days or times in which you and/or your parent(s)/guardian(s) are <u>unable</u> to attend a DHA appeal hearing due to transportation limitations. Every effort will be made to accommodate the schedules of all parties involved.

| Monday | Tuesday | Wednesday | Thursday | Friday |
|--------|---------|-----------|----------|--------|
|        |         |           |          |        |
|        |         |           |          |        |
|        |         |           |          |        |
|        |         |           |          |        |

_____          _____
Signature of Student/Parent/Guardian                               Date

---

**FOR DHA USE ONLY**

Date Received: _____          DHA Appeal Date: _____

Student/Parent Notification Date: _____          DHA Chairman Initials: _____

*Attach the written notification of appeal date, time, and location to this request.*

---

10

Version: June 10, 2019



**TENNESSEE**
STATE BOARD OF EDUCATION

### Request for Governing Board Appeal

Within five (5) school days of the DHA rendering a decision, the student, student's parent(s)/guardian(s), principal, principal-teacher or assistant principal may request, orally or in writing, a review by the governing board, and the governing board shall review the official DHA record. Completion of this form shall serve as official written notice of request for a governing board appeal.

Requestor Name: _____

Requestor Phone Number: _____ Requestor Role: _____

School Name: _____

Date of Incident: _____ DHA Appeal Date: _____

Would you like to request an open hearing?   ☐ Yes, I want the hearing open to the public.

☐ No, I want the hearing closed to the public.

Use the space provided below to identify days or times in which you and/or your parent(s)/guardian(s) are <u>unable</u> to attend a governing board appeal hearing due to transportation limitations. Every effort will be made to accommodate the schedules of all parties involved.

| Monday | Tuesday | Wednesday | Thursday | Friday |
|--------|---------|-----------|----------|--------|
|        |         |           |          |        |
|        |         |           |          |        |
|        |         |           |          |        |
|        |         |           |          |        |

*If you are not the student requesting this hearing, provide the student's name and phone number:

Student Name: _____ Student Phone Number: _____

_____          _____
Signature of Requestor                                         Date

---

**FOR GOVERNING BOARD USE ONLY**

Date Received: _____          Governing Board Appeal Date: _____

Student/Parent Notification Date: _____          Governing Board Chair Initials: _____

*Attach the written notification of appeal date, time, and location to this request.*

---

11

Version: June 10, 2019



### Charter School Disciplinary Hearing Authority Membership Form

A charter school authorized by the State Board shall submit the names of individuals appointed to serve as members of the school's Disciplinary Hearing Authority ("DHA"). Appointments by the governing board are for one (1)-year terms and subject to reappointment. This form must be completed by the chair of the governing board and submitted to the State Board by July 31st of each year via the State Board's reporting calendar.

Name of Charter School: _____

School Year of Appointment: _____

*(The school year of appointment will begin July 1st and end June 30th)*

| Member Role | Member Name[1] | School Position/Relationship[2] | Holds Valid TN Educator License? (Y/N)[3] |
|---|---|---|---|
| Chair | | | |
| Member | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

[1] The DHA shall consist of at least two (2) members. If there are more than ten (10) members of the DHA, please complete a second form for additional space. The number of members may not exceed the number of members of the governing board.
[2] No member of the governing board shall serve as a member of the DHA.
[3] At least one (1) member of the DHA must be a licensed employee of the charter school.

_____          _____
Signature, Governing Board Chair                                              Date


_____
Printed Name, Governing Board Chair

12

Version: June 10, 2019


**TENNESSEE**
STATE BOARD OF EDUCATION

### Request for Review of Disciplinary Actions under Special Circumstances

Completion of this form shall serve as official written notice of request for modification of the required remand for suspensions of more than ten (10) days. This form must be submitted to the Director of Schools of the State Board within five (5) days of the disciplinary decision.

Student Name: _____

Student Phone Number: _____

Principal/Requestor Name: _____

School Name: _____

Date of Incident: _____     Date Discipline Action was Determined: _____

Use the space provided below to provide a description of the special circumstances justifying modification of the required remand.

```
┌──────────────────────────────────────────────────────────────┐
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
│                                                                │
└──────────────────────────────────────────────────────────────┘
```

_____          _____
Signature of Principal/Requestor                    Date

Version: June 10, 2019

13

STATE OF TENNESSEE
OFFICE OF THE
ATTORNEY GENERAL
PO BOX 20207
NASHVILLE, TENNESSEE 37202

June 13, 2005

Opinion No. 05-094

Zero Tolerance Policy — Possession of Illegal Drugs on School Property

## QUESTION

Whether a local education agency (LEA) has the authority under state law to adopt and enforce a zero tolerance policy that requires the expulsion of a student for a first-offense possession of marijuana on school property.

## OPINION

Yes. Tenn. Code Ann. § 49-6-3401(g) mandates a one-year expulsion from school when a student unlawfully possesses any drug on school property. The director of schools may modify the expulsion on a case-by-case basis.

## ANALYSIS

The General Assembly has decided, as a policy matter, that school authorities should have the necessary disciplinary authority to ensure a safe education environment. Zero tolerance policies are the result. *See* Tenn. Code Ann. § 49-6-4216. Every LEA must have a zero tolerance policy. Tenn. Code Ann. § 49-6-4216(a). A zero tolerance policy's purpose is to aid educators in ensuring that schools are safe and secure learning environments and to impose swift and certain disciplinary measures on the student whose conduct violates the policy. Tenn. Code Ann. § 49-6-4216(a). Violations of a zero tolerance rule or policy are not to be tolerated. Tenn. Code Ann. § 49-6-4216(b)(1).

Possession of an illegal drug on school property carries a mandatory one-year expulsion. Tenn. Code Ann. § 49-6-3401(g). Principals, principal-teachers and assistant principals must expel the student for illegal possession of drugs on school property. Tenn. Code Ann. § 49-6-3401(g).[1] The director of schools is the only school official who has the authority to modify the punishment of expulsion. Tenn. Code Ann. § 49-6-3402; § 49-6-4216(b)(2). During the one-year expulsion, the

---

[1]Tenn. Code Ann. § 49-6-3401(g) reads in pertinent part: "[A] pupil determined to . . . unlawfully possessing any drug . . . **shall** be expelled for a period of not less than one (1) calendar year, except that the director [of schools] may modify this expulsion on a case-by-case basis." (Emphasis supplied.)

student may be assigned to an alternative school. Tenn. Code Ann. § 49-6-3401(g); § 49-6-4216(b)(1).

A student charged with violating a zero tolerance policy must be given notice of the charges against him and an opportunity to present his side of the story. *See* Tenn. Code Ann. § 49-6-3401(c)(4); § 49-6-4216(b)(1) ("fair due process procedures"). As a general rule, this opportunity should be given before the student is removed from the school unless the student's presence is dangerous or disruptive. Tenn. Jur., *Schools*, § 24; *see also* Tenn. Code Ann. § 49-6-3401(c)(1). The student's punishment must rationally relate to the offense[2] and thus determination of appropriate punishment must include consideration of the student's intent. *See Seal v. Morgan*, 229 F.3d 567, 575-76 (6th Cir. 2000).[3]

<div style="margin-left:50%;">

PAUL G. SUMMERS<br>
Attorney General

MICHAEL E. MOORE<br>
Solicitor General

KATE EYLER<br>
Deputy Attorney General

</div>

Requested by:

    The Honorable Willie "Butch" Borchert<br>
    State Representatives<br>
    23 Legislative Plaza<br>
    Nashville, TN 37243

---

[2]Tenn. Code Ann. § 49-6-4216(b)(1) states in pertinent part: "Reasoned punishment. . ."

[3]The Court stated that a board of education's zero tolerance policy "would surely be irrational if it subjects to punishment students who did not knowingly or consciously possess [a drug]." *Seal*, 229 F.3d at 577.

⚠ Caution
As of: April 6, 2022 8:49 PM Z

## Seal v. Morgan

United States Court of Appeals for the Sixth Circuit

January 26, 2000, Argued ; October 6, 2000, Decided ; October 6, 2000, Filed

Nos. 99-5090/99-5600

### Reporter

229 F.3d 567 *; 2000 U.S. App. LEXIS 24939 **; 2000 FED App. 0358P (6th Cir.) ***

DUSTIN W. SEAL, Plaintiff-Appellee, v. ALLEN MORGAN, Superintendent, Knox County School (99-5090/5600); KNOX COUNTY BOARD OF EDUCATION (99-5600), Defendants-Appellants, VICKI DUNAWAY, Principal, Powell High School, et al., Defendants.

**Subsequent History:** [**1] Rehearing Denied (99-5600) December 20, 2000, Reported at: 2000 U.S. App. LEXIS 34067.

**Prior History:** Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville. No. 97-00267. James H. Jarvis, District Judge.

**Disposition:** AFFIRMED judgment of the district court to the extent that it denied the Board's motion for summary judgment, REVERSED judgment of the district court to the extent that it entered summary judgment in Seal's favor on the issue of liability, and REMANDED this case for further proceedings consistent with this opinion. With regard to Superintendent Morgan's appeal, we REVERSED judgment of the district court and remanded with instructions to enter summary judgment in his favor.

## Core Terms

knife, expel, district court, weapon, zero tolerance policy, expulsion, summary judgment, possessed, scienter, cases, school property, due process, schools, disciplinary, irrational, suspension, carrying, alcohol, summary judgment motion, glove compartment, dangerous weapon, knowingly,

suspended, violence, board of education, fundamental rights, oral argument, school board, valedictorian, discipline

## Case Summary

### Procedural Posture

Defendants appealed from a judgment of the United States District Court for the Eastern District of Tennessee at Knoxville, denying defendants' motions for summary judgment and entering summary judgment against defendants in plaintiff's action brought pursuant to 42 U.S.C.S. § 1983.

### Overview

In action brought pursuant to 42 U.S.C.S. § 1983, plaintiff sought monetary damages to compensate him for defendant board of education's decision to expel him from high school after a friend's knife was found in the glove compartment of plaintiff's car. Plaintiff, who denied any knowledge of the knife's presence in the car while it was on school property, argued that defendant Board's action was irrational and violated his right to due process of law. The district court not only denied the motions for summary judgment filed by defendant Board and defendant superintendent, but effectively entered summary judgment against both defendants on the issue of liability. The court stated that the decision not to expel a potentially dangerous student also carried very serious potential consequences for other students and teachers. Nevertheless, defendant Board may not absolve itself of its obligation, legal and moral, to determine whether students intentionally committed the acts

Page 2 of 22

229 F.3d 567, *567; 2000 U.S. App. LEXIS 24939, **1; 2000 FED App. 0358P (6th Cir.), ***Cir.)

for which their expulsions were sought by hiding behind a Zero Tolerance Policy that purports to make the students' knowledge a non-issue.

**Outcome**

The court affirmed the judgment of the district court to the extent that it denied defendant Board's motion for summary judgment, and reversed the judgment of the district court to the extent that it entered summary judgment in plaintiff's favor on the issue of liability, and remanded this case for further proceedings consistent with this opinion.

## LexisNexis® Headnotes

Constitutional Law > Bill of
Rights > Fundamental Freedoms > General
Overview

Constitutional Law > ... > Fundamental
Rights > Procedural Due Process > General
Overview

Constitutional Law > ... > Fundamental
Rights > Procedural Due Process > Scope of
Protection

### HN1[⬇] Bill of Rights, Fundamental Freedoms

There is no abstract federal constitutional right to process for process's sake. Rather, U.S. Const. amend. XIV provides that one may not be deprived of life, liberty, or property without due process of law. State law determines what constitutes "property" for due process purposes.

Constitutional Law > ... > Fundamental
Rights > Procedural Due Process > Scope of
Protection

Education Law > ... > Student
Discipline > Methods of

Discipline > Suspensions of Students

Education Law > Departments of
Education > US Department of Education > US
Department of Education Authority

### HN2[⬇] Procedural Due Process, Scope of Protection

In the absence of an emergency, public high school students cannot be suspended without the opportunity for a hearing.

Education Law > Departments of
Education > State Departments of
Education > Authority of Departments of
Education

### HN3[⬇] State Departments of Education, Authority of Departments of Education

Tennessee not only provides its citizens with the right to a free public education, but requires them to attend school through the age of 18. Tenn. Code Ann. § 49-6-3001.

Constitutional Law > ... > Fundamental
Rights > Procedural Due Process > Scope of
Protection

Education Law > ... > Student
Discipline > Disciplinary Proceedings > Due
Process

Education Law > ... > Student
Discipline > Disciplinary
Proceedings > General Overview

### HN4[⬇] Procedural Due Process, Scope of Protection

Due process has two components. The first, procedural due process, is a right to a fair procedure or set of procedures before one can be deprived of property by the state. Even when it is clear that one

Page 3 of 22

229 F.3d 567, *567; 2000 U.S. App. LEXIS 24939, **1; 2000 FED App. 0358P (6th Cir.), ***Cir.)

is entitled to due process, the question remains what process is due. The answer to the question of what process is due depends on appropriate accommodation of the competing interests involved. In the context of disciplining public school students, the student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences. Schools, of course, have an unquestionably powerful interest in maintaining the safety of their campuses and preserving their ability to pursue their educational mission.

when they are narrowly tailored to a compelling governmental interest. The list of fundamental rights and liberty interests--which includes the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, to terminate one's pregnancy, and possibly the right to refuse unwanted lifesaving medical treatment, however, is short, and the United States Supreme Court has expressed very little interest in expanding it.

Constitutional Law > Substantive Due Process > Privacy > Personal Decisions

Healthcare Law > Medical Treatment > Failures & Refusals to Treat > General Overview

Constitutional Law > Substantive Due Process > Privacy > General Overview

Constitutional Law > Substantive Due Process > Scope

Healthcare Law > Medical Treatment > End-of-Life Decisions > General Overview

Healthcare Law > Medical Treatment > Abortion > Right to Privacy

Healthcare Law > Medical Treatment > End-of-Life Decisions > Lifesaving Treatment

Healthcare Law > Medical Treatment > Patient Consent > Right to Refuse Treatment

### HN5[⬇] Privacy, Personal Decisions

The Due Process Clause provides heightened protection against government interference with certain fundamental rights and liberty interests. Government actions that burden the exercise of those fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only

Constitutional Law > Equal Protection > Judicial Review > Standards of Review

Healthcare Law > Medical Treatment > End-of-Life Decisions > Assisted Suicide

Healthcare Law > Medical Treatment > General Overview

### HN6[⬇] Judicial Review, Standards of Review

Government actions that do not affect fundamental rights or liberty interests and do not involve suspect classifications will be upheld if it they are rationally related to a legitimate state interest.

Constitutional Law > Substantive Due Process > Scope

Education Law > ... > Student Discipline > Disciplinary Proceedings > Due Process

Constitutional Law > Substantive Due Process > General Overview

Education Law > ... > Student Discipline > Disciplinary Proceedings > General Overview

Education Law > ... > Student Discipline > Methods of Discipline > General

Page 4 of 22

229 F.3d 567, *567; 2000 U.S. App. LEXIS 24939, **1; 2000 FED App. 0358P (6th Cir.), ***Cir.)

Overview

## HN7[±] Constitutional Law, Substantive Due Process

In the context of school discipline, a substantive due process claim will succeed only in the rare case when there is no rational relationship between the punishment and the offense.

Criminal Law & Procedure > ... > Weapons Offenses > Use of Weapons > General Overview

Education Law > ... > Student Discipline > Methods of Discipline > Expulsions

Constitutional Law > Equal Protection > Judicial Review > Standards of Review

Criminal Law & Procedure > ... > Possession of Weapons > Unregistered Firearm > Elements

Criminal Law & Procedure > ... > Use of Weapons > Simple Use > General Overview

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Knowledge

Education Law > ... > Student Discipline > Methods of Discipline > General Overview

Education Law > ... > Student Discipline > Methods of Discipline > Suspensions of Students

Education Law > ... > Student Discipline > Misconduct > Weapons

## HN8[±] Weapons Offenses, Use of Weapons

Suspending or expelling a student for weapons possession, even if the student did not knowingly possess any weapon, would not be rationally related

to any legitimate state interest. No student can use a weapon to injure another person, to disrupt school operations, or, for that matter, any other purpose if the student is totally unaware of its presence. Indeed, the entire concept of possession--in the sense of possession for which the state can legitimately prescribe and mete out punishment-- ordinarily implies knowing or conscious possession.

Criminal Law & Procedure > ... > Weapons Offenses > Trafficking in Weapons > Exports, Imports & Manufacture

Criminal Law & Procedure > ... > Weapons Offenses > Possession of Weapons > General Overview

Criminal Law & Procedure > ... > Possession of Weapons > Unregistered Firearm > Elements

## HN9[±] Trafficking in Weapons, Exports, Imports & Manufacture

Strict liability in the context of a weapons- possession statute at most means that the government would not need to prove that the defendant knew he was violating the law, or that the weapon possessed the attributes that make it a specific type of weapon--an assault weapon or machine gun, for example--that is likely the subject of heavy regulation or prohibition.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

## HN10[±] Entitlement as Matter of Law, Appropriateness

In appropriate circumstances, courts acknowledge

Page 5 of 22

229 F.3d 567, *567; 2000 U.S. App. LEXIS 24939, **1; 2000 FED App. 0358P (6th Cir.), ***Cir.)

that a district court may enter summary judgment against the moving party in the absence of a cross-motion.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

## *HN11*[⬆] Entitlement as Matter of Law, Appropriateness

A district court has the discretion to entertain a successive or renewed summary judgment motion, and that doing so is particularly appropriate when the factual record upon which summary judgment is sought has been expanded.

Constitutional Law > Equal Protection > Judicial Review > Standards of Review

## *HN12*[⬆] Judicial Review, Standards of Review

The question of whether a governmental action is rationally related to a legitimate state interest is properly decided by the court, although questions regarding the state officials' motivation, if the subject of a genuine dispute of fact, are for the jury.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

## *HN13*[⬆] Local Officials, Customs & Policies

The doctrine of qualified immunity generally shields government officials from civil liability for performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. In determining whether an official is entitled to qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Education Law > ... > Student Discipline > Disciplinary Proceedings > Due Process

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Education Law > Departments of Education > US Department of Education > US Department of Education Authority

Education Law > ... > Student Discipline > Disciplinary Proceedings > General Overview

Education Law > ... > Student Discipline > Disciplinary Proceedings > Notice

Education Law > ... > Student Discipline > Methods of Discipline > General Overview

Education Law > ... > Student Discipline > Methods of Discipline > Expulsions

## *HN14*[⬆] Disciplinary Proceedings, Due Process

As an abstract matter, the right of public school students not to be expelled arbitrarily or irrationally has been clearly established since at least the

Page 6 of 22

229 F.3d 567, *567; 2000 U.S. App. LEXIS 24939, **1; 2000 FED App. 0358P (6th Cir.), ***Cir.)

United States Supreme Court's decision in Goss v. Lopez, which held that long-term suspensions and expulsions must comport with minimal standards of due process. More concretely, however, courts do not believe that the contours of that right were sufficiently clear to put a reasonable school superintendent on notice in 1996 that a school disciplinary policy's lack of a conscious-possession requirement could produce irrational expulsions and thus violate the legal rights of students expelled under the policy.

**Counsel:** ARGUED: Robert L. Crossley, Sr., CROSSLEY LAW FIRM, Knoxville, Tennessee, Mary A.R. Stackhouse, DEPUTY LAW DIRECTOR, BOARD OF EDUCATION, Knoxville, Tennessee, for Appellants.

Laura E. Metcalf, LAW OFFICES OF TOMMY K. HINDMAN, Knoxville, Tennessee, for Appellee.

ON BRIEF: Robert L. Crossley, Sr., CROSSLEY LAW FIRM, Knoxville, Tennessee, Mary A.R. Stackhouse, DEPUTY LAW DIRECTOR, BOARD OF EDUCATION, Knoxville, Tennessee, John E. Owings, KNOX COUNTY LAW DIRECTOR'S OFFICE, Knoxville, Tennessee, for Appellants.

Tommy K. Hindman, LAW OFFICES OF TOMMY K. HINDMAN, [**2] Knoxville, Tennessee, for Appellee.

**Judges:** Before: NELSON, SUHRHEINRICH, and GILMAN, Circuit Judges. GILMAN, J., delivered the opinion of the court, in which NELSON, J., joined. SUHRHEINRICH, J., delivered a separate opinion dissenting in part.

**Opinion by:** RONALD LEE GILMAN

## Opinion

[***2] [*570] RONALD LEE GILMAN, Circuit Judge. In this action brought pursuant to 42 U.S.C. § 1983, Dustin Wayne Seal seeks monetary damages to compensate him for the Knox County Board of Education's 1996 decision to expel him

from high school after a friend's knife was found in the glove compartment of Seal's car. Seal, who denied any knowledge of the knife's presence in the car while it was on school property, argues that the Board's action was irrational and violated his right to due process of law. The district court not only denied the motions for summary judgment filed by the Board and the Board's superintendent, but effectively entered summary judgment against both defendants on the issue of liability. For the reasons set forth below, we **AFFIRM** the judgment of the district court to the extent that it denied the [***3] Board's motion for summary judgment, **REVERSE** the judgment [**3] of the district court to the extent that it entered summary judgment in Seal's favor on the issue of liability, and **REMAND** this case for further proceedings consistent with this opinion. With regard to Superintendent Morgan's appeal, we **REVERSE** the judgment of the district court and remand with instructions to enter summary judgment in his favor.

## I. FACTUAL BACKGROUND

In the fall of 1996, Seal was a junior at Powell High School in Knox County, Tennessee. On October 30, 1996, a friend of Seal's named Ray Pritchett, who was also [*571] a student at Powell High, became embroiled in an out-of-school dispute with another Powell High student who had begun dating Pritchett's ex-girlfriend. As a result, Pritchett started carrying around a hunting knife. The knife had a three-and-one-half inch blade and bore the inscription "Ray loves Jennie" (apparently Pritchett's ex-girlfriend). Seal knew that Pritchett had the knife, because Pritchett showed it to him that day. The next night, Seal went to pick up his girlfriend at her house, accompanied by Pritchett and another friend, David Richardson. Seal was driving his mother's car, because his own was not working. Pritchett, still carrying [**4] the knife, placed it on the floorboard of the car behind the driver's seat where Seal was sitting. When they arrived at the girlfriend's house, Seal went in to get her. Richardson, still in the car, placed the knife in

the car's glove compartment. Whether Seal actually saw the knife when it was on the car's floorboard, or at any other point when the knife was in his mother's car, is not entirely clear from the record. It is, however, uncontroverted that Seal knew that Pritchert had been carrying a knife around, and that Pritchert had the knife on his person when he was in the car on October 31, 1996.

The following night was Friday, November 1, 1996. Seal, again driving his mother's car, drove his girlfriend and Pritchert to Powell High. All three were members of the Powell High band, and the Powell High football team had a [***4] game scheduled that night. The three had worn their band uniforms, but were informed after entering the school that they would not be required to wear their uniforms that night. They then returned to the car, which Seal had parked in the Powell High parking lot, so that they could put on the clothes they had planned to wear after changing out of their [**5] band uniforms. After changing, Seal and Pritchert went back into the school building. There, the band director, Gregory Roach, pulled Pritchert aside and asked him if he and Seal had been drinking. Pritchert said that they had not. Roach let Seal and Pritchert enter the band room, because he did not smell alcohol on Pritchert's breath.

About fifteen minutes later, Roach summoned Seal and Pritchert to his office. There they were joined by Charles Mashburn, the vice-principal of Powell High. Mashburn announced that four students had reported seeing the two of them drinking alcohol. Although Mashburn searched both Seal's and Pritchert's coats and instrument cases, he found no evidence to suggest that either student had been drinking or possessed alcoholic beverages. Mashburn then announced that he needed to search Seal's car for a flask, because one of the assistant band directors said he saw either Seal or Pritchert with a flask, with both students chewing gum and checking the other's breath. Seal consented to the search. Mashburn did not find a flask. He did, however, find two cigarettes in a crumpled pack in the back of the car, a bottle of amoxicillin pills (an antibiotic for which [**6] Seal had a prescription) in the console, and Pritchert's knife in the glove compartment.

Mashburn subsequently had Seal accompany him to his office, where he directed Seal to write out a statement about what had just occurred. Seal asked Mashburn what he should write in the statement, and Mashburn replied that Seal should explain why the knife was in the glove compartment. Seal's entire statement reads as follows:

> Went to Roach's office because he thought or had been told that we had a flask and had been drinking, so we went and Mr. Mashburn searched the car. He found a [***5] knife and 2 cigs. The knife was there because Ray's ex-girlfriend's boyfriend had been following us around with a few of his friends so we were a little uneasy.

Mashburn then prepared a form Notice of Disciplinary Hearing for Long-Term Suspension From School, charging Seal with possession of a knife, possession of [*572] tobacco, and possession of "pills." On November 6, 1996, Powell High's principal, Vicki Dunaway, conducted a disciplinary hearing. After hearing from both Seal and Mashburn, she suspended Seal pending expulsion for possession of a knife. It does not appear from the record that she [**7] took any action against Seal for his possession of the two cigarettes or the antibiotic pills. Seal appealed, and on November 14, 1996, Jimmie Thacker, Jr., the Board of Education's disciplinary hearing authority, conducted an appeal hearing.

Seal attended this hearing, as did his parents, his girlfriend, Principal Dunaway, and David Richardson (the student who had placed the knife in the glove compartment of the car belonging to Seal's mother). At the hearing, Seal testified that he knew that Pritchert had had the knife on his person on October 31, 1996, at a time when Seal was driving Pritchert around in his mother's car, but that he had no idea that the knife was in his car on November 1, or at any other time when the car was

on school property. Richardson testified that Seal had not been in his mother's car when Richardson put Pritchert's knife in the glove compartment, and that as far as Richardson could tell, Seal did not know that the knife was there. Seal's girlfriend also testified that as far as she knew, Seal did not know the knife was in the glove compartment of his mother's car.

On November 18, 1996, Thacker notified Seal's mother by letter that he had decided to uphold [**8] Principal Dunaway's decision to suspend Seal pending expulsion by the Board. In pertinent part, the letter read as follows:

> Testimony and written statements presented during the hearing place the knife in the glove compartment of the car your son was driving and which he parked on the [***6] campus of Powell High School. Possession of a weapon on school property is a violation of Knox County Policy JCCC; therefore, I am upholding the principal's decision to suspend Dustin pending expulsion by the board of education.

The next day, Seal's mother telephoned school authorities to indicate that she and Seal wanted to appeal Thacker's decision to the Board. On November 22, 1996, Thacker notified Seal's mother by certified mail that the Board would consider the appeal of Seal's discipline for "possession of a weapon on school campus" at its next meeting.

The Board heard Seal's appeal on December 4, 1996. Seal was represented by counsel, who forcefully argued that Seal had no idea that the knife was in his mother's car either on November 1, 1996, or at any other time that the car was on school property. Board member Sam Anderson responded:

> My concern was because [**9] the . . . in our record it shows possession of a knife, possession of tobacco, possession of pills. You know, it doesn't just signify a weapon. And . . . you know . . . and either [sic] of the three are justification . . . .

Anderson then asked Seal whether he had ever seen the knife in his car. Seal said that he had not. He admitted that he knew that Pritchert had the knife the day before November 1, 1996--off school property--but insisted that he thought Pritchert had simply taken it with him, and that it had not been left in his mother's car. Anderson then explained that

> the problem I see is that we always have to be consistent in sending a clear message to students. Two or three years ago we were dealing with guns, guns, guns. Now, it's down to knives, knives, knives and I don't want to send a confusing message. Justin [sic], you are responsible for what's in your car and that's where I'm torn but I would have to say that you have to be held responsible as a driver for what's in your car. And that's a problem that you're going to have to deal with.

[***7] At another Board member's suggestion, the Board then voted unanimously to rule [*573] on the appeal based [**10] on the record from the hearings conducted before Principal Dunaway and Disciplinary Hearing Authority Thacker. Anderson then made a motion to uphold Thacker's recommendation to expel Seal, which was approved unanimously. The entire transcript of the Board's proceedings as it relates to Seal spans three pages. In contrast, the transcript of the hearing conducted by Thacker is over fifty pages long.

In pertinent part, the Knox County Board of Education policy pursuant to which Seal was expelled provides that students may not "possess, handle, transmit, use or attempt to use any dangerous weapon [including knives] in school buildings or on school grounds at any time" and that students who are found to have violated the policy "shall be subject to suspension and/or expulsion of not less than one . . . year." The policy also provides that the Superintendent "shall have the authority to modify this suspension requirement on a case-by-case basis," although Superintendent Morgan has argued that it is "not clear" whether he has the power to modify a suspension or expulsion

once it has been finally approved by the Board.

Generally, Tennessee law delegates to its local boards of education [**11] broad authority to formulate rules for student conduct and to prescribe appropriate remedies for the violation of those rules. See Tenn. Code Ann. § 49-6-4012(a). Before the 1996-97 school year, however, the Tennessee legislature directed each of its local school boards to develop and adopt, and to file annually with the state commissioner of education, written policies and procedures that would "impose swift, certain and severe disciplinary sanctions on any student" who, among other things, "brings a . . . dangerous weapon" onto school property, or "possesses a dangerous weapon" on school property. Tenn. Code Ann. § 49-6-4216(a)(2). Specifically, the legislature encouraged "each local and county board of education . . . to include within such policies and procedures a zero [***8] tolerance policy toward any student who engages in such misconduct." Tenn. Code Ann. § 49-6-4216(b).

## II. PROCEDURAL BACKGROUND

In April of 1997, Seal's father initiated an action on Seal's behalf in the United States District Court for the Eastern District of Tennessee pursuant to 42 U.S.C. § 1983. After he reached the age of eighteen, Seal was substituted for his [**12] father as the plaintiff. Seal claimed that his expulsion violated his rights under the Equal Protection and Due Process clauses of the Fourteenth Amendment, and that the search of his mother's car by Vice-Principal Mashburn violated the Fourth Amendment. Initially, Seal named as defendants the principal, the hearing officer, and every member of the Knox County Board of Education. The district court, however, dismissed on its own motion Seal's claims against all of these defendants, concluding that the only proper party defendants were Allen Morgan, the school district's superintendent, and the Board of Education itself. None of these dismissals are at issue in these appeals.

Superintendent Morgan moved for summary judgment, asserting that he was entitled to qualified immunity as a matter of law. The Board of Education also moved for summary judgment. At the time these motions were filed, no discovery had been conducted. Seal did not cross-move for summary judgment. The district court concluded that both Superintendent Morgan and the Board were entitled to summary judgment on Seal's Fourth Amendment claim and Fourteenth Amendment equal protection claim, but that the Board was not entitled [**13] to summary judgment on Seal's Fourteenth Amendment due process claim. In addition, the district court concluded that Superintendent Morgan was not entitled to summary judgment on the basis of qualified immunity. The district court then set the case for trial on the issue of damages only, effectively deciding that Seal was entitled to summary judgment [*574] on his due process claim. Superintendent Morgan appealed as of right from the denial of his motion for summary judgment on the basis of qualified [***9] immunity, and the Board sought and received permission from the district court and this court to take an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## III. ANALYSIS

### A.The Board

HN1[↑] There is no abstract federal constitutional right to process for process's sake. See Olim v. Wakinekona, 461 U.S. 238, 250, 75 L. Ed. 2d 813, 103 S. Ct. 1741 (1983) (noting that "process is not an end in itself."). Rather, the Fourteenth Amendment provides that one may not be deprived of life, liberty, or property without due process of law. State law determines what constitutes "property" for due process purposes. See Board of Regents v. Roth, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972). [**14] It is undisputed that Seal enjoyed a property interest in his public high school education under Tennessee law. See Goss v. Lopez, 419 U.S. 565, 42 L. Ed. 2d 725, 95

S. Ct. 729 (1975) (concluding that, *HN2*[⬆] in the absence of an emergency, public high school students cannot be suspended without the opportunity for a hearing). *HN3*[⬆] Tennessee not only provides its citizens with the right to a free public education, but requires them to attend school through the age of eighteen. See Tenn. Code Ann. § 49-6-3001.

*HN4*[⬆] Due process has two components. The first, procedural due process (often summarized as "notice and an opportunity to be heard"), is a right to a fair procedure or set of procedures before one can be deprived of property by the state. Even when it is clear that one is entitled to due process, "the question remains what process is due." Goss, 419 U.S. at 577 (citation omitted). The answer to the question of what process is due "depends on appropriate accommodation of the competing interests involved." Id. at 579. In the context of disciplining public school students, the student's interest is "to avoid unfair or mistaken exclusion [**15] from the educational process, with all of its unfortunate consequences." Id. Schools, of course, have an unquestionably powerful interest in maintaining the safety of their campuses and preserving their ability to pursue their educational mission. See id. at 580 ("Some modicum of discipline and order is essential if [***10] the educational function is to be performed. Events calling for discipline are frequent occurrences and sometimes require immediate, effective action.").

The district court rejected Seal's claim that he was denied procedural due process, concluding that he had received all of the process that he was due. Even though Seal, in his brief on appeal, asserts that he was "owed both the substantive and procedural components of the due process law and was denied such," he does not really argue that the Board used unfair procedures before expelling him. Rather, his complaint is with the substantive result--the ultimate decision to expel him. His argument is thus one of substantive due process, the other component of due process. In essence, Seal argues

that the Board's ultimate decision was irrational in light of the facts uncovered by the procedures [**16] afforded him.

*HN5*[⬆] The Due Process Clause provides "heightened protection against government interference with certain fundamental rights and liberty interests." Washington v. Glucksberg, 521 U.S. 702, 720, 138 L. Ed. 2d 772, 117 S. Ct. 2258 (1997). Government actions that burden the exercise of those fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest. See United States v. Brandon, 158 F.3d 947, 956 (6th Cir. 1998). The list of fundamental rights and liberty interests--which includes the rights to marry, to have children, to direct the education [*575] and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, to terminate one's pregnancy, and possibly the right to refuse unwanted lifesaving medical treatment, see Glucksberg, 521 U.S. at 720 (citing cases)--however, is short, and the Supreme Court has expressed very little interest in expanding it. See Glucksberg, 521 U.S. at 721 ("We have always been reluctant to expand the concept of substantive due process because [**17] guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.") (citation, internal quotation marks, and brackets omitted). In fact, the Supreme Court has held explicitly that the right to attend public school is not a fundamental right for [***11] the purposes of due process analysis. See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 33-37, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973); see also Smith ex rel. Smith v. Severn, 129 F.3d 419, 429 (7th Cir. 1997) (rejecting due process and equal protection challenges to a school suspension, noting that "the question of whether a public education is a fundamental right is not a novel one.").

The Supreme Court has also recognized the uniquely destructive potential of overextending substantive due process protection. See

Glucksberg, 521 U.S. at 720 (observing that extending substantive due process protection to an asserted right or liberty interest "places the matter outside the arena of public debate and legislative action," and reasoning that "the utmost care" must therefore be exercised before breaking new ground, "lest the liberty protected [**18] by the Due Process Clause be subtly transformed into the policy preferences of this Court."). Indeed, the Court has specifically cautioned that "judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint," and that "by and large, public education in our nation is committed to the control of state and local authorities." Goss, 419 U.S. at 578 (quoting Epperson v. Arkansas, 393 U.S. 97, 104, 21 L. Ed. 2d 228, 89 S. Ct. 266 (1968)); see also Dunn v. Fairfield Community High Sch. Dist. No. 225, 158 F.3d 962, 966 (7th Cir. 1998) (expressing concern about the prospect of allowing the due process clause to "transform[] the federal courts into an appellate arm of the schools throughout the country").

HN6[↑] Government actions that do not affect fundamental rights or liberty interests and do not involve suspect classifications will be upheld if it they are rationally related to a legitimate state interest. See Vacco v. Quill, 521 U.S. 793, 138 L. Ed. 2d 834, 117 S. Ct. 2293 (1997) (applying the rational basis standard of review to uphold New York's statutes [**19] outlawing assisted suicide, which neither infringe fundamental rights nor involve suspect classifications). HN7[↑] In the context of school discipline, a substantive due process claim will succeed only in the "rare case" when there is "no 'rational relationship between the punishment and the offense.'" Rosa R. v. Connelly, 889 F.2d 435, 439 [***12] (2d Cir. 1989) (concluding that substantive due process did not require a student to be credited with "time served" while the student was out of school awaiting expulsion proceedings that were postponed at the student's request) (quoting Brewer v. Austin Indep. Sch. Dist., 779 F.2d 260, 264 (5th Cir.1985)); see also Wood v. Strickland, 420 U.S.

308, 326, 43 L. Ed. 2d 214, 95 S. Ct. 992 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.").

That said, HN8[↑] suspending or expelling a student for weapons possession, even if the student did not knowingly possess any weapon, would not be rationally related to any legitimate state interest. No student can use a weapon to injure another [**20] person, to disrupt school operations, or, for that matter, any other purpose if the student is totally unaware of its presence. Indeed, the entire concept of possession--in the sense of possession for which the state can [*576] legitimately prescribe and mete out punishment-- ordinarily implies knowing or conscious possession. See Wayne R. LaFave & Austin R. Scott, Jr., Substantive Criminal Law § 3.2, at 279 (1986 & Supp. 2000) (noting that "for legal purposes other than criminal law--e.g., the law of finders--one may possess something without knowing of its existence, but possession in a criminal statute is usually construed to mean conscious possession") (footnotes omitted); see also United States v. Lewis, 226 U.S. App. D.C. 236, 701 F.2d 972, 973 (D.C. Cir. 1983) (Bork, J.) (observing that in order to withstand a motion for judgment of acquittal on the charge of constructive possession of an illegal firearm, the government must introduce sufficient evidence for a reasonable jury to conclude "that the possession was 'knowing'") (citation omitted); United States v. Sawyer, 294 F.2d 24, 29 (4th Cir. 1961) (noting, in a prosecution for unlawful [**21] possession of inventory for liquor bootlegging, that "possession, when charged as a crime, must be conscious"); State v. Rice, 172 Conn. 94, 374 A.2d 128, 132 (Conn. 1976) (concluding, in a prosecution for unlawful carrying of a firearm in a motor vehicle, that constitutional due process requires the government to prove the defendant's knowing possession of the firearm); State v. Labato, 7 N.J. 137, 80 A.2d 617, 622 [***13] (N.J. 1951) (noting in a criminal prosecution for possession of illegal

lottery tickets, that the state legislature could legitimately abrogate the common law requirement of scienter, or evil intent, and impose criminal liability on persons who did not know that their possession of the tickets was illegal, but could not abrogate the requirement that the persons intentionally possessed the tickets).

We would have thought this principle so obvious that it would go without saying. The Board, however, devotes a great deal of the discussion in its briefs to arguing that "scienter" is not required by its "Zero Tolerance Policy," and that the criminal law requirement that possession of a forbidden object be knowing or conscious [**22] possession is a "technicality" that should not be "transported into school suspension cases." Frankly, we find it difficult to understand how one can argue that the requirement of conscious possession is a "technicality." Cf. Morissette v. United States, 342 U.S. 246, 250, 96 L. Ed. 288, 72 S. Ct. 240 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty . . . to choose between good and evil.").

We asked counsel at oral argument whether the Board was seriously arguing that it could expel a student for unconsciously possessing a dangerous weapon, posing a hypothetical example involving a high-school valedictorian who has a knife planted in his backpack without his knowledge by a vindictive student. The question was whether the valedictorian would still be subject to mandatory expulsion under the Board's Zero Tolerance Policy, even if the school administrators and the Board members uniformly believed the valedictorian's explanation that the knife had been planted. [**23] Counsel for the Board answered yes. After all, counsel argued, the Board's policy requires "Zero Tolerance," and the policy does not explicitly say that the student must know he is carrying a weapon. Only after the Board's counsel sensed--

correctly--that this answer was very difficult to [***14] accept did counsel backtrack, suggesting that perhaps an exception could be made for our unfortunate hypothetical valedictorian. We find it impossible to take this suggestion seriously, however, and not simply because counsel had just finished arguing the opposite. The suggestion is totally inconsistent with the Board's position in this case, which is that the Zero Tolerance Policy uniformly requires expulsion whenever its terms are violated.

Contrary to the Board's assertion, the criminal law requirement that possession [*577] of contraband must be conscious or knowing is neither arcane nor unsettled. The Board's reliance on Morissette v. United States, 342 U.S. 246, 96 L. Ed. 288, 72 S. Ct. 240 (1952), is completely misplaced. Morissette was a prosecution for conversion of government property (spent bomb casings), in which the statute omitted any mention of a culpable [**24] state of mind being required for conviction. There was no question that Morissette had intentionally picked up the bomb casings, carried them away, and sold them, and that he knew that he was in possession of the casings when he carted them off. See id. at 247-48. Morissette argued, however, that he thought--mistakenly--that the bomb casings were abandoned property, "unwanted and considered of no value to the Government." Id. at 248. The district court concluded that the only intent that mattered was Morissette's intent to take the bomb casings, and instructed the jury that if it found that Morissette had intended to take the bomb casings (Morissette himself admitted that he had), it was required to convict. See id. at 249. Given essentially no choice by the district court's instructions, the jury convicted Morissette, and this court affirmed.

The Supreme Court reversed, refusing to infer from Congress's omission regarding culpability an affirmative intention to impose strict criminal liability and, thus, to "sweep out of all federal crimes, except when expressly preserved, the ancient requirement of a culpable state of mind.

[**25] " **Id.** at 250. Although the Court acknowledged that there might not be a "precise line" separating traditional crimes, for which intent would be presumed to be an element, [***15] and so-called public welfare or regulatory offenses, for which criminal liability without intent could be imposed, the Court refused to accept that larceny-type offenses were near the boundary. Indeed, the Court surveyed the state courts of last resort, "on whom fall the heaviest burden of interpreting criminal law in this country," and could not identify a single state court that had dispensed with the requirement of intent for larceny-type offenses. See **id.** at 260-61.

At oral argument, counsel for the Board also referred to an unspecified recent case involving the illegal possession of assault weapons, presumably **Peoples Rights Organization v. City of Columbus**, 152 F.3d 522 (6th Cir. 1998). Suffice it to say that **Peoples Rights Organization** does not support the Board's position. In that case, this court concluded that a Columbus, Ohio city ordinance prohibiting the possession of "assault weapons" imposed strict criminal liability. **Id.** at 534. [**26] The actual holding of **Peoples Rights Organization**, however, was that much of the ordinance, including its definition of "assault weapon," was unconstitutionally vague, and was thus "little more than a trap for the unwary." **Id.** at 535.

In any event, "*HN9*[⇥] strict liability" in the context of a weapons-possession statute at most means that the government would not need to prove that the defendant knew he was violating the law, or that the weapon possessed the attributes that make it a specific type of weapon—an assault weapon or machine gun, for example—that is likely the subject of heavy regulation or prohibition. But nothing in **Peoples Rights Organization** even remotely suggests that a defendant can be convicted for the unknowing possession of an item that is later revealed to be a statutory "assault weapon" or "machine gun." **Cf. United States v. Staples**, 511 U.S. 600, 606, 128 L. Ed. 2d 608, 114 S. Ct. 1793 (1994) (relying on **Morissette**, among other cases, for the proposition that because "offenses that require no mens rea" are disfavored, "some indication of congressional intent . . . is required to dispense with mens rea as an [**27] element of a crime," and refusing to interpret the federal statute criminalizing the unlicensed possession of machine guns as permitting [***16] convictions without proof that the defendant knew that the weapon had [*578] the specific characteristics that make it a statutory "machine gun").

The Board is, of course, correct when it observes that this is not a criminal case, and that its decision to expel Seal is not vulnerable to a substantive due process attack unless it is irrational. We believe, however, that the Board's Zero Tolerance Policy would surely be irrational if it subjects to punishment students who did not knowingly or consciously possess a weapon. The hypothetical case involving the planted knife is but one illustration of why.

Another example would be a student who surreptitiously spikes the punch bowl at a school dance with grain alcohol, with several students, none of whom having any reason to know that alcohol has been added to the punch, taking a drink. Suppose that the school has a code of conduct that mandates suspension or expulsion for any student who possesses or consumes alcohol on school property, but does not specifically provide that the alcohol must be knowingly [**28] possessed or consumed. Under the Board's reasoning, the student who spiked the punch bowl would of course be subject to suspension or expulsion, but so would any of the students who innocently drank from the punch bowl, even if the school board was completely convinced that the students had no idea that alcohol had been added to the punch. Suspending the students who drank from the punch bowl, not realizing that alcohol had been added, would not rationally advance the school's legitimate interest in preventing underage students from drinking alcohol on school premises any more than suspending a handful of students chosen at random

from the school's directory.

A student who knowingly possesses a weapon and is caught with it can, of course, be lying when he or she claims not to have known of its existence. Simply because a student may lie about what he knew, however, does not mean that it is unnecessary to address the question of what he knew before meting out punishment. The Board, for its part, freely [***17] concedes that "the record does not reflect what the Board did or did not consider with respect to [Seal's] knowledge," but argues that "in the absence of findings of fact [**29] [by the Board], it ought not be concluded that the Board failed to consider [Seal's] knowledge."

Well, why not? The Board's attorney has insisted that Seal's knowledge was completely irrelevant, and that the Board's Zero Tolerance Policy required Seal's expulsion regardless of whether he knew the knife was in his car. At the Board meeting during which the Board voted to expel Seal, Board Member Sam Anderson, who as far can be determined from the record is the only person having anything to do with the decision to expel Seal who even considered the question of what Seal did or did not know, suggested that it would send a "confusing message" to do anything besides expel Seal, regardless of whether Seal had any idea that the knife was in his car. Then again, he also apparently thought that Seal could have been expelled just as easily for having a prescription antibiotic in his car.

In the case before us, we must remember that it was the Board, not Seal, that moved for summary judgment. As the non-moving party, Seal was entitled to have all reasonable inferences drawn in his favor. See Fed. R.Civ. P. 56(c). The absence of any evidence about what the Board concluded regarding [**30] Seal's knowledge is exactly why the Board is **not** entitled to summary judgment. In this regard, we disagree with the dissent's characterization that "Seal admittedly knew that the knife had been placed in his car on October 31,

1996 for use as a weapon" (Dissenting Op. at 28) and that "Seal's attorney conceded during oral argument that Seal had no reason to believe the knife had been removed from his car." (Dissenting Op. at 30). What Seal's attorney said was that Seal did not specifically see anyone pick the knife up off the floor of the car and remove it. [*579] Seal himself testified that he assumed that when Pritchert left Seal's car, Pritchert took his knife with him.

[***18] Similarly, the record provides no clue as to how the Board viewed Seal's written statement to Vice-Principal Mashburn on the night in question. Was it a confession (as characterized by the dissenting opinion at page 31), or was it an after-the-fact deduction (as Seal insists) by Seal about how and when the knife must have gotten into the glove compartment. The dissent apparently concludes that the Board could rationally have decided that the statement was a confession, even though there is absolutely no [**31] indication in the record that this is what the Board actually decided.

We also find ourselves unable to take much comfort in the Board's frequent reminders in its brief and at oral argument that it afforded Seal a number of hearings, expending a significant amount of time in the process, before expelling him. Indeed, one could just as easily view this case as a challenge to the Board's procedures, the obvious defect in which is that they make no attempt to separate out students who knowingly possessed a weapon on school property from those who did not. Based on the evidence of record, it appears that nothing that Seal could have said at any of those hearings would have made one bit of difference. Because there was no dispute that the knife was in Seal's car when on school property, the Board insists that it was required under its Zero Tolerance Policy to expel Seal, whether or not he had any idea that the knife was in his car. We are prepared to take the Board at its word.

A school board can, of course, disbelieve the

student's explanation and conclude that the student knowingly violated school policies. If that occurs, due process would be satisfied as long as the procedures afforded [**32] the student were constitutionally adequate and the conclusion was rational. The Board argues that the district court "erred by substituting its own view of the facts for that of the Hearing Officer and the Board of Education." Again, this begs the question--which nothing in the record answers--of what the views of the hearing officer and the Board were. Did the Board expel him because it disbelieved Seal's explanation, did it expel him despite believing his explanation completely, [***19] or did it expel him without deciding the issue, in the belief that Seal's knowledge was simply irrelevant to the decision? Of these possibilities, the first one would have been permissible if rationally supported by the record, but the other two would not have been.

It may be correct, as the Board argues, that as a matter of "state law, case law or its own rules," the Board is not required to make formal findings of fact in expulsion cases. As a matter of federal constitutional law, however, the Board may not expel students from school arbitrarily or irrationally. To accept the Board's argument would be to allow it to effectively insulate itself even from rational basis review, as long as the [**33] decision the Board reached might have been rational. What is at issue in the present case, however, is not whether the Board could have made a decision that would have been rationally related to a legitimate state purpose, but whether it actually did so.

The fact that we must defer to the Board's rational decisions in school discipline cases does not mean that we must, or should, rationalize away its irrational decisions. And when it is not clear that the Board's decision was rational, because it is impossible to conscientiously determine from the record what the Board's actual decision was, then the Board, as well as other school boards with similar "Zero Tolerance" policies, should not be entitled to summary judgment in civil rights actions

arising from their decisions to impose long-term suspensions and expulsions.

On the basis of the record presented, a reasonable trier of fact could conclude that Seal was expelled for a reason that would have to be considered irrational. We [*580] therefore conclude that the district court correctly denied the Board's motion for summary judgment.

The district court, however, did more than deny the Board's motion for summary judgment. By [**34] ordering that the case "proceed to trial by jury . . . only to determine the amount of damages to be awarded" to Seal, the district court effectively entered summary judgment against the Board on the issue of [***20] liability. It did this even though Seal had not moved for summary judgment. $HN10[\boxed{\uparrow}]$ In appropriate circumstances, we acknowledge that a district court may enter summary judgment against the moving party in the absence of a cross-motion. See, e.g., Rogers v. Management Tech., Inc., 123 F.3d 34, 38 (1st Cir. 1997) (explaining that "the major limitation on this rule is that 'the losing party' must be 'on notice that she had to come forward with all of her evidence.'") (citation omitted); Martinson v. Massachusetts Bay Ins. Co., 947 F. Supp. 124, 127 (S.D.N.Y. 1996) (entering summary judgment in favor of the non-moving defendant and against the plaintiffs, who had moved for summary judgment); see also 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 346-53 (3d ed. 1998 & Supp. 2000).

In the present case, however, we do not believe that this disposition was appropriate. [**35] As noted above, one cannot determine conclusively from the record in its present state why Seal was expelled. We do not believe that a reasonable factfinder would be compelled to find that the Board expelled him for an irrational reason, i.e., without making any determination of whether Seal consciously possessed the knife, or despite believing Seal's explanation that he did not. The Board might conceivably be able to show that it expelled Seal

for a reason that would have to be accepted as rational. Accordingly, we will affirm the judgment of the district court to the extent that it denied the Board's motion for summary judgment, reverse the judgment of the district court to the extent that it entered summary judgment against the Board on the issue of liability, and remand the case for further proceedings.

On remand, the district court could, as an exercise of its discretion, permit discovery and allow the Board to renew its motion for summary judgment, supplemented by appropriate affidavits or other evidence. See, e.g., **Whitford v. Boglino**, 63 F.3d 527, 530 (7th Cir.1995) (noting that *HN11*[⬆] a district court has the discretion to entertain a successive or renewed [**36] summary [***21] judgment motion, and that doing so is particularly appropriate when the factual record upon which summary judgment is sought has been expanded). The district court's other option would be to conduct a trial on the issues of liability and damages. At trial, the determination of whether the Board's action was rationally related to a legitimate state interest is one of law and would be made by the court. The questions of what the Board did, and why, would be questions of fact for the jury. See **Sameric Corp. v. City of Philadelphia**, 142 F.3d 582, 591 (3d Cir. 1998) (noting that *HN12*[⬆] the question of whether a governmental action is rationally related to a legitimate state interest is properly decided by the court, although questions regarding the state officials' motivation, if the subject of a genuine dispute of fact, are for the jury).

## B. Superintendent Morgan

*HN13*[⬆] The doctrine of qualified immunity generally shields government officials from civil liability for performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." **Bloch v. Ribar**, 156 F.3d 673, 678 (6th Cir.

1998) [**37] (quoting **Harlow v. Fitzgerald**, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)); see also **Malley v. Briggs**, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986) [*581] ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). In determining whether an official is entitled to qualified immunity, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." **Daughenbaugh v. Tiffin**, 150 F.3d 594, 602-03 (6th Cir. 1998) (citation and internal quotation marks omitted).

*HN14*[⬆] As an abstract matter, the right of public school students not to be expelled arbitrarily or irrationally has been clearly established since at least the Supreme Court's decision in **Goss v. Lopez**, 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975), which held that long-term suspensions and expulsions must comport with minimal standards of due process. More concretely, however, we do [***22] not believe that the contours of that right were sufficiently clear [**38] to put a reasonable school superintendent on notice in 1996 that a school disciplinary policy's lack of a conscious-possession requirement could produce irrational expulsions and thus violate the legal rights of students expelled under the policy. For this reason, we will reverse the judgment of the district court to the extent that it denied Superintendent Morgan's motion for summary judgment, and remand with instructions to enter summary judgment in his favor.

For the future, however, we expect that our opinion today will clarify the contours of a student's right not to be expelled for truly unknowing or unconscious possession of a forbidden object. See **Daughenbaugh**, 150 F.3d at 603 (noting that an on-point appellate court decision can put future defendants on notice that certain specific types of conduct will violate clearly established legal rights). Because we have concluded that Superintendent Morgan was entitled to summary

judgment on the basis of qualified immunity, we need not and do not address the question--which Superintendent Morgan's counsel conceded at oral argument was "not clear"--of whether he had the authority to disturb the decision to expel [**39] Seal once it was finally made by the Board.

## IV. CONCLUSION

We would not for a minute minimize the Board's obligation to maintain the safety of its campuses, and its right to mete out appropriate discipline (including expulsion) to students who commit serious violations of its rules. But we cannot accept the Board's argument that because safety is important, and because it is often difficult to determine a student's state of mind, that it need not make any attempt to ascertain whether a student accused of carrying a weapon knew that he was in possession of the weapon before expelling him.

The decision to expel a student from school is a weighty one, carrying with it serious consequences for the student. See Goss, 419 U.S. at 576 ("Education is perhaps the most important function of state and local governments, and the total exclusion from the educational process for more than a [***23] trivial period . . . is a serious event in the life of the suspended child.") (internal quotation marks and citation omitted). We understand full well that the decision not to expel a potentially dangerous student also carries very serious potential consequences for other [**40] students and teachers. Nevertheless, the Board may not absolve itself of its obligation, legal and moral, to determine whether students intentionally committed the acts for which their expulsions are sought by hiding behind a Zero Tolerance Policy that purports to make the students' knowledge a non-issue. We are also not impressed by the Board's argument that if it did not apply its Zero Tolerance Policy ruthlessly, and without regard for whether students accused of possessing a forbidden object knowingly possessed the object, this would send an inconsistent message to its students.

Consistency is not a substitute for rationality.

[*582] For the reasons set forth above, we **AFFIRM** the judgment of the district court to the extent that it denied the Board's motion for summary judgment, **REVERSE** the judgment of the district court to the extent that it entered summary judgment in Seal's favor on the issue of liability, and **REMAND** this case for further proceedings consistent with this opinion. With regard to Superintendent Morgan's appeal, we **REVERSE** the judgment of the district court and remand with instructions to enter summary judgment in his favor. [***24]

**Dissent by:** SUHRHEINRICH [**41] (In Part)

## Dissent

## DISSENTING IN PART

SUHRHEINRICH, Circuit Judge, dissenting in part. As the majority acknowledges, the right to attend a public school is not a fundamental right for purposes of a due process analysis. A school's disciplinary decision will therefore survive a constitutional substantive due process challenge if it is rationally related to a legitimate government purpose. See **Washington v. Glucksberg**, 521 U.S. 702, 728, 138 L. Ed. 2d 772, 117 S. Ct. 2258 (1997). Furthermore, as the majority notes, the Supreme Court has specifically cautioned that "judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint," and that "by and large, public education in our nation is committed to the control of state and local authorities." **Goss v. Lopez**, 419 U.S. 565, 578, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975) (quotation omitted). Thus,

it is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. Public high school students do have substantive and procedural

rights while [**42] at school. But § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

Wood v. Strickland, 420 U.S. 308, 326, 43 L. Ed. 2d 214, 95 S. Ct. 992 (1975) (emphasis added). The majority ignores these principles in holding that the Board acted irrationally in expelling Seal.

[***25] I.

First of all, the Board's decision was rational because the zero tolerance policy does not contain an express scienter requirement. By holding that "suspending or expelling a student for possessing a weapon, even if that student did not knowingly possess the weapon, would not be rationally related to any state interest," the majority has improperly substituted its interpretation [**43] of the regulation for the School Board's. As Wood indicates, however, the Board's construction of its regulations is entitled to deference. See id.

Nor is it irrational to interpret the zero tolerance policy as the Board did. In addition to their duty to educate, schools act in loco parentis. Given this enormous responsibility, and the potentially devastating consequences of weapons on campus, a strict weapons policy is rationally related to a legitimate government interest - protecting our children from the very real threat of violence. The Columbine High School massacre and other school shootings have, unfortunately, become part of the national consciousness. The Knox County schools themselves are not immune from the threat of violence. Their disciplinary records show twenty injuries as a result of knives and sharp weapons in the three years preceding Seal's expulsion. Given this national and local landscape of violence, it is perfectly rational to establish [*583] a strict zero tolerance policy to ensure students' safety.

The Supreme Court has recognized the growing concern over school violence and the "substantial interest" of schools in maintaining discipline on campus. [**44] See New Jersey v. T.L.O., 469 U.S. 325, 339, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985) ("Maintaining order in the classroom has never been easy, but in recent years, school disorder often has taken a particularly ugly form: drug use and violent crime in the schools have become major social problems."); see also Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ., 158 F.3d 361, 378-79 n.23 (6th Cir. 1998) ("Indeed, we do not have to search beyond recent local and national media headlines to understand that schools are, unfortunately, too often turned into places in which children are subjected to [***26] grave and even life-threatening dangers. . . ."). The court system should not further hamstring the process of education by substituting its judgment on matters relating to the safety of students for that of school administrators and school board members. [1]

[**45] Indeed, the Board implemented the zero tolerance policy in recognition of its statutory duty to provide safe schools. The Tennessee Constitution empowers the General Assembly to "provide for the maintenance, support and eligibility standards of a system of free public schools." Tenn. Const. art. XI, § 12. The General

---

[1] The majority argues that "no student can use a weapon to injure another person, to disrupt school operations, or, for that matter, any other purpose if the student is totally unaware of its presence." (Maj. Op. at 12.) Aside from the fact that the majority is again improperly substituting its assessments for those of the Board's, I disagree with this proposition. Even if the student who brought the weapon onto school property was unaware of its presence, another student could find the weapon and use it to cause injury. For example, even if the Board believed that Seal did not know the weapon was in the car on November 1, 1996, Pritchett knew it was there and presumably would have used it to injure another student had he felt threatened.

Assembly's authority concerning public education is in turn delegated to local boards of education which are vested with the power to dismiss students when the progress or efficiency of the schools makes such action necessary. See Tenn. Code Ann. § 49-2-203(a)(8). Tennessee also delegates broad authority to its local boards of education to formulate a code for student conduct and to prescribe remedies for the violation of those rules. See Tenn. Code Ann. § 49-6-4012(a).

The General Assembly seeks "to secure a safe environment in which the education of the students of Tennessee may occur." Tenn. Code Ann. § 49-6-4203(a),(b). In 1996, the General Assembly reacted to the growing incidents of school violence by amending the School Security Act to encourage zero tolerance policies for students who possess dangerous weapons on campus. See Tenn. Code Ann. [**46] § 49-6-4216(b). [***27] The statute now requires all boards of education to develop such policies:

(a) Prior to commencement of fall classes for the 1996-1997 school year, and annually thereafter, each local and county board of education shall file with the commissioner of education written policies and procedures developed and adopted by the board:

(1) To ensure safe and secure learning environments free of drugs, drug paraphernalia, violence and dangerous weapons; and

(2) To impose swift, certain and severe disciplinary sanctions on any student

(A) Who brings a drug, drug paraphernalia or a dangerous weapon onto a school bus, onto school property or to any school event or activity; or

(B) Who, while on the school bus, school property or while attending any school event or activity:

(i) Is under the influence of a drug; or [*584]

(ii) Possesses a drug, drug paraphernalia or dangerous weapon; or

(iii) Assaults or threatens to assault a teacher, student or other person.

(b) Each local and county board of education is encouraged to include within such policies and procedures a zero tolerance policy toward any student who engages in [**47] such misconduct . . . .

Tenn. Code Ann. § 49-6-4216 (1999) (emphasis added).

Let us remember that we are talking about dangerous weapons here, which the zero tolerance policy defined to include, inter alia, "any firearm, explosive, explosive weapon, Bowie knife, hawk bill knife, ice pick dagger, slingshot, switchblade knife, black jack knuckles . . . . " All the defined weapons, including the weapon possessed by Seal, have the potential to kill or seriously injure a fellow student. In fact, Seal admitted that the knife was placed in his [***28] automobile for use in a fight. As the General Assembly itself has recognized, children are entitled to a safe learning environment. Given the alarming increase in school violence nationwide, the Board's zero tolerance policy, enacted as part of a comprehensive network of state and local control over the schools, is not only rational but prudent.

The majority attempts to bolster its position with the hypothetical of the high-school valedictorian who, unknowingly, has a knife planted in his backpack by a vindictive student. The Board indicated at oral argument that an exception could be made to the zero tolerance policy [**48] in that situation. The majority seizes upon this statement as being "totally inconsistent with the Board's position in this case, which is that the Zero Tolerance Policy uniformly requires expulsion whenever its terms are violated." (Majority Op. at 14).

The majority's hypothetical assumes that the zero tolerance policy affords no discretion to the school administrators. Ironically, the majority would read a scienter requirement into the policy and read discretion out of the policy. Certainly, if at any stage of the proceedings, Seal or the mythical valedictorian provided a reasonable, believable,

explanation for the weapon's presence that would end the matter. Furthermore, the analogy is inapt. [2] Here, unlike the unwitting valedictorian, Seal admittedly knew that the knife had been placed in his car on October 31, 1996 for use as a weapon. [3] [***29] The Board, as part of its discretionary authority, was therefore free to infer from the facts of the case sub judice that Seal also knew that the knife was in his car the next night, because Seal knew that Pritchert began carrying a hunting knife as a result of a dispute with another PHS student and Seal drove Pritchert to [**49] PHS. In light of the evidence and the Board's legitimate interest in preventing school violence, it was not irrational for the Board to expel Seal for possessing a knife in his car because it is undisputed that the knife was there on November 1, 1996.

[**50] The majority's ruling, in effect, means that there can be no such thing as zero tolerance. School boards in this circuit will, from today forward, have to include scienter a requirement in any such policy, even if the state does not impose such a condition on the enforcement of a weapons or drug policy.

[*585] II.

Even if we assume that scienter is required, the majority's criticism of the Board's ruling is faulty because scienter can be imputed from the fact of possession. Because Seal undisputedly possessed

the knife, the Board could reasonably presume that Seal knew it was in his car. At this point, the burden of persuasion shifted to Seal to explain why he did not know the knife was there. Seal, and the hypothetical valedictorian were, after all, in the best position to explain the situation. The administrative due process hearings gave him the opportunity to rebut the presumption of scienter. Seal failed to meet that burden here. Seal offered no facts to show that he knew the knife had been removed from his car after it was placed there on October 31, 1996. Thus, the Board's decision was rational because there was proof of scienter and a lack of evidence to rebut that presumption. [**51] Furthermore, this burden of persuasion makes the policy itself rationally related to the goal of preventing school violence because it [***30] affords the student an opportunity to rebut the presumption of scienter, thereby guaranteeing that the zero tolerance policy is reasonably applied. For this reason, there was no substantive due process violation.

III.

The Board's decision is also rational because there is ample proof of scienter here. There is no question that the knife was in Seal's car when it was parked on the PHS parking lot on November 1, 1996. Seal admitted to the Board, and his attorney conceded at oral argument, that he knew the knife was in the car a few days prior to its discovery. He acquiesced to its presence in the car at that time. Seal also knew on October 31, 1996, that Pritchert intended to use the knife if threatened by his ex-girlfriend's boyfriend. Seal's attorney conceded during oral argument that Seal had no reason to believe the knife had been removed from the car. [4] [***31]

---

[2] A more apt comparison would be: "Friend hands knife to valedictorian to carry for protection. Valedictorian puts knife in his pocket. Unbeknownst to valedictorian, friend later moves knife to valedictorian's backpack, which valedictorian carries to school."

Like Seal, this valedictorian knew at some point that he had the knife on his person. The majority's comparison of Seal to the completely clueless valedictorian is a false analogy.

[3] The majority disagrees with this characterization. Yet, the majority does not, and cannot, dispute that Seal knew the knife was in the car on October 31, 1996 or that Seal explicitly stated that the knife was there because he and Pritchert felt "uneasy." What other possible conclusion can be drawn but that they brought the knife to protect themselves should a fight with Pritcher's ex-girlfriend's boyfriend materialize?

[4] The majority also disagrees with this characterization. This characterization was drawn from the following statements and colloquy at oral argument:

[Seal's Attorney]: The record has shown that Mr. Seal did know on October 30th [sic] that there was a knife in his mother's car. The knife belonged to Ray Pritchert, was placed in the car by Mr. Pritchert because of what had been going on with some other individuals at the school over this girl

Seal also admitted in his confession that he knew the knife had been in the car for protection because he and Pritchert felt "uneasy." It was certainly plausible that [**52] the knife would be needed for protection at PHS on November 1, 1996, as well since the conflict that made them feel uneasy involved a fellow PHS student.

[**53] Most significantly, in his signed confession [5] taken on November 1, 1996, Seal did **not** state that he was unaware of the knife's presence. Rather, he stated that "the knife was there because [deleted] ex girlfriend's boyfriend had been following us around with a few of his friends so we [*586] were a little uneasy." From this statement, with its significant omission, made on the night in question and not after the fact, the Board could easily have concluded that Seal knew the knife was in the car on November 1, 1996. Given record evidence to

---

[indecipherable].

. . . .

[Judge Suhrheinrich]: So he knew the knife was in his car. What difference did it matter that he didn't know the exact location of the knife?

Seal's Attorney]: Well your Honor, I don't think he is saying that he knew the knife was in his car. It was not his knife.

[Judge Suhrheinrich]: No, I appreciate -- but I think there is certainly enough in there that he knew that knife was there and he never saw anybody take it out.

[Seal's Attorney]: He didn't see anybody take it out, but I think that what he would say was that he assumed it was taken out because it was not his knife.

. . . .

[Judge Suhrheinrich]: But what bothers me in that he knew it was in the car and he never saw it being taken out.

[Seal's Attorney]: Yes your Honor.

(Emphasis added).

[5] The majority rejects this characterization as well, preferring to refer to the November 1 statement as an "after-the-fact deduction," "After-the-fact" to what? The statement was given as an explanation for the knife's presence on school property on November 1, 1996. It was certainly not an "after-the-fact" deduction of the November 1 event, since Seal provided the statement that very evening at vice-principal Mashburn's behest. It is by no means a stretch to characterize the statement as a confession, because Seal acknowledged the weapon's presence.

support the Board's ruling, it is improper for this court to second-guess the Board's decision. The only statement to the contrary is Seal's statement made after he obtained an attorney. Seal offered no evidence to support that statement, however. This is an insufficient basis to overturn the Board's decision.

[**54]

### [***32] IV.

The real problem here is that the majority does not approve of the manner in which the Board made its decision. Presumably the majority would be satisfied if the Board had explicitly stated that it did not believe Seal's after-the-fact denial, because: (1) Seal knew as of October 30, 1996, that his friend Pritchert was carrying a knife for protection because of a dispute with another PHS student; (2) Seal acquiesced to the presence of the knife in his car on October 31, 1996; (3) Seal drove Pritchert in his car to PHS on November 1, 1996; (4) Seal admitted in his signed confession taken that night that the knife was in the car because Seal and Pritchert felt "uneasy"; (5) it is entirely plausible that Seal and Pritchert would continue to feel uneasy on November 1, 1996, while attending a PHS function; (6) Seal did not state until after the fact that he did not know the knife was in the car on November 1, 1996; (7) there are no facts to support Seal's statement of lack of knowledge; and (8) because there are no facts to back his conclusion, the Board does not believe his statement. Had the Board's ruling followed this blueprint, we would not be remanding the [**55] matter to the district court for further proceedings. However, since the majority plans to remand for further proceedings, I think the only proper recourse in this case is to refer the matter back to the Board for more express fact findings on the issue of scienter or to simply allow the Board to present an affidavit concerning its findings. If the Board states that it disbelieved Seal, then there can be no trial, and judgment must be entered for the Board.

This case has far-reaching implications for school boards. School boards in this circuit should be on notice that, in attempting to implement weapons or drug policies, they must find scienter, and articulate those findings in a way that resembles the rulings of a federal district judge.

In any event, I am not prepared to hold school boards to the same standards as federal district courts. The majority has ignored the Supreme Court's admonitions in **Goss** and **Wood** [***33] that federal courts play a very limited role in public education, which is most properly left in the competent hands of state and local authorities.

For all of the foregoing reasons, I respectfully **DISSENT** as to III.A.

End of Document

FILED
CLERK & MASTER ROBERTSON CO. TN

MAY 0 4 2022

AT 3:29 O'CLOCK P M
ROSEMARY L SPRAGUE
BY

# Robertson County Board of Education

### April 25, 2022 School Board Minutes

The Robertson County Board of Education met on Monday, April 25, 2022 at 6:00 p.m. Those present were Mrs. Connie Hogan, Mr. Allan Heard, Mr. Scott Rice, Mr. Stephen Ayres, Mr. Mark Reid and Mr. Jeff White. Ms. Hogan opened the meeting in regard to the DHA appeal. Mr. Sam Jackson, Robertson County School Board Attorney, addressed the Board regarding an in person Discipline Hearing appeal of a Robertson County student. Board Members were provided documentation prior to the meeting.

A motion was made by Mr. Ayres to uphold the DHA decision with the addition pending good behavior the student return to Greenbrier High School on the first day of the 2022-2023 school year. Mr. Heard seconded the motion. Members discussed their thoughts, and the student and parents also shared their concerns. The motion passed 5 – 0 with Mr. White abstaining from voting

Respectfully Submitted,

Connie Hogan, Board Chair

Chris J. Causey, Director of Schools

EXHIBIT
G

# Robertson County Schools

## Student Handbook
## 2022-2023

**Robertson County Board of Education**
800 M.S. Couts Blvd
Springfield, Tennessee 37172
(615) 384-5588
http://www.rcstn.net/







EXHIBIT
H

## FOREWORD

This Student Handbook is intended to inform students and parents of some of the Robertson County School System's Policies that pertain directly to students. This is not an inclusive list of all policies. The Board of Education's policies are available in each school library within the System and on the System's Internet Website (http://www.rcstn.net/). School policies and procedures are set forth in the Robertson County Handbook; however, individual schools may include additional policies and procedures that pertain only to those schools
(Refer to your student's school handbook).

## MISSION STATEMENT

To ensure each student is prepared to succeed in life.

## VISION STATEMENT

Robertson County Schools will enable all students to reach and exceed high academic and career standards while empowering them to succeed in a technologically advanced and culturally diverse society.

## STATEMENT OF NON-DISCRIMINATION

The Robertson County School System does not discriminate on the basis of race, color, national origin, sex, disability, age, religion or marital status, in training, activities or employment practices in accordance with Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Acts of 1997 and 2004.

## CAREER AND TECHNICAL EDUCATION NON-DISCRIMINATION

The Career and Technical Education Department of Robertson County Schools offers classes to all students regardless of race, color, national origin, gender, age, disability, religion, or marital status. Students with limited or lack of skill in speaking and writing English are eligible for admission in all CTE programs. For information concerning CTE activities in accordance with Title VI of the Civil Rights Act of 1964 (34 CFR, Part 100, Appendix B, IV(O)), Title IX of the Educational Amendments of

1972, 34 CFR 106.8(b), Title II of the Americans with Disabilities Act of 1990, 28 CFR, 35.107(a), Age Discrimination Act of 1975, Section 110.25(b), Section 504 of the Rehabilitation Act of 1973, Subpart D (104.32)(a) and (b), Federal Register Vol. 44, No. 56, 3/21/79- Guideline IV(O) contact Title IX coordinator, Beth Batson, at 384-5588 or by mail at 800 M.S. Couts Blvd, Springfield, TN 37172.

### Please See Board Policy 6.3401 Below

Any person wishing to file a complaint concerning issues of discrimination should first contact their school administration for procedures and forms. Additional information may be obtained by visiting our district's website at http://www.rcstn.net/ or by contacting Beth Batson @ beth.batson@rcstn.net or (615) 384-5588.

In order to maintain a safe, civil, and supportive learning environment, all forms of sexual harassment and discrimination on the basis of sex are prohibited. This policy shall cover employees, employees' behaviors, students, and students' behaviors while on school property, at any school-sponsored activity, on school-provided equipment or transportation, or at any official school bus stop in accordance with federal law. This policy shall be disseminated annually to all school staff, students, and parent(s)/guardian(s). The Title IX Coordinator as well as any personnel chosen to facilitate the grievance process shall not have a conflict of interest against any party of the complaint.[5] These individuals shall receive training as to how to promptly and equitably resolve student and employee complaints.

All employees shall receive training on complying with this policy and federal law.

### TITLE IX COORDINATOR

The Title IX Coordinator shall respond promptly to all general reports as well as formal complaints of sexual harassment. He/she shall be kept informed by school-level personnel of all investigations and shall provide input on an ongoing basis as appropriate.

Any individual may contact the Title IX Coordinator at any time using the information below:

**Title: Human Resources Supervisor**
**Mailing address**: 800 M. S. Couts Blvd, Springfield, TN 37172
**Phone number**: 615-384-5588
**Email**: beth.batson@rcstn.net

### DEFINITIONS

"Complainant" is an individual who is alleged to be the victim of conduct that could constitute sexual harassment.

"Respondent" is an individual who is reported to be the perpetrator of conduct that could constitute sexual harassment.

"Sexual harassment" is conduct on the basis of sex that satisfies one or more of the following:

1. A school district employee conditioning an aid, benefit, or service of an education program or activity on an individual's participation in unwelcome sexual conduct;
2. Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the education program or activity; or
3. Sexual assault, dating violence, domestic violence, or stalking as defined in state and federal law.

Behaviors that constitute sexual harassment may include, but are not limited to:

1. Sexually suggestive remarks;
2. Verbal harassment or abuse;
3. Sexually suggestive pictures;
4. Sexually suggestive gesturing;
5. Harassing or sexually suggestive or offensive messages that are written or electronic;
6. Subtle or direct propositions for sexual favors; and
7. Touching of a sexual nature.

Sexual harassment may be directed against a particular person or persons, or a group, whether of the opposite sex or the same sex.

"Supportive measures" are non-disciplinary, non-punitive, individualized services and shall be offered to the complainant and the respondent, as appropriate. These measures may include, but are not limited to, the following:

1. Counseling;
2. Course modifications;
3. Schedule changes; and
4. Increased monitoring or supervision.

The measures offered to the complainant and the respondent shall remain confidential to the extent that maintaining such confidentiality would not impair the ability of the school district to provide the supportive measures.

### GRIEVANCE PROCESS

Upon learning of an instance of alleged sexual harassment, even if no formal complaint is filed, the Title IX Coordinator shall:

1. Promptly contact the complainant to discuss the availability of supportive measures;
2. Consider the complainant's wishes with respect to supportive measures;
3. Inform the complainant of the availability of supportive measures; and
4. Explain the process for filing a formal complaint.

While the school district will respect the confidentiality of the complainant and the respondent as much as possible, some information may need to be disclosed to appropriate individuals. All disclosures shall be consistent with the school district's legal obligations and the necessity to investigate allegations of harassment and take disciplinary action.

Disciplinary consequences or sanctions shall not be initiated against the respondent until the grievance process has been completed. Unless there is an immediate threat to the physical health or safety of any student arising from the allegation of sexual harassment that justifies removal, the respondent's placement shall not be changed. If the respondent is an employee, he/she may be placed on administrative leave during the pendency of the grievance process. The Title IX Coordinator shall keep the Director of Schools informed of any employee respondents so that he/she can make any necessary reports to the State Board of Education in compliance with state law.

### Complaints

Any individual who has knowledge of behaviors that may constitute a violation of this policy shall immediately report such information to the Title IX Coordinator, however, nothing in this policy requires a complainant to either report or file a formal complaint within a certain timeframe. If the complaint involves the Title IX Coordinator, the complaint shall be filed with the Director of Schools.

If a complaint involves allegations of child abuse, including child abuse on school grounds, appropriate notification shall be made per the board policy on reporting child abuse.

Upon receipt of a formal complaint, the Title IX Coordinator shall promptly:

1. Provide written notice of the allegations, and the grievance process to all known parties to give the respondent time to prepare a response before an initial interview;
2. Inform the parties of the prohibition against making false statement or knowingly submitting false information;
3. Inform the parties that they may have an advisor present during any subsequent meetings; and
4. Offer supportive measures in an equitable manner to both parties.

If the Title IX Coordinator dismisses a complaint, written notice, including the reasons for dismissal, shall be provided to both parties simultaneously.

### Investigations

The Human Resources Supervisor and the Student Services Director shall serve as the investigators and be responsible for investigating complaints in an equitable manner that involves an objective evaluation of all relevant evidence. The burden for obtaining evidence sufficient to reach a determination regarding responsibility rests on the school district and not the complainant or respondent.

Once a complaint is received, the Investigator shall initiate an investigation within forty-eight (48) hours of receipt of the complaint. If an investigation is not initiated within forty-eight (48) hours, the investigator shall provide the Title IX Coordinator with appropriate documentation detailing the reasons why the investigation was not initiated within the required timeframe.

All investigations shall be completed within twenty (20) calendar days from the receipt of the initial complaint. If the investigation is not complete within twenty (20) calendar days, the investigator shall provide the Title IX Coordinator with appropriate documentation detailing the reasons why the investigation has not been completed. All investigations shall:

1. Provide an equal opportunity for the parties to present witnesses and evidence;
2. Not restrict the ability of either party to discuss the allegations under investigation or gather and present relevant evidence;
3. Refrain from requiring, allowing, relying upon, or otherwise using questions or evidence that seek disclosure of information protected under a legally recognized privilege unless such privilege has been waived;
4. Provide the parties with the same opportunities to have others present during any grievance proceeding;
5. Provide to parties whose participation is requested written notice of the date, time, location, participants, and purpose of all investigative interviews, or other meetings, with sufficient time for the party to prepare to participate;
6. Provide both parties an equal opportunity to inspect and review any evidence directly related to the allegations in the formal complaint; and
7. Result in the creation of an investigative report that fairly summarizes relevant evidence.
   a. Prior to the completion of the investigative report, the investigator shall send to each party the evidence subject to inspection and review. All parties shall have at least ten (10) days to submit a written response which shall be taken into consideration in creating the final report.

Within the parameters of the federal Family Educational Rights and Privacy Act, the Title IX Coordinator shall keep the complainant and the respondent informed of the status of the investigation process. At the close of the investigation, a written final report on the investigation will be delivered to the parent(s)/guardian(s) of the complainant, parent(s)/guardian(s) of the respondent, and to the Director of Schools.

**Determination of Responsibility**

The respondent is presumed not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process. The preponderance of the evidence standard shall be used in making this determination.

The Assistant Director of Schools shall chair a committee of 2 (two) supervisors who act as the decision-makers. He/she shall receive the final report of the investigation and allow each party the opportunity to submit written questions that he/she wants asked of any party or witness prior to the determining responsibility.

The decision-makers shall make a determination regarding responsibility and provide the written determination to the parties simultaneously along with information about how to file an appeal.

A substantiated charge against a student may result in corrective or disciplinary action up to and including expulsion. A substantiated charge against an employee shall result in disciplinary action up to and including termination.

After a determination of responsibility is made, the Title IX Coordinator shall work with the complainant to determine if further supportive measures are necessary. The Title IX Coordinator shall also determine whether any other actions are necessary to prevent reoccurrence of the harassment.

**APPEALS**

Either party may appeal from a determination of responsibility based on a procedural irregularity that affected the outcome, new evidence that was not reasonably available at the time of the determination that could affect the outcome, or an alleged conflict of interest on the part of the Title IX Coordinator or any personnel chosen to facilitate the grievance process. Appeals shall be submitted to the Title IX Coordinator within ten (10) days of a determination of responsibility.

Upon receipt of an appeal, the Title IX Coordinator shall:
1. Provide all information to the Director of Schools, who serves as the appeals hearing officer, within five (5) days of receipt of the appeal; and
2. Notify the parties in writing.

During the appeal process, the parties shall have a reasonable, equal opportunity to submit written statements. Within ten (10) calendar days, the hearing officer shall issue a written decision describing the result of the appeal and the rationale for the result. The written decision shall be provided simultaneously to both parties.

**RETALIATION**

Retaliation against any person who makes a report or complaint or assists, participates, or refuses to participate in any investigation of an act alleged in this policy is prohibited.

## SCHOOL NUTRITION STATEMENT OF NON-DISCRIMINATION

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and

employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, sex, disability, age, or reprisal or retaliation for prior civil rights activity in any program or activity conducted or funded by USDA.

Persons with disabilities who require alternative means of communication for program information (e.g. Braille, large print, audiotape, American Sign Language, etc.), should contact the Agency (State or local) where they applied for benefits. Individuals who are deaf, hard of hearing or have speech disabilities may contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, (AD-3027) found online at: http://www.ascr.usda.gov/complaint_filing_cust.html, and at any USDA office, or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992.

Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20540-9410; (2) fax: (202) 690-7442; or (3) email: : program.intake@usda.gov. This institution is an equal opportunity provider.

## SECTION 504 PROCEDURES

In compliance with state and federal law, Robertson County Schools will identify, evaluate, and provide access to appropriate educational services to any student eligible under Section 504. Eligible students must be of school age with a physical or mental disability which substantially limits or prohibits participation in or access to an aspect of the school program. For further information on the evaluation procedures and provision of services, please contact your school's 504 coordinator.

## CHANGES TO THIS NOTICE

We reserve the right to revise or change this document and the policies herein. The current policies and procedures are posted on the system's website and include the effective date.

Robertson County Schools is following the guidelines set forth by the State Department of Education and The CDC.

# CONTENTS

Foreword, Mission Statement, Vision Statement,

Statements of Non-Discrimination, Titles VI, IX, Section 504 Procedures

System Leadership............................................................................1

System Administration .......................................................................1

School Listing and Principals ..............................................................4

School Calendar ...............................................................................7

Code of Behavior .............................................................................8

Procedural Due Process and Searches ....................................................9

Student Complaints and Grievances .....................................................11

RC Bullying, Hazing, & Harassment Procedures .....................................11

Student Conduct..............................................................................14

Bus Conduct/Rules...........................................................................16

Weapons and Dangerous Instruments....................................................19

Dress Code....................................................................................21

Admissions....................................................................................21

Absences from School / Attendance......................................................23

Release During School Hours..............................................................24

Acceptable Use Agreement.................................................................25

Driver's License..............................................................................26

Medications...................................................................................27

Honor Rolls and Ranking...................................................................28

Grading System...............................................................................31

Visitors........................................................................................31

Care of School Property.....................................................................32

School Nutrition Program...................................................................32

Directory Information........................................................................33

Student Assignment..........................................................................34

Discipline Procedures/Discipline Levels.................................................35

Zero Tolerance Behavior....................................................................40

R.O.L.E........................................................................................40

Programs and Services.......................................................................41

School System General Information........................................................42

Parent/School Liaison........................................................................42

School Nursing/ Coordinated School Health..............................................43

Gifted Education..............................................................................46

Every Student Succeeds Act................................................................46

Parent Resources.............................................................................49

## SYSTEM LEADERSHIP

Director of Schools ...................................................................Chris Causey
Beverly Corbin, Executive Administrative Assistant
Brandy Bonner, Receptionist
Ariane Overby, Administrative Assistant

Assistant Director of Schools.........................................................MelanieDickerson
Donna Trice, Administrative Assistant

## BOARD OF EDUCATION

District 1 ..........................................................................................TBD

District 2 ...............................................................................Mark Reid

District 3 ...................................................................................Jeff White

District 4 ...................................................................................Scott Rice

District 5 ............................................................................... Stephen Ayers

District 6 ............................................................... Connie Hogan, Chairman

**SYSTEM ADMINISTRATION** (Unless otherwise noted, all phone numbers are 615-384-5588)

Athletic Director.......................................................................Pat Brown

Budget and Finance .........................................Sheila Clinard, Finance Coordinator
Melissa Arms, Benefits Coordinator
Mary Sanders Purchasing/Bookkeeping Coordinator
Della Jones, Purchasing

Buildings and Grounds ............................................Clint Corbin, Supervisor
Melinda Thompson, Administrative Assistant
615-384-0213

Career and Technical Education ...................................Mark Gregory, Supervisor

Will Elliott, Coordinator

Coordinated School Health Services.............................Dawn Callas, Coordinator

Elementary and Middle Grades Education ................Michele'Galluzzi, Supervisor
Angel Williams, PreK-5 Coordinator
Vicki Young, Administrative Assistant

Family Resource Center/ Diversity Coordinator ........................Danielle Frazier

Federal Programs ...........................................Emily Hollingsworth, Supervisor
Kelly Whyte, Federal Programs Coordinator
Deborah Nance, Title III Coordinator
Danielle Kaminsky, ESSER Grant Coordinator
Pam Stewart, Part-Time Administrative Assistant
Lester Woodard, Administrative Assistant

Gifted Coordinator....................................................................Paula Kiggans

Human Resources ..................................................... Beth Batson, Supervisor
Annette Weeks, Coordinator, Certified
TBD, Coordinator, Classified
TBD, Administrative Assistant

Preforming & Visual Arts Coordinator............................................J.R. Baker

Public Information Officer...............................................................Jim Bellis

Safety.............................................................................. Donna Rae Dorris

Secondary Education ................................................... Bob Pruitt, Supervisor
Nicki Fields 6-12 Coordinator

School Nursing Services .........................................Amber Hester, Coordinator
Amber Bell, Administrative Assistant

Special Education ..............................................Misti Swindle, Supervisor
Angie Adams, Special Education Coordinator
Alishia Gilmore , Special Education Coordinator
Jenea Jackson, Transition Coordinator
Kelly Monfette, Administrative Assistant

School Nutrition ......................................................Patsi Gregory, Supervisor
Robert Swieder, Field Manager
Tracy Jones, Administrative Assistant
Brooke Stiles, Administrative Assistant
Amy Castle, Administrative Assistant

Student Services/Records.......... .............................. Teresa Leavitt, Supervisor
Cathy Watkins, Administrative Assistant
Donna Fryer, Administrative Assistant- Records

System Data....................................................Lewis Walling, Supervisor
Melinda Thompson, EIS Coordinator
Christy Bundy, Administrative Assistant

Technology........................................................James Marshall, Supervisor
Sherri Traughber, Administrative Assistant
Robin Couts, Instructional Coordinator

Textbooks, Materials and Media ...................................Ginny Britt, Coordinator
Sheila Pennington, Administrative Assistant
615-384-0238

Transportation/Safety............................................ Joshua A. Hinerman, Director
Joan Whitt, HR Coordinator
Jesse Castillo Translator/Safety Coordinator
Brooks Spencer, Routing Coordinator
Julie Braswell, Operations Coordinator
Mike Whitney, Service Manager
Jason Gray, Dispatcher
615-384-4555

Webmaster.......................................................Stephen Hudak

## SCHOOL LISTINGS AND PRINCIPALS

Bransford Elementary School (Pre K)......................................615-384-4313
Jill Reeves, Principal

Cheatham Park Elementary School (Grades 3 – 5)..........................615-384-0232
Theresa Chandler, Principal
Tiffany Green, Assistant Principal

Coopertown Elementary School (Grades Pre K – 3).........................615-384-7642
Tiffany Hyde, Principal
Kristie Vertrees, Assistant Principal

Coopertown Middle School (Grades 4 - 8) ................................615-382-4166
Amy West, Principal
Kevin White, Assistant Principal

Crestview Elementary School (Grades K-5)................................615-382-2222
Lori Smith, Principal
January Finch, Assistant Principal
Larae Johnson, Assistant Principal

East Robertson Elementary School (Grades Pre K – 5) ....................615-654-3874
Cory Willoughby, Principal
Kecia Young, Assistant Principal

East Robertson High School (Grades 6 – 12) ............................615-654-2191
Mary Cook, Principal
Jeff Chatman, Assistant Principal
Holly Michie, Assistant Principal

Greenbrier Elementary School (Grades Pre K – 5)........................615-643-4529
Brooke Callis, Principal
Jennifer Hayes, Assistant Principal

Greenbrier Middle School (Grades 6 – 8) ...............................615-643-7823
Kathy Carroll, Principal
Scott Woodall, Assistant Principal

Greenbrier High School (Grades 9 –12)...............................................615-643-4526
Katie Osborne, Principal
Steve Freeland, Assistant Principal
Tracey Raines, Assistant Principal

Jo Byrns Elementary School (Grades Pre K –5) ...............................615-696-0533
Megan Keyes, Principal
Alisa Holmes, Assistant Principal

Jo Byrns High School (Grades 6 - 12) ............................................615-696-2251
Jeff Haines, Principal
Chesley Trelstad, Assistant Principal
Michael Cumberledge, Assistant Principal

Krisle Elementary School (Grades Pre K - 5)...............................615-384-2596
Amanda Miglore, Principal
Danielle Holden, Assistant Principal

Robert F. Woodall Elementary School (Grades Pre K – 2) ...............615-672-777
Dinah Maupin, Principal
Patricia Appleby, Assistant Principal

Robertson County Phoenix Academy .........................................615-382-2328
Cody Capps, Principal of Behavior Interventions
Mary Jo Holmes, Principal of Academics.....................................615-382-8920

Springfield Middle School (Grades 6 - 8) ...................................615-384-4821
Grant Bell, Principal
Warren Corbin, Assistant Principal
TBD, Assistant Principal

Springfield High School (Grades 9 –12)......................................615-384-3516
Larry Staggs, Principal
Angie Inman, Assistant Principal
Casey Khun, Assistant Principal
Chris Tucker, Assistant Principal

Watauga Elementary School (Grades K - 5) ...............................615-859-5252
Kelley Armstrong, Principal
Amanda Ralph, Assistant Principal

Westside Elementary School (Grades K-2) ...................................615-384-8495
Michelle Darnell, Principal
Michelle Barnett, Assistant Principal

White House Heritage Elementary School (Grades 3 - 6) ..................615-672-4595
Cecilia Earheart, Principal
Amy Shapton, Assistant Principal

White House Heritage High School (Grades 7 - 12) .......................615-672-0311
Kim Hass, Principal
Stephen Owens, Assistant Principal
Emily Thompson, Assistant Principal



**Robertson County Schools**
**Approved 2021-22 Calendar**

---

has a direct and immediate effect on maintaining order and discipline in the schools. You and your student agree to follow all COVID-19 guidelines set by the district. Failure to follow the guidelines could result in disciplinary action and/or removal from school.

Robertson County Schools is following the guidelines set forth by the State Department of Education and the CDC.

## Rights and Responsibilities

The Board expects all school staff, students, and parents to assume the responsibility for appropriate behaviors in school.

### Each student has the right to:

❖ Have the opportunity for a free education in the most appropriate learning environment;

❖ Be secure in person, papers and effects against unreasonable searches and seizure;

❖ Expect that school will be a safe place;

❖ Have an appropriate environment, conducive to learning;

❖ Not be discriminated against on the basis of sex, race, color, creed, religion, national origin, or disabilities; and

❖ Be fully informed on school rules and regulations.

### Each student has the responsibility to:

❖ Know and adhere to reasonable and established rules/regulations;

❖ Respect the human dignity and worth of every other individual;

❖ Refrain from libel, slanderous remarks, and obscenity in verbal and written expression;

❖ Study and maintain the best possible academic achievement;

❖ Be punctual and present in the regular school program;

❖ Dress and groom in a manner that meets reasonable standards of health, cleanliness, modesty and safety;

❖ Maintain and/or improve the school environment, preserve school and private property, and exercise care when using facilities;

❖ Refrain from behavior which would lead to harm or which disrupts the educational process;

❖ Respect the authority of school administrators, teachers and other authorized personnel in maintaining discipline in the school and at school-sponsored activities;

❖ Obey the law and school rules as to the possession or the use of alcohol, illegal drugs and other unauthorized substances or materials; and

❖ Possess on school grounds only those materials that are acceptable under the

## CODE OF BEHAVIOR

The Robertson County Board of Education is required by state law to make and adopt rules setting forth standards of conduct and behavior that must be met by all pupils. Each school, in accordance with Board policies, shall also develop a code of behavior and discipline that is appropriate for that school. The following regulations apply to any student who is on school property, on a school bus, in attendance at any school-sponsored activity. Additionally, the regulations apply to any student whose conduct

law, and to accept the consequences for articles stored or held in one's locker, bags, vehicles, or person.

## Procedural Due Process

Before school authorities administer disciplinary measures, reasonable inquiry shall be made to determine the truth of what happened. The nature of this inquiry will vary in degree with the seriousness of the offense.

For minor offenses where the classroom teacher takes corrective measures, no formal procedure is required. The teacher will make an inquiry into the incident to ensure that the offender is accurately identified, that he/she understands the nature of the offense, and that he/she knows the consequences of the offense for which he/she is accused.

In case of severe offenses where there is a possibility of suspension or legal action, the student shall be advised of the nature of his/her misconduct, questioned about it, and allowed to give an explanation. The principal shall investigate the incident prior to administering discipline.

If the principal determines that the offense is of such nature that the student's suspension should exceed ten days, he/she shall refer the case to the Disciplinary Hearing Authority.

## INTERROGATIONS AND SEARCHES

### Interrogations by School Personnel

Students may be questioned by teachers or principals about any matter pertaining to the operation of a school and/or the enforcement of its rules. Questioning must be conducted discreetly and under circumstances which will avoid unnecessary embarrassment to the student. Any student answering falsely, or evasively or refusing to answer a question may be subject to disciplinary action, including suspension.

If a student is suspected or accused of misconduct or infraction of the student code of conduct, the principal may interrogate the student without the presence of parent(s)/guardian(s).

School personnel have a duty to report any reasonable suspicion that a student is carrying, or has carried, a weapon or is violating or has violated, a provision of the Tennessee Drug Control Act to the principal/designee. If the principal/designee is unavailable and the offense was committed on school property, the suspicion shall be reported to the appropriate authorities

### Interrogations by the Police Department

If the principal has requested assistance by law enforcement to investigate a crime involving his/her school, the police may interrogate a student suspect in school during school hours, on school grounds, and/or during school activities. The principal shall first attempt to notify the parent(s)/guardian(s) of the student unless circumstances require otherwise. However, the interrogation may proceed without attendance of the parent(s)/guardian(s), and the principal or his/her designee shall be present during the interrogation. The use of policewomen or female staff members is desirable in the interrogation of female students.

### Police-initiated Interrogations

If the police deem circumstances of sufficient urgency to interrogate students at school for unrelated crimes committed outside of school hours, the police department shall first contact the principal regarding the planned interrogation and inform him/her of the probable cause to investigate. The principal shall make reasonable effort to notify the parent(s)/guardian(s) of the interrogation unless circumstances require otherwise. The interrogation may proceed without attendance of the parent(s)/guardian(s), but the principal or his/her designee shall be present during the interrogation.

### Searches by School Personnel

Any principal/designee having reasonable suspicion may search any student, place, package or container, or thing on school property. Such objects may be in the actual or constructive possession of the student while on school property or during any organized school activity, including while riding any school owned vehicle. Such searches may be conducted if the principal/designee receives information which would cause a reasonable suspicion that the search will lead to the discovery of:

1. Evidence of any violation of the law;
2. Evidence of any violation of school rules or proper standards of conduct;
3. Any object or substance which because of its presence presents an immediate danger of harm or illness to any person.

All lockers or other storage areas provided for student use on school premises remain the property of the system and are provided for the use of students, are subject to inspection, and may be accessed for maintenance, or search.

A student may be subject to a physical search, or a student's pocket, purse, or other container may be required to be emptied because of the results of a locker search, or because of information received which seems reasonable to the principal.

School officials may conduct hand-held or walk-through metal detector checks of a student's person or personal effects.

## Searches by the Police Department

The principal may request the assistance of a school resource officer or the police to:

1. Search any area of the school premises, any student or any motor vehicle on the school premises; or

2. Identify or dispose of anything found in the course of a search conducted in accordance with this policy.

## Student Complaints and Grievances

Student complaints and grievances shall first be made to the teacher, then to the principal/designee. If not resolved, the matter may then be appealed to the Director of Schools/Designee, then ultimately to the Board of Education. Forms for the reporting of such grievances are maintained in the office of each school.

## ROBERTSON COUNTY SCHOOLS BULLYING, HAZING AND HARASSMENT PROCEDURE

The Robertson County Schools Bullying, Hazing, and Harassment Procedure will be disseminated annually to all school staff, students, and parents via the Robertson County Student Handbook and/or website. This policy is in effect while students are on school property, at any school sponsored activity, on school provided equipment or transportation, or at any official school bus stop. If the act takes place off school property or outside of a school sponsored activity, this policy is in effect if the conduct is directed specifically at a student or students and has the effect of creating a hostile educational environment or otherwise creating a substantial disruption to the education environment or learning process. These acts may also take place through electronic means. Cyber-bullying is bullying undertaken through the use of electronic devices. Electronic devices include, but are not limited to telephones, cellular phones, or other wireless telecommunication devices, text messaging, emails, social networking sites, instant messaging, videos, websites, or fake profiles.

**Bullying** is conduct that meets one or more of the following criteria:
1. Is an act directed at one or more students that is intended to harm or embarrass;
2. Is repeated over time; and
3. Involves an imbalance of physical, emotional or social power.

Bullying can be conducted verbally or in writing (teasing, name calling, taunting, threatening to cause harm) socially/relationally (hurting someone's reputation or relationship), or physically (hurting someone or their possessions).

**Hazing** is an intentional or reckless act by a student or group of students that is directed against any other student(s) that endangers the mental or physical health or safety of the student(s) or that induces or coerces a student to endanger his/her mental or physical health or safety. Hazing does not include customary athletic events or similar contests or competitions and is limited to those actions taken and situation created in connection with initiation or affiliation with any organization.

## Reporting and Investigations

The policy requires the principal and /or principal's designee, at each school to be responsible for investigating and resolving complaints alleging violation of this policy. They are responsible for determining whether an alleged act constitutes a violation of this policy. They shall conduct a prompt, thorough, and complete investigation of each alleged incident. Once determined through investigation that the policy has been violated, a report on the investigation will be delivered to the parents of the complainant and accused student(s) and to the Director of Schools (within the parameters of the Federal Family Educational Rights, and Privacy Act (FERPA) at 20 U.S.C.§ 1232g). Documentation of all alleged violations of the bullying policy will be kept for historic reference.

All school employees are required to report alleged violations of this policy to the principal and/or principal's designee. All other members of the school community including students, parents, volunteers, and visitors, are encouraged to report any act that may be a violation of this policy. Reports may be made anonymously; however, such complaints may affect the school's ability to issue formal disciplinary action.

## Preventions and Intervention Response

Consequences and appropriate remedial for anyone who commits one or more acts of harassment, bullying, or other acts of violent behavior may range from the development of a behavior plan up to and including suspension or expulsion, as set forth in the Robertson County Board of Education's approved code of conduct. School administrators shall consider the nature and circumstances of the incident, the age and maturity of the student, the degree of harm, previous incidences or pattern of behavior, or any other factors as appropriate to properly respond to each situation. Consequences for a student who commits an act of harassment, bullying or other act of violent behavior shall be unique to the individual incident and will vary in method and severity according to the nature of the behavior, the developmental age of the student, and the student's history of problem behaviors and performance, and must be consistent with the Board of Education's approved code of conduct.

## Reprisal, Retaliation, and False Accusations

The Robertson County Board of Education prohibits reprisal or retaliation against any person who reports or assists in any investigation of an act alleged in this policy. It prohibits any person from falsely accusing another of having committed an act of harassment or bullying as means of reprisal or retaliation. The consequences of appropriate remedial action for a person who engages in reprisal or retaliation shall be determined by the administrator after consideration of the nature, severity, and circumstances of the act.

District Contact: Teresa Leavitt, Supervisor of Student Services
Phone: 615-384-5588          Email: teresa.leavitt@rcstn.net
Website: http://www.rcstn.net/departments/student_services

## Sexual Harassment of Students

Sexual harassment activity toward any student by an employee or another student will not be tolerated. Sexual harassment is defined as conduct, advances, gestures or words of a sexual nature which:

1. Unreasonably interferes with the student's work or educational opportunities; or
2. Creates an intimidating, hostile or offensive learning environment; or
3. Implies that submission to such conduct is an explicit or implicit term of receiving grades; or
4. Implies that submission to or rejection of such conduct will be used as a basis of determining the student's grades and/or participation in an activity.

Victims of sexual harassment shall report these conditions to the appropriate school official. Confidentiality will be maintained, and no reprisals or retaliation will occur as a result of good faith reporting of charges.

In determining whether alleged conduct constitutes sexual harassment, all of the circumstances, including the nature of the conduct and the context in which the alleged conduct occurred will be investigated. The principal/designee shall be responsible for investigating the complaint. If satisfactory resolution of the complaint is not reached, the student may appeal the matter to the Director of Schools and, ultimately, to the Board.

## Racial Harassment

Racial harassment activity toward any student by an employee or another student will not be tolerated. Racial harassment may include:

1. Oral/written statements having racially demeaning implications; or
2. Gestures or conduct rooted in racial prejudice, or factors or considerations that signal contempt toward others of any race; or
3. Evidence, suggestion or implication that racial factors may be considered as a basis for academic or personnel decisions.

Any person who alleges racial harassment by a staff member or student may complain directly to a principal or other individual designated to receive such complaints. Filing of a complaint or otherwise reporting racial harassment will not reflect upon the individual's status nor will it affect future employment, grades, or assignments.

The right to confidentiality, both complainant and of the accused, will be respected, consistent with the Board's legal obligations, and with the necessity to investigate allegations of misconduct and to take corrective action when the conduct has occurred.

## Student Conduct

The staff is authorized to take reasonable measures to establish appropriate school behavior. Any employee shall have the authority to control the conduct of any student while under the supervision of the system. This authority shall extend to all school activities, including all games and public performances of athletic teams or other groups, trips and excursions. Such measures may include the use of reasonable force to restrain or correct students and maintain order.

A student shall not use violence, force, noise, coercion, threat, intimidation, fear, passive resistance or any other conduct which causes the disruption, interference or obstruction of any school purpose while on school property, in school vehicles or at any school-sponsored activity, function or event, whether on or off campus. Neither shall he/she urge other students to engage in such conduct.

A student found guilty of misbehavior may receive punishment ranging from verbal reprimand to suspension and/or expulsion dependent upon the severity of the offense and the offender's prior record, age and appropriate accommodation to meet individual differences. The protections of IDEA and Section 504 are required and will be followed for all identified eligible students.

## Use of Tobacco

The use and possession of tobacco products, electronic cigarettes, or tobacco paraphernalia by students is prohibited in school buildings or on school grounds, in school vehicles or buses, or at any school-sponsored activity at any time, whether on

or off school grounds.

State law states that law enforcement officials may issue a juvenile court citation for students under 18 who unlawfully possess tobacco products and/or electronic cigarettes. At the time of issuance of the citation, the officer or school official shall seize the tobacco product. In addition, the following actions will be taken:

| 1st offense | ISS, warning, and a letter explaining the violation |
| 2nd offense | 1 day suspension |
| 3rd and subsequent offenses | 2 day suspension |

### Alcohol and Drug Use

Students will not possess, distribute, or be under the influence of illegal drugs or alcoholic beverages in school buildings or on schools grounds, school vehicles, or at any school-sponsored activity at any time whether on or off school campus.

Students will not market or distribute any substance that is represented to be or is substantially similar in color, shape, size or markings to a controlled substance.

Upon information that a student is suspected of violating this policy, the principal/designee shall be notified immediately. If it is determined that the policy has been violated the principal/designee shall notify the parent and appropriate law enforcement officials. The student shall be suspended to the Disciplinary Hearing Authority and be subject to a one calendar year suspension.

### Reporting Unsafe Operation of a School Bus

If you observe a Robertson County School Bus being operated in an unsafe manner, please report unsafe behavior to the Supervisor of Transportation by calling 615-382-4680.

### Bus Conduct

The school bus is an extension of the school and a privilege; therefore, students shall conduct themselves on the bus in a manner consistent with the established standards for safety and classroom behavior. Students are under the supervision and control of the bus driver while on the bus, and all reasonable directions shall be followed.

The principal/designee of the student transported shall be informed by the bus driver of any serious discipline problem and may be called upon to assist if necessary. A student may be denied the privilege of riding the bus if the principal/designee determines that the behavior is such as to cause disruption on the bus or if s/he disobeys state or local rules pertaining to transportation.

Any student who gets off the bus at any point between the pick-up point and the school must present the bus driver with a note of authorization from the parent and signed by the principal/designee of the school that the student attends. Any student wishing to ride a bus other than his/her designated bus must have written permission from the parent and approval of the principal/designee.

### Bus Rules

Safe and dependable pupil transportation requires constant team effort from all those involved in the process. It is of great concern that each child is safe every day.

| 1. ON TIME | In order that drivers may meet their schedules, students must be at the proper location for boarding the bus on time. Running to the bus presents added danger. Students should be at their stop prior to their scheduled bus pickup time. |
| 2. WAITING | All students must stay well clear of traffic lanes while waiting for the bus. Running, fighting, or shoving will not be allowed. |
| 3. COURTEOUS | Each student who rides a school bus is expected to demonstrate a courteous and cooperative manner to all personnel. |
| 4. GOOD ORDER | Students must maintain reasonable order so that the driver may be alert for any traffic hazards, signals, or emergency vehicles. |
| 5. REMAIN SEATED | All students are to be seated and remain seated for the total trip. The drivers are encouraged to assign seats to students to maintain order and safety. |

6. **PROPER DESTINATION** Students must ride to their proper destination. To get off elsewhere, the student will give the driver a dated note signed by the parent and the principal/designee.

7. **NO EATING** Eating is not allowed on the bus. Drinks (soft drinks, coffee, orange juice, milk, etc.) are not allowed to be opened or consumed on the bus. The system may occasionally provide water for students during hot months.

8. **KEEP INSIDE** No student is to put his/her head, hands, or arms outside the bus window.

9. **DEPARTING BUS** If students must cross the road after getting off the bus, they shall walk across approximately twelve (12) feet in front of the bus, making sure traffic has stopped in both directions, and then cross upon a signal from the driver. Students should never walk behind the bus.

10. **STAY CLEAR** Students must never play about the bus when getting on and off. Horseplay getting on and off the bus can be extremely dangerous. Students shall remain out of the Danger Zone at all times for safety.

11. **ELIGIBILITY** A student shall become ineligible for pupil transportation when his/her behavior is such as to cause dissension on a school bus or when he/she disobeys state or local rules and regulations pertaining to student transportation. School Transportation services are a privilege and may be revoked if safety violations occur.

12. **RESPONSIBILITY** It is the personal responsibility of the student and his/her parent(s)/guardian(s) to maintain eligibility to ride the bus.

13. **PAY FOR DAMAGE** Students who are known to inflict damages to the bus will pay the cost of repairs. This may be part of the principal's disciplinary action. Failure to pay for the cost of repairs may affect bus riding privileges.

14. **PRINCIPAL IN CHARGE** The principal of the school which the student attends is in charge of students' behavior on the bus just as in the classroom. Drivers will report to the principal students who need correction. The Transportation Supervisor may make recommendations to principals regarding disciplinary action.

15. **DISCIPLINE** The principal of the school will administer discipline for inappropriate behavior as required. This discipline may include suspension from school. When suspended from the bus, a student is suspended from all buses.

16. **RAILROAD CROSSING** Students must reduce the noise level and assist the driver in listening and looking in order for a safe crossing.

17. **PRE-K BOARDING** Pre-K students always board and unload the bus first to facilitate sign-on/sign off and ensure student safety.

18. **PARENT RESPONSIBILITY AT BUS STOPS**

Although we are committed to the safety of students on the bus and at the bus stop, there are situations that require your assistance and participation in order to enhance child safety. Students are under the control of the parent/guardian walking to and from the bus stop.

19. **BUSES EQUIPPED WITH SAFETY BELTS**

If a school bus is equipped with safety belts, students must wear them; students who do not properly equip their seat belts are subject to disciplinary action.

## Weapons and Dangerous Instruments

Students shall not possess, handle, transmit, use, or attempt to use any dangerous weapon in school buildings or on school grounds at any time, or in school vehicles, or off school grounds at a school-sponsored event.

Upon information that a student is suspected of violating this policy, the principal shall notify the student's parent and the appropriate law enforcement officials as required by law. Any weapon or instrument that is deemed to be hazardous, including laser pointers, shall be immediately confiscated.

Instruments, including tools and clips and unaltered nail files, used solely for the preparation of food, instruction and maintenance must be approved by the principal and used under the direct supervision of the teacher.

The Board of Education identifies the following items to be a hazard to the safety of the school population and a detriment to a positive educational environment. The board prohibits the possession of these items. After inquiry and obtaining the facts of the accusations, the principal shall take appropriate action. [References are made to FL - Federal Law; SL - State Law; or CO – Central Office Policy.]

## Items and Consequences

The disciplinary infractions listed below will result in suspension to the Disciplinary Hearing Authority (DHA) and subject to expulsion for one calendar year:

*Firearms (as defined by the Gun-Free School Act) – FL*
*Possession of other Weapons - SL*
*Threatened Use / Use of any Weapon - CO*
*Toy Guns (Used in a Threatening Manner) – CO*

The disciplinary infractions listed below will result in the following:
*Knives (Possession - Less Than 4") – CO*
*Grades K-3*
1st offense - in school suspension (ISS) and notification of parent
2nd offense - out of school suspension (OSS)
3rd offense - suspension to the DHA

*Be advised, it is a violation of rules to possess a knife of ANY size on school grounds or at school events.

*Toy Guns (Possession)*
*Grades K-3*
1st offense – confiscation and parent conference
2nd offense - in school suspension (ISS)
3rd offense - out of school suspension (OSS)

*Knives (Possession - Less Than 4") – CO*
*Toy Guns (Possession)*
*Grades 4-12*
1st offense - in school suspension (ISS) and notification of parent
2nd offense - out of school suspension (OSS)
3rd offense - suspension to the DHA

*Ammunition, Fireworks and Explosives - Possession of – CO*
*Grades K-3*
1st offense – confiscation and parent conference
2nd offense - in school suspension (ISS)
*Grades 4-12*
1st offense - in school suspension (ISS)
2nd offense - out of school suspension (OSS)
Maximum – out of school suspension (OSS)

*Ammunition, Fireworks And Explosives – Use - CO*
*Grade K-3*
1st offense - Confiscation and parent conference
2nd offense – in school suspension (ISS)
3rd offense - suspension to the DHA
*Grades 4-12*
Minimum - in school suspension (ISS) and notification of parent
Maximum - suspension to the DHA

## Dress Code Policy 6.310

Students shall dress and groom in a clean, neat, and modest manner so as not to distract or interfere with the operation of the school, during the school day and any school events on school property. Any clothing that exposes underwear or body parts is prohibited. Specific guidelines appropriate for each level of school (elementary, middle, junior high and senior high) may be developed but include the following areas:

1. No head coverings, except for religious head coverings
2. No bare midriff, revealing necklines, tube tops, tank tops, or see through tops
3. Appropriate length of shorts and skirts
4. Clothing that exposes underwear or body parts in an indecent manner is prohibited.
5. No sagging pants
6. No attire promoting alcohol, tobacco, or drugs
7. No dusters or trench coats
8. No clothing containing advertising for objectionable causes or offensive language
9. No facial piercings, earrings only
10. All gang symbols and clothing are prohibited
11. Shoes/sandals must be worn at all times (tied/fastened)
12. Outer clothing which resembles lounge wear, pajamas, or underwear is prohibited
13. No spikes, chains, or other items that cause a safety concern

When a student is attired in a manner that violates the school dress code or is likely to cause disruption or interference with the operation of the school, the teacher and/or principal shall take appropriate action.

## Admission Requirements

Parents of newly enrolling students must present:
- Long form birth certificate or officially accepted evidence of date of birth at the time of registration
- Evidence of current medical examination
- Evidence of required immunizations on a Tennessee Certificate
- Proofs of residence

If a student is experiencing homelessness or is an unaccompanied minor, contact Jenni Duskey, Homeless Liaison (615-382-3609).

Students must reside with the custodial parent, court appointed legal guardian, or properly delegated adult as provided for in T. C. A. 34-6-301 - 34-6-310. Both the parent(s)/guardian(s) and the designated caregiver must reside in the State of Tennessee and the caregiver must reside in Robertson County.

Delegation of authority- "Parent" defined. (a)

(1) A parent or parents of a minor child may delegate to any adult person residing in this state temporary care-giving authority regarding the minor child when hardship prevents the parent or parents from caring for the child. This authority may be delegated without the approval of a court by executing in writing a power of attorney for care of a minor child on a form provided by the department of children's services. Hardships may include but are not limited to:
   (A) The serious illness or incarceration of a parent or legal guardian;
   (B) The physical or mental condition of the parent or legal guardian or the child is such that care, and supervision of the child cannot be provided; or
   (C) The loss or inhabitability of the child's home as the result of a natural disaster.

(2) A local education agency (LEA) is not required to enroll a student with a power of attorney stating a hardship other than one (1) of the three (3) specifically stated in subdivisions (a)(1)(A)-(C). The LEA may, however, enroll a student with a properly executed power of attorney for other hardships on a case by case basis. Additional documentation may be requested.

(b) The power of attorney for care of the minor child shall be signed and acknowledged before a notary public by the parent.

(c) For purposes of this part the term "parent" includes a legal guardian or legal custodian of the minor child. [Acts 2003, ch. 71§ 1; 2004, ch. 521, §1.] All POAs must be revisited annually.

## Admission of Suspended or Expelled Students

The Board may deny admission of any student who has been suspended or expelled from another in-state school system, even though the student changes residence. Enrolled students may be dismissed if it is determined subsequent to the enrollment that the student has been suspended or expelled from the former school system.

## Compulsory Attendance

Attendance is a key factor in student achievement and students are expected to be present each day school is in session. The State requires all children between the ages of 6 and 17, inclusively, to attend school. A child entering kindergarten shall be no less than 5 on or before August 15. No child shall be eligible to enter first grade without having attended an approved kindergarten program. A child entering a special education program shall be no less than three years of age.

## Absences from School and Attendance

Absences shall be classified as either excused or unexcused by the Principal/Designee.

### Excused absences may include, but not be limited to:

(1) illness of student; after three (3) consecutive days, or repeated absences, a note from a physician may be required;
(2) illness of an immediate family member which requires the student's help at home;
(3) death of a family member;
(4) extreme weather conditions;
(5) religious observances;
(6) college visits;
(7) pregnancy;
(8) School sponsored or school endorsed activities;
(9) Summons, subpoena, or court order;
(10) circumstances, in the judgment of the principal/designee, created by emergencies over which the student has no control.

Schools may require an official verification of any appointment prior to excusing the absence. Schools may limit the number of excused absences for appointments.
Unexcused absences shall include but are not limited to:
(1) car trouble;
(2) personal business (e.g. cleaning house, shopping, babysitting, errands, hair appointment, work in the private sector).

In order to receive any attendance credit, including credit toward perfect attendance, a student must be present for the majority of the school day in accordance with State Attendance Accounting policies.

Reasons for absences or tardiness and requests for early dismissals before the close of school must be requested by the custodial parent or guardian or those authorized by the parent/guardian to request release. Students participating in school-sponsored activities whether on or off campus shall not be counted absent.

All missed class work or tests may be made up. Reasonable effort must be made, and ample opportunities must be provided by school personnel. Grades may reflect less than full credit. (Exceptions include pre-announced tests and term assignments that will be due upon return.) School work and tests missed for suspensions may be required to be made up.

Students may be denied the privilege of making up work missed as a result of an unexcused absence or suspension. All schools will review students' attendance and refer students to the Student Services Supervisor.

An accumulation of 8 unexcused tardies/early dismissals will equal 1 unexcused day, which will contribute to the number of unexcused days that trigger truancy interventions. Such absences may result in referral to Juvenile Court.

### Chronic Absenteeism

While only unexcused absences accumulate for truancy purposes, the Robertson County Schools firmly believe in the importance of regular school attendance and recognize the role attendance plays in student success. As such, all student absences must be investigated and verified. School attendance is an essential dimension of overall student success. School attendance for children ages 6 to 17 inclusive is mandated by state law (TCA 49-6-3001) and penalties will apply for truant children (TCA 49-6-3007).

### Release During School Hours

The following procedures will be observed with regard to dismissal:

1. No student will leave school prior to regular dismissal hours except with the approval of the principal and parent. Elementary students will be permitted to leave school prior to regular dismissal only in the company of a parent, guardian, employee, police officer, court officer, or a person designated by the parent in writing.
2. No student will be sent from school to perform an errand or act as a messenger.
3. When dental/medical appointments cannot be scheduled outside school hours, a parent/guardian must send a signed, written request for dismissal or call for the student in person. Schools may require an official verification of the appointment prior to excusing the absence.
4. Students will be released only upon the written request of the custodial parent/guardian or to those authorized by the parent/guardian.
5. Schools shall not permit a change in the physical custody of a child unless the person seeking custody presents a certified copy of a court order and gives reasonable advance notice.
6. High School students may be released for jobs and training centers outside their home school only when it is a part of an approved program.

## Acceptable Use Policy

I understand that, as a Computer & Internet user, I am responsible for my actions and that I am responsible to act considerately and appropriately, in accordance with the following rules. When using any Robertson County Schools Technology Resources or a personal device on district property, including computers and the Internet:

* I will not send, display, download or receive offensive and obscene messages, pictures, videos and/or music. * I will not use inappropriately explicit language. * I will not violate copyright laws. * I will not use Facebook, Twitter, Instagram or any other social media sites except when related to classroom instruction. * I will not attempt to hack, bypass or infiltrate any computer, network system, or web-filtering system. * I will not attempt to enter administrative network areas or other network areas not related to specific classroom instruction. * I will not sexually harass, insult, embarrass, stalk or cyber-bully others. (see Board policy 6.304) * I will not intentionally damage or vandalize computers, computer systems, computer networks, software or any other district owned equipment. * I will not use technological systems for a private gain or any commercial purpose. * I will not use other users' passwords, nor will I share my password with others.

* I will not attempt to access another user's private files, phone or e-mail messages, for this will be considered theft. * I will not intentionally misuse resources provided by the school system. * I will not disregard internet safety practices. Children's Internet Protection Act (CIPA) * I will not use a personal technological device during the school day, unless it is being used for an academic purpose with permission from a faculty member in a designated area. * I will not load software not specifically licensed to Robertson County Schools. * I will not use a third-party Internet provider while on school property (personal hotspot/personal data plan). * I will not attach non-approved devices to the school network (personal router, etc.).

Safety instruction – Students will be given appropriate instruction in Internet safety, security, appropriate online behavior and cyberbullying awareness.

All data including e-mail communications stored or transmitted on school system computers shall be monitored. Students have no expectation of privacy with regard to such data.

I understand that any or all of the following sanctions could be imposed if I violate any of the policies and procedures regarding the use of Robertson County Schools Technology Resources, including the Internet.

* Loss of access to Internet, access to other electronic media, and/or use of computers or other technology resources

* Additional disciplinary action to be determined at the school or district level in line with existing practice regarding inappropriate language or behavior

* Legal action, when applicable

Sanctions listed above may also apply when activity away from school is harmful to or involves other students/staff and/or causes a disruption with regular school business.

The information above is an overview of Board Policy #4.406. You can review the entire board policy at http://rcstn.net/board_of_education/policies/table_of_contents/. Board policy will be enforced in all Robertson County Schools.

If a student is part of a 1:1 laptop program, student/parent understands that they are responsible for equipment that is school issued including all accessories. This equipment is treated the same as textbooks issued according to board policy (Student Fees and Fines 6.709, Care of School Property 6.311). An optional protection plan can be purchased. This protection plan covers accidental damage and theft. This plan does not cover negligence.

## Driver's License

Any student 15 or older who becomes academically deficient or deficient in attendance shall be reported to the Department of Safety for driver license denial or revocation. A student is academically deficient if s/he has not earned two (2) credits (block schedule) each semester. A student shall be deemed deficient in attendance when s/he drops out of school or has ten (10) consecutive or fifteen (15) days total of unexcused absences during a semester. T.C.A. 49-6-3014

## Emergency Closing

The Board authorizes the Director of Schools to close schools in the event of hazardous weather or any other emergency that presents a threat to the safety of students, staff members, or school property. As soon as the decision to close schools is made, the Director of Schools will notify the local public media and request that an announcement be made. In addition, the SchoolMessenger system will be implemented. Parents are requested to maintain up-to-date telephone numbers for the SchoolMessenger system. In the event of a school evacuation, please listen to SchoolMessenger for instructions on the reunification (student pick-up) site; do not go to the school that has been evacuated.

## Storm Warning Dismissal

Students may not be released to parent(s)/guardian(s) while the immediate area of the school is under a warning. Parents who arrive during an active warning will be encouraged to remain in a safe place within the school. Students who drive will not be dismissed until the warning has been expired. Students may be held beyond regular dismissal time if there is an active weather warning at the time of dismissal. Students who are on buses at the time of a weather warning will seek shelter at the first available facility.

## Medications

No school official/teacher will routinely dispense medication to students except in unique situations in which a child's health is dependent upon medical aid. If under exceptional circumstances, a child is required to take oral medication during school hours and the parent cannot be present, only the trained principal/designee will administer the medication in compliance with the following regulations:

### All Medications must be:

1. Stored in a locked box/cabinet in a secure area;
2. Brought to school by a responsible adult in a properly labeled pharmacy container (prescription), or unopened bottle (over the counter).
3. Accompanied by written permission from the parent/guardian.

### Emergency Medication:

1. Epi-pens and glucagon injections may be kept with the student. Students carrying epi-pens must have a physician's order stating they are capable of using the epi-pen without supervision. This physician's order must be accompanied by written permission from the parent/guardian.
2. Inhalers and glucagon injections may be kept with the student if there is parent permission and a physician's order on file with the school nurse. The student must be responsible for carrying the inhaler and/or glucagon injection.

### Over-The-Counter Medicines:

1. Must be brought to school in a new, unopened container and labeled with the student's name and reason medication is needed.
2. Shall be administered according to the manufacturer's recommendation;
3. Aspirin/aspirin containing products will not be administered without a physician's order.
4. Herbals, vitamins, and essential oils will not be administered at school.

### Prescriptions:

1. All prescription medications require a physician's order.
2. Prescription narcotic pain medications will not be given at school.
3. Medications prescribed 3 times per day should be given at home (before school, after school, and at bedtime).

### Stock Medication/Supplies:

1. A limited amount of stock medical supplies (gauze, latex free bandages, isopropyl alcohol, hydrocortisone, peroxide, calamine lotion, wound cleanser, petroleum jelly, etc.) are maintained in nursing clinics for use with our students.
2. If you do not wish your student to be treated with such items, please provide notice to the building principal in writing.
3. No stock medications are kept in school clinics. All medications must be provided by the parents along with correct documentation.

## Honor Rolls and Awards

Honor Rolls may be published for students in grades 4-12. In order to qualify for the "A" honor roll, a student must receive an "A" in each subject attempted during the grading period. In order to qualify for the "A-B" honor roll, a student must receive at least a "B" in each subject attempted during the grading period. Parents may make a written request that their student's name not be included.

## Class Ranking

Senior class ranking is calculated at the end of the 3rd nine weeks of high school.

## Graduation

All other in Robertson County, including those entering Springfield High for the 2019-2020 school year, will be required to complete 26 credits on the block schedule. Students must meet all graduation requirements in order to participate in any

graduation ceremony. The school system will sponsor graduation exercises two times per year during winter and spring. Should a student be found to be deficient in terms of attendance or behavior, s/he may be denied the privilege of participating in graduation exercises.

### Honor Graduates
Any student who completes all requirements for a regular diploma with a minimum grade point average of 3.5 shall be designated a graduate with "Honors".

### Graduate with Distinction
Students will be recognized as graduating with "Distinction" by attaining a 3.0 average AND completing at least one of the following: earn a nationally recognized industry certification; participate in at least one of the Governor's Schools; participate in one of the state's All-State musical organizations; be selected as a National Merit Finalist or Semi-Finalist; attain a score of 31 or higher composite score on the ACT; attain a score of 3 or higher on at least two advanced placement exams; successfully complete the International Baccalaureate Diploma Program; or earn 12 or more semester hours of transcript postsecondary credit.

### Graduate with State Honors
Any student who scores at or above all of the subject area readiness benchmarks on the ACT or equivalent score on the SAT shall graduate with "State Honors." Students achieving such will be recognized at their individual commencements.

### Tennessee Promise
The Tennessee Promise is only open to graduating high school seniors. It offers free tuition for five consecutive semesters of community college. There are several steps and requirements that must be completed by specified dates in order to remain eligible for the program:
- Students must complete the application at www.tnpromise.gov by the November 2020 deadline. Check with your guidance counselor.
- Submit a FAFSA (Free Application for Federal Student Aid) at www.fafsa.gov by February 2021.
- Attend two mandatory meetings as scheduled in the Spring 2021.
- Make application to a Tennessee community college or Tennessee College of Applied Technology (TCAT).
- Meet and maintain the grade point average requirement of the community college or technical college to which you are applying.

- Complete eight hours of community service before enrolling in community college and maintain that level of service each term they are enrolled in the program.
- Start college in the first fall semester after you graduate from high school. Once enrolled, you must take at least 12 hours of classes each semester you are enrolled.

For more information, contact your school counselor and visit www.tnpromise.gov.

### Tennessee Scholars
The Tennessee Scholars curriculum gives students the greatest number of options to pursue academic excellence, to enter post-secondary education, the military, or the workforce. The benefits for graduating as a Tennessee Scholar are: full tuition to any Tennessee College of Applied Technology and scholarships to many two year and four year Tennessee postsecondary schools. It guarantees increased job potential, recognition, and rewards. The Scholars designation is recognized on job applications in more than twenty states.

Students must meet all Tennessee Diploma Project academic requirements and the following workforce development skill requirements:
- 80 hours of Volunteer Service to the Community (See website for non-approved Volunteer hours).
- Maintain a "C" Average minimum in all Tennessee Scholars courses.
- 95% Attendance Required. (Cannot miss more than 36 total days in 4 years of high school)
- No out-of-school suspensions

For more information, contact your school counselor or visit www.tennesseescholars.org.

### Early Graduation
Students who will meet all graduation requirements at the end of the first semester of their senior year may apply for early graduation status. Application will be made on the appropriate forms and submitted per established guidelines.

Students approved for early graduation status will be awarded their diploma and be officially graduated at the end of the first semester as part of a school sponsored graduation exercise. Upon graduation, these students are no longer eligible for participation in school-sponsored activities; such activities include but are not limited to: athletic programs, extracurricular activities, baccalaureate, prom, and second term graduation.

## Grading System

Conduct grades shall be based upon criteria developed within each school and shall
be:   E - Excellent   S - Satisfactory   U – Unsatisfactory

In grades 1-12, the following scale is used:

| | | | |
|---|---|---|---|
| 93 – 100 | A | 70 – 74 | D |
| 85 – 92 | B | 0 – 69 | F |
| 75 – 84 | C | | |

TNReady/EOC grades have a percentage impact on final grades as required in state
law.

## Visitors to the school

Except on occasions, such as school programs, athletic events, open house or public
events, **ALL VISITORS MUST** report to the office when entering the school and
sign in with the front desk. Authorization to visit in the building will be determined
by the principal/designee.

In order to maintain the conditions and atmosphere suitable for learning, no other
person shall enter onto the school grounds or into the buildings during hours of
student instruction except students, the staff, parents of students, and other persons
with lawful and valid business on school premises.

The principal/designee has the authority to exclude from the school premises any
persons disrupting the educational programs, disturbing the teachers or students, or on
the premises for the purpose of committing an illegal act. The principal/designee
shall engage law enforcement officials when s/he believes the situation warrants such
measures. Requests by students to bring visitors to school must be submitted and
approved by the principal. In general, visitors are not allowed to observe in
classrooms.

## Student Vehicles

Students who ride bicycles or drive motor vehicles to school must leave them parked
in designated areas until the end of the school day, unless permission is obtained from
the principal/designee. Parking regulations for each school will be developed.
Vehicles parked on school property by students or visitors are subject to be searched
for drugs, drug paraphernalia, dangerous weapons and/or other prohibited items.

## Safety

Only students assigned to the school, parents of students, and other persons with
lawful and valid business on the school premises shall enter the grounds or buildings
during the hours of student instruction.

The principal/designee shall secure assistance from law enforcement officials when
deemed necessary to maintain order or security during the school day or during any
activities of the school.

## Care of School Property

Students shall help maintain the school environment, preserve school property and
exercise care while using school facilities or property. School property is defined as
buildings, buses, books, equipment, materials or any other item under the jurisdiction
of the Board.

Any student found to be responsible for the loss or damage of school property may be
held liable for replacement or fine. Failure to pay the fine imposed within a
reasonable time may result in:

1. Refusal to issue any additional textbooks until restitution is made; or
2. Withholding of all grade cards, diplomas, certificates or
   transcripts until restitution is made.

## School Nutrition Program

Childhood is an important time to establish lifelong healthy eating habits. Healthy
school meals and nutrition education will be available to all children as an important
part of their education. In addition to meal service, other foods and beverages sold on
the school campus will meet federal and state nutrition standards as directed by
Robertson County Wellness Policies.

Applications for no cost or reduced-cost meals may be obtained from schools at any
time during the school year and are available on-line on the county website. Students
who participate in reduced-cost meals will not be distinguished in any way from
students who pay regular prices.

Robertson County School Board Policy 3.501 states that a student may charge meals,
not to exceed five meals; a parent must be contacted when a student is denied a charge
and sustenance must be provided. An alternative meal is given when the charge policy
is exceeded. Such a meal includes a cheese sandwich, a vegetable, a fruit, and a milk.

School breakfast and lunch prices for the 2022-2023 school year are as follows:

|                    | **Breakfast** | **Lunch** |
|--------------------|-----------|---------|
| Elementary School  | $-0-      | $ 2.25  |
| Middle School      | $-0-      | $ 2.50  |
| High School        | $-0-      | $ 2.75  |
| Student – Reduced  | $-0-      | $-0-    |
| Staff Member       | $ 2.25    | $ 3.50  |
| Visitor Adult      | $ 2.50    | $ 4.00  |
| Visitor Child      | $1.75     | $ 3.00  |

Schools who are members of the Community Eligibility Provision allow students in those schools to eat breakfast and lunch at no cost. Please consult your school for membership status.

## COMPETITIVE FOODS/VENDING MACHINES

The sale of competitive foods must be in compliance with all local procedures, but at a minimum must be as stringent as the current state and federal regulations concerning competitive foods.[3]

Vending machines in the schools will be controlled so that they will not offer competition to the school lunch and breakfast program or encourage poor eating habits. Students may not have access to vending machines containing competitive foods during meal service periods. Local, State, and Federal guidelines and procedures for implementation are on file in the district food service office.

## 7 CFR § 210.11

(2) *Competitive food* means all food and beverages other than meals reimbursed under programs authorized by the Richard B. Russell National School Lunch Act and the Child Nutrition Act of 1966 available for sale to students on the *School campus* during the *School day*.

## Student Records -- Annual Notification or Rights/ Privacy Rights

The student's parent/guardian or the eligible student has the right to:

1. Inspect and review the education record.
2. Seek correction of items in the records which are believed to be inaccurate, misleading or in violation of the student's rights.
3. File a complaint with the appropriate officials when the System violates laws and regulations relative to records.
4. Obtain a copy of such records at a minimal expense.
5. Exercise control over other people's access to the records, except when prior written consent is given, or under circumstances as provided by law, or where the System has designated certain information as "directory information".

## Directory Information

Statistical information not identified with a particular student may be released to any person, agency, or the public. Directory information includes: name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received and the most recent or previous educational agency or institution attended by the student.

Student directory information for 11th and 12th graders shall be made available upon request to persons or groups which make students aware of occupational and educational options, including official recruiting representatives of the military forces of the State and the United States.

Parents/Guardians of students or eligible students have 2 weeks after this notification to advise the system in writing of items they designate not to be used.

## Student Assignment

Students are expected to attend the school to which they are assigned by virtue of their residence. Legal residence is defined as the place of regular lodging by the parent/guardian.

Students are enrolled in school on a temporary basis pending verification of enrollment documents.

If at any time students are found to be in violation of enrollment guidelines, the parent/guardian will be notified by the school administrator. The parent/guardian will withdraw the child and enroll in the appropriate school of zone.

## Out of Zone

Parents may make application to enroll their children in another school in the school system provided they meet the guidelines listed in Board Policy. If requests are approved, the parent must arrange transportation to and from that respective school. Requests must be made annually in writing to the Supervisor of Student Services on the approved request form.

All transfers are provisional based on a periodic review of enrollment data and continued efforts to reduce segregation. No transfers will be granted (in county or out of county) where the cumulative effect will reduce desegregation in the sending or receiving school.

## Personal Communication and Electronic Devices

Students in grades 6 – 12 may possess personal communication devices and personal electronic devices so long as such devices are turned off and stored in backpacks, purses, or personal carry-alls. Such devices include but are not limited to: wearable technology such as eye glasses, rings, or watches that have the capability to record, live stream or interact with wireless technology; cell phones; laptops; tablets; and mp3 players. At no time shall a student operate a cellular device with video or picture taking capabilities in a locker room, classroom, bathroom, or other location where such operation may violate the privacy right of another person. Violation of this policy may result in confiscation of the device and other disciplinary actions.

At no time shall the school be responsible for preventing theft, loss or damage to devices brought onto school property.

Students can use personally owned devices in the classroom for education purposes only, and this must be done under the direct supervision of the teacher.

1st offense—Confiscation of device; return in 3 school days or 10 dollar fine.
2nd offense—Confiscation of device; return in 5 school days or 20 dollar fine.
3rd offense—Confiscation of device; return in 10 school days or at end of grading period, whichever is longer, or 30 dollar fine.
4th offense—Confiscation of device; return at end of semester or 40 dollar fine.
Subsequent offenses will be treated under 4th offense guidance and may result in more serious discipline.

Code of Conduct

## MISBEHAVIORS: LEVEL 1

This level includes minor misbehavior on the part of the student which impedes orderly classroom guidelines or interferes with the orderly operation of the school, but which can usually be handled by an individual teacher/staff member

| Student Conduct | Disciplinary Procedures | Disciplinary Options |
|---|---|---|
| Classroom disturbances | 1. The teacher/staff member intervenes immediately. | Verbal reprimand |
| Classroom tardiness | | Special assignment |
| Cheating and lying | 2. The teacher/staff member determines what offense was committed and its severity. | Restricting activities |
| Violation of hands-off expectations — keep hands, feet, and objects to oneself | 3. The teacher/staff member determines who committed the offense and if the student understands the nature of the offense. | Counseling |
| Failure to carry out directions | | Withdrawal of privileges |
| Wearing, while on the grounds of a public school during the regular school day, clothing that exposes underwear or body parts in an | 4. The teacher/staff member employs appropriate disciplinary options. | Issuance of demerits |
| indecent manner that disrupts the learning environment. | 5. The teacher/staff member informs the student's parent(s)/guardian(s). | Strict supervised study |
| | | Detention |
| Abusive language | 6. The record of the offense and disciplinary action shall be maintained by the teacher/staff member. | In-school suspension |
| Harassment/bullying | | |
| Disrespect to teachers and staff | | |
| Other conduct warranting discipline | | |

## MISBEHAVIORS: LEVEL II

This level includes misbehavior whose frequency or seriousness tends to disrupt the learning climate of the school. These misbehaviors do not represent a direct threat to the health and safety of others but have educational consequences serious enough to require corrective action on the part of administrative personnel.

| *Student Conduct* | *Disciplinary Procedures* | *Disciplinary Options* |
|---|---|---|
| Continuation of unmodified Level I misbehaviors<br><br>School truancy<br><br>School tardiness<br><br>Using forged notes or excuses<br><br>Disruptive behavior<br><br>Abusive language<br><br>Victimization of any student (harassment (sexual, racial, ethnic, religious), bullying, cyber-bullying, and/or hazing)<br><br>Use or possession of tobacco products/e-cigarettes/vaping paraphernalia<br><br>Disrespect to teachers and staff | 1. The student is referred to an administrator/designee for appropriate disciplinary action.<br><br>2. The administrator/designee meets with the student and the staff member.<br><br>3. The administrator/designee hears the accusation made by the staff member and allows the student the opportunity to explain his/her conduct.<br><br>4. The administrator/designee takes appropriate disciplinary action and notifies the staff member and parent(s)/guardian(s) of the action.<br><br>5. The record of offense and disciplinary action shall be maintained by the administrator/designee. | Teacher schedule change<br><br>Peer counseling<br><br>Referral to school counselor<br><br>Referral to outside agency<br><br>In-school suspension<br><br>Transfer<br><br>Detention<br><br>Suspension from school-sponsored activities or from riding school bus<br><br>Out-of-school suspension |

## MISBEHAVIORS: LEVEL III

This level includes acts directly against persons or property but whose consequences do not seriously endanger the health or safety of others in the school.

| *Student Conduct* | *Disciplinary Procedures* | *Disciplinary Options* |
|---|---|---|
| Continuation of unmodified Level I and II misbehaviors<br><br>Fighting<br><br>Vandalism (under $100)<br><br>Stealing (under $500)<br><br>Threats to others<br><br>Leaving school campus without permission<br><br>Abusive language<br><br>Victimization of any student (harassment (sexual, racial, ethnic, religious), bullying, cyber-bullying, and/or hazing)<br><br>Disrespect to teachers and staff | 1. The student is referred to the administrator/designee for appropriate disciplinary action.<br><br>2. The administrator/designee meets with the student and the staff member.<br><br>3. The administrator/designee hears the accusation and allows the student the opportunity to explain his/her conduct.<br><br>4. The administrator/designee takes appropriate disciplinary action and notifies the staff member and parent(s)/guardian(s) of the action.<br><br>5. The record of offense and disciplinary action shall be maintained by the administrator/designee. | In-school suspension<br><br>Detention<br><br>Restitution from loss, damage, or stolen property<br><br>Out-of-school suspension<br><br>Social adjustment classes<br><br>Referral to outside agency<br><br>Suspension from school-sponsored activities or from riding the bus |

| MISBEHAVIORS: LEVEL IV |
|---|

This level of misbehavior includes acts which result in violence to another's person or property, or which pose a threat to the safety of others in the school. These acts are so serious that they usually require administrative actions which result in the immediate removal of the student from the school, the intervention of law enforcement authorities, and/or action by the Board.

Any occurrence of Level IV behaviors must be reported to the school administration. The minimum disciplinary action by the school's administration is suspension to the Director of Schools/Disciplinary Hearing Authority.

If a student's action poses a threat to the safety of others in the school, a teacher, principal, school employee, or school bus driver may use reasonable force when necessary to prevent bodily harm or death to another person.

| Student Conduct | Disciplinary Procedures | Disciplinary Options |
|---|---|---|
| Continuation of unmodified Level I, II, and III misbehaviors<br><br>Death threat<br><br>Extortion<br><br>Bomb threat<br><br>Possession, use, and/or transfer of dangerous weapons (which include but are not limited to firearms and knives with blades greater than four inches)*<br><br>Assault that results in bodily injury upon any student, teacher, principal, administrator, any other employee of the school, or a school resource officer*<br><br>Aggravated assault* | 1. The school administration confers with appropriate staff members and with the student.<br><br>2. The school administrator hears the accusations and allows the student the opportunity to explain his/her conduct.<br><br>3. The parent(s)/guardian(s) are notified.<br><br>4. Law enforcement officials are contacted when warranted.<br><br>5. The incident is reported, and recommendations are made to the Director of Schools/Discipline Hearing Authority.<br><br>6. The school administrator notifies the staff members and parent(s)/guardian(s) of the resolution. | Other hearing authority or Board action which results in appropriate placement |

| Consensual or non-consensual sexual contact<br><br>Vandalism ($100 or more)<br><br>Theft, possession, and/or sale of stolen property ($200 or more)<br><br>Arson<br><br>Use, possession, sale, or distribution of drug paraphernalia*<br><br>Use, possession, sale, distribution, or being under the influence of alcohol and/or unauthorized substances including marijuana, stimulant drugs, and prescription drugs not prescribed to the student (e.g., any controlled substance, controlled substance analogue, or legend drug)*<br><br>Use or transfer of unauthorized substances<br><br>Victimization of any student (harassment (sexual, racial, ethnic, religious), bullying, cyber bullying, and/or hazing)<br><br>Credible electronic threat to cause bodily injury or death to another student or school employee*<br><br>*Designates zero tolerance offense | 7. If the student's placement is to be changed, adequate notice of the charges shall be given to the student and his/her parent(s)/guardian(s) and his/her right to appear at a hearing. | |

## In-School Suspension (ISS)

Any principal or assistant principal may suspend any pupil from attendance in a specific class, classes, or school-sponsored activity without suspending such student from attendance at school. Good and sufficient reasons for such in-school suspension shall include but are not limited to:

1. Adversely affecting the safety and well-being of other pupils.
2. Disrupting a class or school-sponsored activity.
3. Being prejudicial to good order and discipline occurring in class, during school-sponsored activities, on the school bus, or on the school campus.

Students given ISS in excess of one (1) day from class shall attend either special classes attended only by students guilty of misconduct or be placed in an isolated area specified for study. Personnel responsible for ISS will see that each student is supervised at all times and has textbooks and class work assignments from his/her regular teachers. Students given ISS shall be required to complete academic assignments and shall receive credit for work completed. ISS personnel shall provide assistance as needed for students to successfully complete that assigned work.

## Corporal Punishment

Corporal punishment is not used in the Robertson County School System.

## STUDENT SUSPENSIONS

**Reasons for Suspensions** -- Any Principal or Assistant Principal may suspend any student from attendance at school, including its sponsored activities, or from riding a school bus for good and sufficient reasons including but not limited to:

- ❖ Willful and persistent violation of the rules of school or truancy.
- ❖ Immoral or disreputable conduct, including vulgar or profane language.
- ❖ Violence or threatened violence against the person or any personnel attending or assigned to any school
- ❖ Willful or malicious damage to real or personal property of the school or the property of any person attending or assigned to the school.
- ❖ Inciting, advertising, or counseling of others to engage in any of these acts.
- ❖ Possession of a pistol, gun, or firearm on school property.
- ❖ Possession of a knife.
- ❖ Assaulting a principal/teacher with vulgar, obscene, or threatening language.
- ❖ Unlawful use/possession of barbital or schedule drugs (TCA 53-10-101).
- ❖ Engaging in behavior that disrupts a class or school-sponsored activity.
- ❖ Any other conduct prejudicial to good order or discipline in any school.
- ❖ Off-campus criminal behavior that results in the student being legally charged with a felony when the student's continued presence in school poses a danger to persons or property or disrupts the educational process.

Days school is closed do not count as suspension days.

## Procedures for In-School Suspension (ISS) and Out-of School Suspension (OSS)

Unless the student's continued presence in the school, class or activity presents immediate danger to the student or other persons or property, no Principal shall suspend any student until that student has been advised of the nature of the misconduct, questioned about the incident, and allowed to give an explanation.

Upon suspension of any student (including ISS in excess of one (1) day), an immediate attempt shall be made to contact the parent to inform him/her of the suspension. The student shall not be sent home before the end of the school day unless contact has been made.

Upon suspension of any student, other than for ISS of one day or less, the principal shall, within 24 hours, notify the parent and the Director of Schools of (1) the length, (2) the cause, and (3) the conditions for readmission which may include, at the request of either party, a meeting with the parent, student and principal.

If the suspension is to exceed five (5) days, but is no more than ten (10) days, the principal shall request a meeting with the parent and student within the first five (5) days following the issuance of the suspension and shall develop and implement a plan for correcting the behavior. At the time of this meeting, whether attended or not by the parent/guardian and the student, the Principal shall determine the length of the suspension (up to ten (10) days total) and the conditions for readmission.

If at the time of the suspension, the principal/designee determines that an offense has been committed which in the judgment of the principal/designee would justify a suspension for more than ten (10) days, s/he shall immediately suspend the student to the Disciplinary Hearing Authority. After the hearing, the Disciplinary Hearing Authority may:

1. Order the removal of the suspension.
2. Order the removal of the suspension upon terms and conditions it deems reasonable.
3. Assign the student to an Alternative Program.
4. Suspend a student for a specified period of time.
5. Recommend expulsion to the Board of Education.

The Disciplinary Hearing Authority (DHA) shall make a written record of the proceedings. The student, parent, or Principal, may, within five days of the decision, request an appeal of the decision of the DHA. After a review, the Board may affirm the decision of the DHA, modify the decision, or grant a hearing before the Board. After the hearing, the Board may affirm the decision, modify the decision, including imposing a more severe penalty than that of the DHA.

If the suspension occurs during the last ten (10) days of any term or semester, the student shall be permitted to take such final examinations or submit such work as necessary to complete the course of instruction for that semester, subject to conditions prescribed by the principal/designee. Students under suspension from one school in the System cannot enter another school, nor attend school-sponsored activities/events in the System.

## Zero-Tolerance Behavior

In order to ensure a safe and secure learning environment free of drugs, drug paraphernalia, violence and dangerous weapons, any student who engages in the

following behaviors will be subject to a suspension for a period of not less than one calendar year. The Director of Schools shall have the authority to modify the suspension requirement on a case-by-case basis.

Zero-tolerance acts as defined by Law or Board of Education Policy:

- ❖ Possession/use/transfer of illegal substances, including alcohol, marijuana, stimulant drugs, prescription medication not prescribed to the student, or drug paraphernalia.
- ❖ Assault, threatening to assault, or committing aggravated assault upon any student, teacher, or system employee.
- ❖ Possession/use/transfer of dangerous weapons.
- ❖ Unauthorized possession of a firearm as defined in 18 USC 921.
- ❖ Who transmits by an electronic device any communication containing a credible threat to cause bodily injury or death to another student or school employee and the transmission of such threat creates actual disruptive activity at the school that requires administrative intervention.

## Robertson County Online Learning Experience

The Robertson County Online Learning Experiences (ROLE) office exists to offer students personalized, online learning opportunities. Please contact Mary Jo Holmes at 615-382-8920 for more information. ROLE is comprised of the following programs:

- ❖ The Focus Program
- ❖ Credit Recovery
- ❖ Alternate Credit
- ❖ Robertson County Virtual School

## Robertson County Virtual School

The Virtual School is an online learning opportunity for Robertson County students in grades 3-12 who are not experiencing success in a traditional school setting. Students should be on track for graduation and free of substantial credit deficiencies. Since a great deal of learning will be self-directed, students must be eager to learn and motivated to do so. To schedule an eligibility screening, please contact RCVS at 615-382-8920.

## Alternative School (RCPA)

The Board operates an Alternative School Program for students in grades 4 -12 who have been suspended or expelled from regular school programs. Attendance in the Alternative School shall be mandatory, and students attending an alternative school shall provide their own transportation. Only district level action may determine placement in the Alternative School Program. The Robertson County School System honors the alternative school assignments of other districts.

## PROGRAMS AND SERVICES

Robertson County Schools are proud to offer a variety of programs and services to meet a diversity of student needs. For more information about any of these programs, please call 384-5588.

- ❖ Academic Competitions
- ❖ Alternative School Program
- ❖ Athletic Programs
- ❖ Career and Technical Programs
- ❖ Child Nutrition Program
- ❖ Clubs and Organizations
- ❖ Correspondence Courses
- ❖ Counseling Services
- ❖ Cover Kids
- ❖ Dual and Joint Enrollment
- ❖ Family Resource Center
- ❖ Fine Arts Program
- ❖ Health Services
- ❖ Pre-Kindergarten Program
- ❖ RISE (Gifted Education)
- ❖ ROLE (RC Online Learning Experiences)
- ❖ Special Education Services
- ❖ Student Transportation
- ❖ Summer School
- ❖ Tennessee Scholars
- ❖ Title I Parenting Center
- ❖ Virtual School
- ❖ Well-Child

## SCHOOL SYSTEM GENERAL INFORMATION

Up-to-date information about the Robertson County School System can be found by visiting the school system website: https://www.rcstn.net/

## SCHOOLMESSENGER

SchoolMessenger is a telephone notification program that has been made available to Robertson County Schools by Community Bank and Trust and NorthCrest Medical

Center. SchoolMessenger is a web-based program and it has the capacity to make more than 500,000 phone call attempts and deliver 200,000 messages an hour. If you have children in the school system you can be kept up-to-date on any school event from scheduling to emergencies. *Please make sure your telephone number is up-to-date in the school's office.*

## STUDENT HOMEWORK HELP

Robertson County is proud to be in partnership with the Homework Hotline program. Homework Hotline provides one-on-one free tutoring by phone to Middle Tennessee students and parents. With Homework Hotline, students tackle new concepts, complete challenging assignments, and gain academic skills. Homework Hotline helps students achieve and thrive – one assignment at a time. Students who get the help they seek return to school better prepared and less discouraged.

Bilingual assistance is available in several languages. This program is free thanks to the program's sponsor. Robertson County Schools students may obtain homework help in any subject by calling the toll free number at 1-888-868-5777 or 615-298-6636 on Monday through Thursday from 5:00 pm - 8:00 pm or you can email questions to director@homeworkhotline.info.

## PARENT / SCHOOL LIAISON

The Office for the Parent/School Liaison and Homeless Liaison is located at Bransford Elementary School, 700 Bransford Drive, Springfield, Tennessee. The office number is 615-382-3609. Mrs. Jenni Dusky (Jennifer.dusky@rcstn.net) is the Parent/ School Liaison for Robertson County Schools. She can also be reached by cell at 615-289-6945. The Parent/School Liaison assists with academic, attendance, and home needs of students/families. Resources for food, clothing, shelter, health, or other types of relief are provided by the Parent Center.

## HOMELESS LIAISON

McKinney – Vento Education Assistance Act – Children who lack a fixed, regular and adequate nighttime residence have specific rights under the McKinney – Vento Education Assistance Act. The Homeless Liaison is Mrs. Sarah Evans, sarah.evans@rcstn.net. You can contact her at 615-382-3609 or 615-487-0546, for additional information

## FAMILY RESOURCE CENTER

The mission of the Family Resource Center is to help individuals identify and overcome barriers that impede the fulfillment of their goals, to promote the development of strong families, to assist in the preservation of family units, and to break the cycle of at-risk behaviors.

The Family Resource Center is a non-threatening referral agency that matches the problems individuals are experiencing with a community-based agency or a direct service offered by the Family Resource Center. Referrals to the Family Resource Center can be made by any individual, and the referral process is free. The Family Resource Center provides access to programs and workshops such as parenting support and stress management classes. These programs and workshops serve students, parents and the community. The Family Resource Center is located at 700 Bransford Drive, Springfield Tennessee. Danielle Frazier is the Director and can be reached at 615-382-3104, 615-487-9888 or danielle.frazier@rcstn.net.

## SCHOOL NURSING SERVICES

The major objective of School Nursing Services is to protect and promote the health of students. Verification of physicals/immunizations, assessment of sick and injured students, performance of procedures, and assisting with medications are just a small portion of the services School Nurses provide daily. School Nursing services are conducted based on Tennessee State Laws, Guidelines for Health Care Professionals in the School Setting, and Board/Departmental Policies. Healthy children learn better! School Nurses are doing their part and thank you for doing yours!

Robertson County Schools' Suicide Protocol is available from the School Nursing Office upon request.

This department is located at 800 M.S. Couts Blvd, Springfield, TN. You may reach Amber Hester, RN, Coordinator, at 615-382-3606 or by email at amber.hester@rcstn.net.

## COORDINATED SCHOOL HEALTH

Coordinated School Health is an effective system designed to connect health (physical, emotional, and social) with education. This model consists of eight inter-related components. This approach constitutes a systems change by improving students' health and their capacity to learn through personal responsibility, and the support of families, communities and school.

### Screenings

Robertson County students have the opportunity for various health screenings including vision, hearing, dental, body mass index, scoliosis, and blood pressure.

Students in Kindergarten, 2nd, 4th, 6th, 8th, and 10th grades will be offered a hearing, vision, blood pressure, and height/weight (Body Mass Index) screening. A color vision screening will be offered to those students in 2nd grade. In addition, those students in 6th grade will be offered a screening for scoliosis. Parents will only be notified of their student's screening results if they are found to be outside of normal limits.

Please contact Coordinated School Health Coordinator, Dawn Callas, at dawn.callas@rcstn.net or 615-384-0512 with further questions.

## Student Wellness Policy

The Board recognizes the link between student wellness and academic achievement. In order to promote overall wellness for our students, a Student Wellness Policy (policy number 6.402) has been created. This policy can be found on the county website under Board Policies. This policy states than an advisory council shall be established to serve as a resource to school sites for implementing policies. The School Health Advisory Council consists of individuals representing the school and community, including parents, students, teachers, school administrators, school board members, health professionals, school food service representatives, and members of the public. Notice of all Advisory Council meetings will be posted on the county website, and all stake holders are invited to attend meetings. Please contact Coordinated School Health Coordinator, Dawn Callas, at dawn.callas@rcstn.net or 615-384-0512 with questions.

## Notification of Family Life Education

Your student has the opportunity to participate in valuable age-appropriate programs presented at school that will be offered during the school year that address abstinence based family life education (teen pregnancy and STD/HIV prevention). This student handbook serves only as NOTIFICATION of the potential programs. A parent permission form will be sent home prior to all program opportunities. All program content follows the guidelines and requirements set forth in the Family Life Domain of the TN Health Education Standards as required by the TN State Board of Education. According to state law, SB3310, Family Life Education is required. You have the right to review any and all program materials prior to the implementation. Please contact the individual agencies and request to review their curriculum. Contact information for each agency will be on the provided parent permission form.

Please contact Coordinated School Health Coordinator, Dawn Callas, at dawn.callas@rcstn.net or 615-384-0512, with any further questions.

## PHOTO / VIDEO

On occasion, students may be videotaped or photographed while participating in instructional programs or school activities. Over the course of the year, children's names and/or photos may be used or published in District publications or in local newspapers or other media or letters relating to school activities. If parents elect for students to be excluded, they must provide written documentation to the building Principal. Due to confidentiality, video recordings remain the property of the school system and are not to be shared / copied for the public.

Parents may photograph or video their own student, but photos or videos of other students or school personnel are prohibited without prior written notice from parents or guardians.

## SURVEYS

On occasion, students in Robertson County Schools may be asked to participate in various surveys. The Principal will notify parents of the time and place where they may review these surveys. A permission form will be sent home with all students prior to completion of surveys.

## EVERY STUDENT SUCCEEDS ACT

The Every Student Succeeds Act provides information to parents regarding students, parents and schools.

- ❖ Parents have the right to request information about the professional qualifications of teachers and paraprofessionals who instruct their child.
- ❖ Parents have the right to be notified if a district employs a teacher for over four weeks who does not meet the highly qualified requirements.
- ❖ The local school system is implementing a plan to ensure that all Robertson County teachers and paraprofessionals meet the requirements defining "highly qualified."
- ❖ Parents have the right to request that their child's name, address and telephone number not be released to a military recruiter without prior written consent.
- ❖ Parents may access complete information on the ESSA Act on the internet at www.ed.gov/esea.

For additional information please contact the Robertson County Board of Education at 615-384-5588.

## Definition for Intellectually Gifted

"Intellectually Gifted" means a child whose intellectual abilities, creativity, and potential for achievement are so outstanding that the child's needs exceed differentiated general education programing, adversely affects educational performance, and requires specifically designed instruction or support services. Children from all populations (e.g., all cultural, racial, and ethnic groups, English Learners, all economic strata, twice exceptional, etc.) can be found to possess these abilities. Children identified as intellectually gifted are exempted from the discipline procedures at 34.C.F.R. 300.530-537. Children with a dual diagnosis that includes intellectually gifted must be considered as children with a disability and may not be exempted from the discipline procedures at 34 C.R.F. 300.530-537.

"Adverse affect" means the general curriculum alone is inadequate to appropriately meet the student's educational needs.

Intellectual giftedness is found throughout diverse populations and crosses all economic and cultural boundaries. Early identification and intervention are often required to meet the unique needs of children. The State of Tennessee and Local Education Agencies are committed to providing equitable and appropriate assessment for all students.

Do you know a student who?

- Is unusually eager to learn
- Is a creative thinker
- Can easily transfer knowledge to new situations
- Shows unusual empathy for people and concern for social issue

Research shows that 3-5% of our population possesses many of these exceptional traits. These children should be nurtured and their education enhanced for their own benefit, and for the advancement of mankind.

## Assessment Criteria

Eligibility for services as a gifted student is based on evaluation in each of the following component areas:

- Educational Performance/Achievement
- Creativity/Characteristics
- Cognitive/Intelligence

## Eligibility Criteria

In addition to meeting assessment criteria, a student must demonstrate a need for services beyond what is provided in the general education curriculum.

## The Referral Process

Anyone, including the parent(s), guardian, or community professional may refer a student for screening and possible evaluation. A screening team of educational professionals considers screening information, previous evaluations, and teacher/parent input to determine if a comprehensive evaluation is needed. The team's decision is based on multiple data sources. An assessment team will determine the types of assessment needed. All procedural safeguards are followed to ensure evaluation procedures are non-discriminatory.

## Services for Gifted Students

Special services are often required to meet the unique needs of gifted children. A team of professionals and the child's parent(s) plan the student's educational program based on the assessment information obtained through the evaluation process.

If you know of a child with these outstanding abilities and characteristics and would like to refer him/her for gifted evaluation, please contact your school's gifted teacher or the Gifted Coordinator at the County Office at any time.

**Robertson County Schools Family Engagement Plan** – Robertson County Schools developed the following standards of family engagement to help accomplish our mission to ensure each student is prepared to succeed in life.

- ❖ The school district will establish opportunities for families to actively engage in the district's mission and strategic goals.
- ❖ The school will establish opportunities for families to actively support its mission and goals.
- ❖ The teacher will establish opportunities for families to actively engage in supporting their children's education.
- ❖ The family will support the learning of its members and the efforts of the school system to provide a quality education to all students.
- ❖ Handbooks, newsletters, report cards and other communications are easy to understand and translated to the degree practicable.

The complete Family Engagement Plan may be accessed at http://www.rcstn.net/departments/federal_programs/family_engagement_plan/ or a paper copy may be obtained at your child's school. This plan is to be reviewed annually by parents and educators.

**Unsafe School Choice Policy** – Under the Tennessee State Board of Education's Unsafe School Choice Policy, any public school student who is the victim of a crime as defined under T.C.A. 40-38-111(g), or the attempt to commit one of these offenses

as defined under T.C.A. 39-12-101, shall be provided an opportunity to transfer to another grade-level appropriate school within the district.

Additional information regarding this option may be obtained by contacting the Office of Student Services at 615-384-5588.

### Before/After School Care-
For more information, please contact the before/aftercare site.

| | |
|---|---|
| Coopertown Elementary Eagle's Town | 615-382-0920 |
| Crestview Elementary Explorers | 615-384-3105 |
| Greenbrier Elementary Bobcat Buddies | 615-643-1724 |
| Robert F. Woodall Patriot Pals | 615-672-8726 |
| Watauga Elementary Ridgetoppers | 615-859-0026 |
| White House Heritage Elementary Patriot Friends | 615-672-4682 |

## PARENT RESOURCES

### Child Advocacy Group Contact Information
In addition to the state and local resources available to parents and children, there are many agencies and organizations that offer support, information, training and help in advocating for persons with disabilities in Tennessee. This information is provided as a service to individuals seeking additional avenues for help and information. Neither the Department of Education nor the Robertson County Board of Education intends this as an endorsement or recommendation for any individual, organization, or service represented on these pages.

### The ARC of Tennessee
44 Vantage Way, Suite 550, Nashville, TN 37228
Web site: www.thearctn.org
Phone: 615-248-5878        toll free: 1-800-835-7077
Fax: 615-248-5879          Email: pcooper@thearctn.org

### Family Focused Solutions
Pamela Taylor, Counselor
615-230-0125
615-547-5047

### Robertson County Health Department

800 Brown Street, Springfield, TN 37172
615-384-4504

### Robertson County Schools
800 MS Couts Boulevard, Springfield, TN 37172
www.rcstn.net
615-384-5588

### Support and Training for Exceptional Parents (STEP)
712 Professional Plaza, Greenville, TN 37745
Web site: www.tnstep.org/

| | | |
|---|---|---|
| West Tennessee | 901-756-4332 | jenness.roth@tnstep.org |
| East Tennessee | 423-639-2464 | karen.harrison@tnstep.org |
| Middle Tennessee | 615-463-2310 | information @tnstep.org |

### Tennessee Protection and Advocacy (TP&A)
412 21st Avenue South, Nashville, TN 37212

| | |
|---|---|
| Phone: 615-298-1080 | Toll free 1-800-287-9636 |
| Fax: 615-298-2046 | TTY 615-298-2471 |

### Tennessee Voices for Children
Web site: www.tnvoices.org

| | |
|---|---|
| West Tennessee 731-660-6365 | Fax: 731-660-6372 |
| East Tennessee 865-609-2490 | Fax: 865-609-2543 |
| Middle Tennessee 615-269-7751 | Fax: 615-269-8914 |
| TN Toll free: 1- 800-670-9882 | |

**Legal Services Division**
**Division of Special Education**
Tennessee Department of Education
710 James Robertson Parkway
Andrew Johnson Tower, 5th Floor
Nashville, TN 37243-2851
Fax: 615-223-5567 or 615-532-9412

### Department of Children's Services-
To report abuse or neglect: 1-877-237-0004
This number is posted in each school building.

**Robertson County Crisis Line**- 877-652-3069
Project Aware is available 24 hours a day, 7 days a week

**Robertson County Resource Directory**
https://www.rcstn.net/q/2021_resource_directory/

**National Suicide Prevention Hotline**
800-273-8255

**Tennessee Suicide Prevention Network- tspn.org**
446 Metroplex Drive
Suite A224
Nashville, TN 37212
Phone: 615-297-1077
The Tennessee Suicide Prevention Network (TSPN) is the statewide public-private
organization responsible for implementing the Tennessee Strategy for Suicide Prevention
as defined by the 2001 National Strategy for Suicide Prevention.

**Stopbullying.gov**
This site has a wealth of information on bullying and anti-bullying resources.
Answers to many questions and other helpful information not found in this handbook
may be obtained from the State Department of Education by calling
1-888-212-3162 or visiting the web site: **www.tn.gov/education**

**NOTES**

FILED
CLERK & MASTER ROBERTSON CO. TN

MAY 0 4 2022

AT 3:29 O'CLOCK P M

# Robertson County Board of Education

| Monitoring: Review: Annually, in April | Descriptor Term: **Zero Tolerance Offenses** | Descriptor Code: 6.309 | Issued Date: 01/13/20 |
|---|---|---|---|
| | | Rescinds: 6.309 | Revised: 07/11/16 |

1 In order to ensure a safe and secure learning environment, the following offenses shall not be
2 tolerated:[1]

## 3 WEAPONS & DANGEROUS INSTRUMENTS

4 Students shall not possess, handle, transmit, use or attempt to use any dangerous weapon in school
5 buildings or on school grounds at any time, or in school vehicles and/or buses or off the school
6 grounds at a school-sponsored activity, function or event.

7 Dangerous weapons for the purposes of this policy shall include, but are not limited to a fi rearm or
8 anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily
9 injury or anything that in the manner of its use or intended use is capable of causing death or serious
10 bodily injury.

11 Violators of this section shall be subject to suspension and/or expulsion from school.

12 *Firearms (as defined in 18 U.S.C. § 921)[2]*

13 In accordance with state law, any student who brings or possess a firearm on school property shall be
14 expelled for a period of not less than one (1) calendar year. The director of schools shall have the
15 authority to modify this expulsion requirement on a case-by-case basis.[5]

## 16 DRUGS[3]

17 In accordance with state law, any student who unlawfully possesses, uses, transfers, or is under the
18 influence of any drug including any controlled substance or legend drug shall be subject to expulsion
19 for a period of not less than one (1) calendar year.[5]

20 Any student who possesses drug paraphernalia shall be subject to expulsion for a period of not less
21 than one (1) calendar year. Any student who possesses, uses, transfers, or is under the influence of
22 alcohol shall be subject to expulsion for a period of not less than one (1) calendar year. The director of
23 schools shall have the authority to modify this expulsion requirement on a case-by-case basis.[5]

## 24 ASSAULT

25 In accordance with state law, any student who commits aggravated assault as defined in § 39-13-102,
26 or commits assault that results in bodily injury[4] upon any teacher, principal administrator, any other
27 employee of the school or school resource officer shall be expelled for a period of not less than one (1)
28 calendar year. The director of schools shall have the authority to modify this expulsion requirement on
29 a case-by-case basis.[5]

**EXHIBIT**
I

1   **ELECTRONIC THREATS**

2   In accordance with state law, any student who transmits by an electronic device any communication
3   containing a credible threat to cause bodily injury or death to another student or school employee and
4   the transmission of such threat creates actual disruptive activity at the school that requires
5   administrative intervention shall be expelled for a period of not less than one (1) calendar year. The
6   director of schools shall have the authority to modify this expulsion requirement on a case-by-case
7   basis.[3]

8   All zero tolerance offenses shall be referred to the Disciplinary Hearing Authority for a due process
9   hearing.

10  **NOTIFICATION**

11  When it is determined that a student has violated this policy, the principal of the school shall notify the
12  student's parent or guardian and the criminal justice or juvenile delinquency system as required by
13  law.[6]

Legal References

1.  TCA 49-6-3401(g)
    18 USCA § 921(a)(3); 20 USCA § 7961(b)(3)
2.  TCA 39-17-454; TCA 53-10-101
3.  TCA 39-13-101(a)(1)
4.  TCA 49-6-3401(g)(2); TCA 49-6-3042
5.  TCA 49-6-4209; TCA 39-17-1312; 20 USCA §
    7961(h)(1)

Cross References

Discipline Procedures  6.313
Suspension/Expulsion/Remand  6.316

Case 3:22-cv-00408   Document 1-3   Filed 06/03/22   Page 111 of 140 PageID #: 118

<table>
<tr><td>Robertson     County<br>Chancery Court</td><td>**STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 1</td><td>**Case Number**<br>CH22·CV-220</td></tr>
</table>

| Melissa Davis and Chris Davis Individually and as Next Friend of their minor son, Arlis "Buck" Davis | **Vs.** | Robertson County School Board of Education, and Chris Causey, Indivudally, and in his capacity as Director of Schools for Robertson County Schools, |
|---|---|---|

Served On:

Robertson County School Board of Education    800 M.S. Couts Blvd., Springfield, TN 37172

You are hereby summoned to defend a civil action filed against you in **Chancery**   Court, **Robertson**   County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued:   May 4, 2022

_Jess Roach_
Clerk / Deputy Clerk

Attorney for Plaintiff:   Robert Briley and Matthew Eggleston
Shuttleworth PLLC, 7984 Coley Davis Rd, Suite 101, Nashville, TN 37221

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to   _____, _____ Clerk, _____ County

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____
             Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date:_____
By:_____
           Please Print: Officer, Title

Agency Address _____
           Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____
Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff _____
Plaintiff's Attorney (or Person Authorized to Serve Process)
**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*

| Robertson County | | |
|---|---|---|
| **Chancery Court** | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 1 | **Case Number**<br>CH 22-CU-220 |

Melissa Davis and Chris Davis Individually and as Next Friend of their minor son, Arlis "Buck" Davis **Vs.** Roberson County School Board of Education, and Chris Causey, Individually, and in his capacity as Direct of Schools for Robertson County Schools

Served On:

Chris Causey      800 M.S. Couts Blvd., Springfield, TN 37172

You are hereby summoned to defend a civil action filed against you in Chancery    Court, Robertson    County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: May 4, 2022

                          Jess Roach
                          Clerk / Deputy Clerk

Attorney for Plaintiff:    Robert Briley and Matthew Eggleston
                      Shuttleworth PLLC, 7984 Coley Davis Rd, Suite 101, Nashville, TN 37221

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to               _____, _____ Clerk, _____ County

---

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____ _____
                                    Clerk / Deputy Clerk

**OFFICER'S RETURN**: Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____        By: _____
                                       Please Print: Officer, Title

_____           _____
Agency Address                                Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage

prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____ _____
                                 Notary Public / Deputy Clerk (Comm. Expires _____ )

_____        _____
Signature of Plaintiff                Plaintiff's Attorney (or Person Authorized to Serve Process)
                               (Attach return receipt on back)

*ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.*

*Rev. 03/11*



## TENNESSEE COURTS
## UNIFORM FACSIMILE FILING COVER SHEET

TO (COURT CLERK): Robertson County Chancery Court Clerk and Master

WITH (COURT): Robertson County Chancery Court

CLERK'S FAX NUMBER: 615-382-3128

CASE NAME: Melissa Davis and Chris Davis Individually and as Next Friend of their minor son, Arlo "Buck" Davis v. Robertson County School Board of Education, and Chris Causey, Individually and in his capacity as Director of Schools for Robertson County Schools,

DOCKET NUMBER: CH22-CV-220

TITLE OF DOCUMENT: First Amended Verified Complaint, Motion for Injunctive Relief, and Petition for Writ of Certiorari

FROM (SENDER): Robert Briley

SENDER'S ADDRESS: Shuttleworth PLLC, 7984 Coley Davis Rd, Suite 101, Nashville, TN 37221

SENDER'S VOICE TELEPHONE NUMBER: (615) 833-3390

SENDER'S FAX TELEPHONE NUMBER: (615) 902-3094

DATE: 05/05/2022          TOTAL PAGES, INCLUDING COVER PAGE: 17

FILING INSTRUCTIONS/COMMENTS (attach additional sheet if necessary):

Unless authorized by the Court, a facsimile transmission exceeding fifty (50) pages, including the cover page, shall not be filed by the clerk.

IN THE CHANCERY COURT OF ROBERTSON COUNTY, TENNESSEE

MELISSA DAVIS and CHRIS DAVIS,
Individually and as Next Friend of their minor son,
ARLIS "BUCK" DAVIS,

      Plaintiffs,

v.                                   NO. CH22-CV-220

ROBERTSON COUNTY SCHOOL BOARD
OF EDUCATION, and CHRIS CAUSEY, Individually,
and in his capacity as Director of Schools for
Robertson County Schools,

      Defendants.

## FIRST AMENDED VERIFIED COMPLAINT, MOTION FOR INJUNCTIVE RELIEF, and PETITION FOR WRIT OF CERTIORARI

COME NOW the Plaintiffs, Melissa Davis and Chris Davis, Individually and as Next Friends of their minor son, Arlis "Buck" Davis ("Plaintiffs"), through the undersigned counsel, and file this First Amended Verified Complaint, Motion for Injunctive Relief, and Petition for Certiorari pursuant to Tennessee common law, Tenn. Code Ann. § 27-8-101, et seq., Tenn. Code Ann. § 27-9-101, et seq., and 42 U.S.C. § 1983, against Defendants Robertson County School Board of Education, and Chris Causey, Individually and in his official capacity as Director of Schools for Robertson County Schools. Pursuant to Tenn. R. Civ. P. 10.04, the Plaintiffs adopt by reference and incorporate herein all exhibits, affidavits, and supporting materials that were attached to and filed with the Verified Complaint and Motion for Injunctive Relief. In support thereof, Plaintiffs would state to the Court the following:

1

## SUMMARY OF THE CASE

The minor Plaintiff, Buck Davis, is a junior at Greenbrier High School. On February 8, 2022, Buck was accused of, investigated for, charged with, and punished for a zero-tolerance policy violation of a zero-tolerance policy that does not exist. Buck was sentenced by the Disciplinary Hearing Authority as a zero-tolerance defendant to a one-year term at Robertson County's alternative school, The Phoenix Academy. Buck's case is also marred by a series of errors in the investigation and prosecution of his case that further eroded Buck's constitutional rights to due process. On February 17, 2022, Buck's appeal to the Robertson County Director of School, Chris Causey, was denied. On April 25, 2022, Buck exhausted his administrative remedies by appealing his suspension to the Robertson County School Board. That appeal was likewise denied.

Having been tried, convicted, and sentenced for violating a Robertson County School Board policy that does not even exist, and having had every appeal of that wrongful conviction denied, Buck Davis and his family have no choice but to resort to the power of this Honorable Court to restore his rights and grant his remedies before more harm occurs to him.

## PARTIES

1.      Plaintiff Melissa Davis is the mother and next friend of Arlis "Buck" Davis, a minor. She is an adult resident citizen of Robertson County, Tennessee, residing therein at 3112 Lights Chapel Road, Greenbrier, Tennessee 37073.

2.      Plaintiff Chris Davis is the father and next friend of Arlis "Buck" Davis, a minor. He is an adult resident citizen of Robertson County, Tennessee, residing therein at 3112 Lights Chapel Road, Greenbrier, Tennessee 37073.

3.     Arlis "Buck" Davis is a minor who resides with his parents, Melissa and Chris Davis, at 3112 Lights Chapel Road, Greenbrier, Tennessee 37073.

4.     Defendant Robertson County School Board ("RCSB") is a public entity entitled to sue and be sued under the laws of the State of Tennessee. RCBS operates the public school system in Robertson County, Tennessee, consisting of 21 schools plus a virtual school. RCSB operates Greenbrier High School. RCSB may be served through its Director of Schools, Chris Causey at Robertson County School Board, Central Office, 800 M. S. Couts Blvd. Springfield, TN 37172, or through counsel for the parties by previously agreement.

5.     Chris Causey is the Director of Schools for Robertson County. The Director of Schools is the chief executive officer of the school system and has, under the direction of the RCSB, general supervision of all the public schools, personnel and departments of the school system. The Director of Schools is responsible for the management of the schools under the RCSB's policies and is accountable to the RCSB. Dr. Causey can be served at Robertson County School Board, Central Office, 800 M. S. Couts Blvd., Springfield, TN 37172, or through counsel for the parties by previously agreement.

6.     Venue is correct, and this Court has jurisdiction to hear all claims alleged herein.

## FACTS

7.     Buck Davis is a junior at Greenbrier High School.

8.     On February 8, 2022, Buck was observed with chewing tobacco while on the Greenbrier High School campus. The school resource officer brought Buck to the office of the assistant principal, Tracey Raines.

9.     Buck voluntarily agreed to a search of his truck that was parked on campus.

10. At the truck, Assistant Principal Tracey Raines and the school resource officer found more cans of tobacco, and in the passenger console, a vape pen.

11. There was also a backpack in the truck with the name "C.B." (Student B) embroidered on it. In the backpack was allegedly a can of "40 Loco" and an empty container of Twisted Delta 8 Hemp. Buck had no knowledge of the contents of the backpack belonging to "C.B." (Student B), including specifically any alcohol. The backpack had been placed in Buck's normal truck by another student without Buck's knowledge, and when Buck's normal truck broke down, Buck transferred the contents of that truck to the family's farm truck, including the backpack belonging to "C.B." (Student B). Buck never looked inside the backpack to examine its contents before driving to school.

12. After returning to the office, J.W. (Student A) came by and asked about getting his keys out of Buck's truck. Assistant Principal Raines asked J.W. (Student A) about the other items in the truck, and J.W. (Student A) confessed to owning the vape pen. Buck was not cited for possession of this item.

13. Buck was cited, however, for "possession of alcohol on campus" by Assistant Principal Tracey Raines and referred to the Disciplinary Hearing Authority ("DHA") with the following recommendation, "zero tolerance one calendar year at Phoenix Academy." (Exhibit A.)

14. Since Buck's case involved a suspension exceeding ten days, the Principal of Greenbrier High School, Katie Osborne, was required to make the referral to the DHA.

15. Tracey Raines is not the Principal of Greenbrier High School.

16. On February 11, 2022, the DHA met to hear Buck's case. The DHA considered the infraction against Buck to be "Possession of alcohol (ZT)." The DHA's recommendation

4

was "the student assigned to RCPA for 1 calendar year for a ZT. The student may return to GHS on 2.12.2023." (Exhibit B.) Notably, this document fails to include "a summary of the facts and the reasons supporting the decision" of the DHA a required by Tenn. Code Ann. § 49-6-3401(6). For this reason, it was not until the hearing before the RCSB discussed below that Buck and his parents learned for the first time that the DHA's position was that its members simply chose not to believe Buck's story. This document (Exhibit B) and the subsequent declarations of the DHA members are inconsistent with each other.

17.    At the DHA hearing, Buck's parents were advised by the DHA panel that Buck's guilt or innocence of the alleged offense was not to be discussed, nor were the names of any other students involved. According to the DHA panel at the hearing, because the charge involved a zero-tolerance offense, the only topic for discussion was whether to suspend Buck for one calendar year, or to expel him.

18.    On February 11, 2023, the Plaintiffs appealed the DHA's decision to the Director of Robertson County Schools, Chris Causey. (Exhibit C.)

19.    On February 17, 2022, Dr. Causey refused to overturn the decision of the DHA, finding that Buck had "committed a zero tolerance offense." (Exhibit D.)

20.    On April 6, 2022, through counsel, Buck appealed Dr. Causey's decision to uphold the DHA decision that suspended Buck for an alleged zero-tolerance violation to the Robertson County School Board. These materials alleged a number of substantive and procedural defects in the investigation and hearing of charges against Buck, including the argument that the Robertson County School Board has not made possession of alcohol on school property a zero-tolerance offense. (Exhibit E.)

21.     On April 7, 2022, counsel for the Plaintiffs submitted additional information to

the Robertson County School Board for consideration at the final administrative appeal. These

materials reminded the RCSB that knowledge and intent are critical components to any

procedural due process analysis related to school discipline investigations. (Exhibit F.)

22.     On April 19, 2022, ostensibly on behalf of itself, counsel for the Robertson

County School Board submitted written materials for the Board's consideration.

23.     On April 25, 2022, the Robertson County School Board met for a specially called

meeting to consider Buck's appeal. With one abstention, the Board voted unanimously to uphold

the DHA and Dr. Causey's decisions to suspend Buck for a zero-tolerance violation for

possession of alcohol on campus. The Board did modify the one calendar year suspension and

provided that on "good behavior" he would be allowed to return to Greenbrier High School on

the first day of the 2022-2023 school year. (Exhibit G.)

## THE ROBERTSON COUNTY SCHOOL BOARD HAS NOT MADE "POSSESSION OF ALCOHOL ON CAMPUS" A ZERO TOLERANCE OFFENSE

24.     Zero tolerance offenses are created by State law, Tenn. Code Ann. § 49-6-

3401(g); and additionally, as in the case of the RCSB, by specific school board policy, Board

Policy § 6.309.

25.     The three types of offenses mandated as "Zero tolerance" offenses under

Tennessee statute are those involving guns, assaults and drugs. Tenn. Code Ann. § 49-6-

3401(g)(2)(A-C).

26.     "Zero tolerance offense" means an offense committed by a student requiring the

student to be expelled from school for at least one (1) calendar year that can only be modified on

a case-by-case basis by the director of schools or the head of a charter school.

27.     Disciplinary policies and procedures for all other student offenses, including terms of suspensions and expulsions, must be determined by local board of education policy.

28.     The RCSB has broadened the scope of "Zero Tolerance Offenses" by developing a policy that includes both the state law mandated offenses of guns, assaults, and drugs, and which goes further by adding sections covering "ELECTRONIC THREATS" and "NOTIFICATION." *See*, Board Policy § 6.309. (Exhibit H.)

29.     Robertson County School Board Policy § 6.309 on "Zero Tolerance Offenses" does not make possession of alcohol on campus a zero-tolerance offense.

30.     Buck has not been accused of an offense involving guns, assaults, drugs, or electronic threats.

31.     Buck has not been accused of violating a State law or RCSB policy that makes possession of alcohol on campus a zero-tolerance offense.

32.     The Director of Schools prepared a Student Handbook for Robertson County Schools for 2021-2022. (Exhibit I.)

33.     The Student Handbook has the following statement regarding alcohol and drug use:

> **Alcohol and Drug Use**
>
> Students will not possess, distribute, or be under the influence of illegal drugs or alcoholic beverages in school buildings or on schools grounds, school vehicles, or at any school-sponsored activity at any time whether on or off school campus.
>
> Students will not market or distribute any substance that is represented to be or is substantially similar in color, shape, size or markings to a controlled substance.
>
> Upon information that a student is suspected of violating this policy, the principal/designee shall be notified immediately. If it is determined that the policy has been violated the principal/designee shall notify the parent and appropriate law enforcement officials. The student shall be suspended to

the Disciplinary Hearing Authority and be subject to a one calendar year suspension.

34. The statement contained in the Student Handbook regarding "Alcohol and Drug Use" is not a statement of board policy as required by Tenn. Code Ann. § 49-6-3401(g)(4), nor is this statement regarding alcohol and drug use contained in any official policy adopted by the RCSB.

35. Even if the statement contained in the Student Handbook regarding alcohol and drug use can be interpreted as being a board policy, it does not make possession of alcohol on school property a zero-tolerance offense because it simply describes punishment as, "The student shall be suspended to the Disciplinary Authority and be subject to a one calendar year suspension." By statute, "Zero tolerance offense" means an offense committed by a student requiring the student to be expelled from school for at least one (1) calendar year that can only be modified on a case-by-case basis by the director of schools or the head of a charter school.

36. The Student Handbook also purports to include alcohol among a list of items that if possessed are "Zero-tolerance acts as defined by Law or Board of Education Policy." However, alcohol is not included in Tenn. Code Ann. § 49-6-3401(g)(2)(A-C), Board Policy § 6.309, or any other "Board of Education Policy."

37. The Student Handbook purports to define zero-tolerance behavior as:

## Zero-Tolerance Behavior

In order to ensure a safe and secure learning environment free of drugs, drug paraphernalia, violence and dangerous weapons, any student who engages in the following behaviors will be subject to a suspension for a period of not less than one calendar year. The Director of Schools shall have the authority to modify the suspension requirement on a case-by-case basis.

Zero-tolerance acts as defined by Law or Board of Education Policy:

❖ Possession/use/transfer of illegal substances, including alcohol, marijuana, stimulant drugs, prescription medication not prescribed to the student, or drug paraphernalia.

❖ Assault, threatening to assault, or committing aggravated assault upon any student, teacher, or system employee.
❖ Possession/use/transfer of dangerous weapons.
❖ Unauthorized possession of a firearm as defined in 18 USC 921.
❖ Who transmits by an electronic device any communication containing a credible threat to cause bodily injury or death to another student or school employee and the transmission of such threat creates actual disruptive activity at the school that requires administrative intervention.

38. The statement contained in the Student Handbook regarding "Zero Tolerance

Behavior" is different than and inconsistent with Robertson County School Board Policy § 6.309

on "Zero Tolerance Offenses."

39. The statement contained in the Student Handbook regarding "Zero Tolerance

Behavior" is not a statement of board policy as required by Tenn. Code Ann. § 49-6-3401(g)(4).

40. The statement contained in the Student Handbook regarding "Zero Tolerance

Behavior" does not provide a link to Robertson County School Board Policy § 6.309 on "Zero

Tolerance Offenses" so that a student or parent could refer to the actual policy.

41. Robertson County School Board Policy § 6.309 on "Zero Tolerance Offenses"

does not contain the full text of Robertson County School Board Policy § 6.309 on "Zero

Tolerance Offenses."

42. The Student Handbook does not serve as the RCSB's policy handbook.

43. The RCSB maintains its policies separately from the Student Handbook in a

policy manual on a website. (*See*, https://tsba.net/robertson-county-board-of-education-policy-manual/)

44. The Student Handbook does not contain an accurate summary of the Robertson

County School Board Policy § 6.309 on "Zero Tolerance Offenses."

45.     The Student Handbook does not contain an accurate summary of the Robertson County School Board Policy § 6.309 on "Zero Tolerance Offenses" with a link to the text of the full policy.

46.     The Robertson County School Board has not made the possession of alcohol on campus a zero-tolerance offense by policy.

47.     The Robertson County School Board has not made the possession of alcohol on campus a zero-tolerance offense by proper use of the Student Handbook.

48.     Because Buck was accused of, investigated for, charged with, and punished for a zero-tolerance policy violation for a zero-tolerance policy that does not exist, the entire process was tainted from the beginning and resulted in the violation of Buck's procedural and substantive due process rights, and other rights secured by law.

## REQUEST FOR TEMPORARY AND PERMANENT INJUNCTIVE RELIEF
## (FIRST REQUEST)

49.     Plaintiffs hereby incorporate each and every paragraph contained in this Complaint verbatim as if fully set forth herein.

50.     Pursuant to Rule 65 of the Tennessee Rules of Civil Procedure, this Court may grant a restraining order in this matter requiring the RCSB and/or Dr. Causey to return to the pre-investigation status quo by returning Buck Davis to his normal class schedule at Greenbrier High School immediately, and enjoining the Defendants from taking any action against Buck Davis as a result of RCBS's flawed zero-tolerance policy, should the Plaintiffs demonstrate, through affidavit or through verified complaint, that they will suffer immediate and irreparable harm, loss or damage if the Court does not grant the requested relief. Plaintiffs also request that the Court enter a temporary injunction on the same basis following the initial hearing of this matter.

51.     Plaintiffs request that a restraining order should be issued prior to the adverse party being heard in opposition as Buck Davis continues to be wrongfully deprived of his education by being forced to sit at a desk for hours straight at The Phoenix Academy and use a remote learning system that the RCSB already determined was ineffective during the interruptions caused by COVID-19. In addition, Buck has an Individualized Education Plan ("IEP") that is not being met at The Phoenix Academy. Like every other student, Buck also missed most of the past two years of in-person school due to COVID-19 and taking away half of his junior year for this non-infraction will simply exacerbate this learning deficit. Buck Davis will continue to be wrongfully deprived of his constitutional right to a free public education until this matter is final, unless the Court restores him to the pre-deprivation status quo.

52.     Plaintiffs have put Defendants on notice of this filing as best as possible under the circumstances and their request for an immediate restraining order/temporary injunction, both orally and in writing.

53.     Plaintiffs submit that there is a strong likelihood that they will succeed on the merits of the claims asserted herein and that Defendants will not suffer any harm, loss, or damage, should the Court grant the injunctive relief sought in this matter.

## COUNT I – PROCEDURAL DUE PROCESS

54.     Plaintiffs hereby incorporate each and every paragraph contained in this Complaint verbatim as if fully set forth herein.

55.     Defendants violated the Plaintiffs' procedural due process rights guaranteed by the United States Constitution and the Constitution of the State of Tennessee in multiple ways, including but not limited to the following:

a. Failing to adhere to its own policies and procedures in the investigation and prosecution of zero-tolerance charges;

b. Failing to provide a meaningful and accurate description of the alleged zero-tolerance charges at issue;

c. Failing to give the Plaintiffs the opportunity to discuss guilt or innocence at the DHA hearing, and instead instructing that the only issues for discussion were suspension or expulsion under the RCSB zero-tolerance policy;

d. Sentencing Buck pursuant to the zero-tolerance policy when it was not authorized;

e. Failing to perform a reasonable investigation into Buck's guilt or innocence, including the unauthorized use of a school resource officer to search Buck's truck; and

f. The failure of Dr. Causey to conduct any reasonable investigation before denying Buck's appeal to him;

g. The DHA's failure to follow State law and RCBS policy by not including a summary of the facts and reasons supporting the decision to sentence Buck to the Phoenix Academy; and

g. Other additional violations of RCBS's own rules, regulations, and policies regarding student discipline.

56. The Defendants actions proximately caused harm to the Plaintiffs for which they are entitled to recover damages.

## COUNT II – SUBSTANTIVE DUE PROCESS

57. Plaintiffs hereby incorporate each and every paragraph contained in this Complaint verbatim as if fully set forth herein.

58. Defendants' actions in disciplining Buck were arbitrary, capricious, and illegal, so as to shock the conscience, and they displayed a deliberate indifference to and a conscious disregard of

Buck's constitutional rights, in violation of his substantive due process rights under the United States Constitution and the Constitution of the State of Tennessee. Defendants have violated Buck's substantive due process rights in multiple ways, including but not limited to the following:

a.      Defendants arbitrarily, capriciously, and illegally charged Buck with and found him guilty of a zero-tolerance violation for alleged conduct that was not included among the list of zero-tolerance offenses enacted by State law or Board policy;

b.      Defendants arbitrarily, capriciously, and illegally charged Buck with and found him guilty of a zero-tolerance violation without the requisite factual support for the finding;

c.      Defendants arbitrarily, capriciously, and illegally imposed and upheld a punishment that is grossly disproportionate to the offense charged and specifically not authorized by State law or Board policy; and

d.      The disciplinary actions Defendants undertook against Buck were arbitrarily, capriciously, and illegally driven by improper motives unrelated to the maintenance of school discipline.

59.     The Defendants actions proximately caused harm to the Plaintiffs for which they are entitled to recover damages.

## **COUNT III – FAILUIRE TO TRAIN/SUPERVISE**

60.     Plaintiffs hereby incorporate each and every paragraph contained in this Complaint verbatim as if fully set forth herein.

61.     Defendants have failed to adequately train and supervise their employees with regard to student discipline.

62.     These failures exhibit a deliberate indifference to Buck's constitutional rights.

63.     Defendants' inadequate training and supervision of its employees proximately caused a deprivation of Buck's constitutional rights, for which Plaintiffs are entitled to damages.

## COUNT IV – NEGLIGENCE

64.     Plaintiffs hereby incorporate each and every paragraph contained in this Complaint verbatim as if fully set forth herein.

65.     The Defendants were negligent in the investigation, consideration and administration of their duties, including the duty to follow their own policies and procedures relative to student discipline which led to the wrongful conviction of Buck Davis under the RCSB zero-tolerance policy.

66.     The Defendants' negligence was a proximate cause of harm and damage to Plaintiffs.

## RELIEF SOUGHT

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray:

1.     That proper process issue upon Defendants, compelling each to answer this First Amended Verified Complaint, Motion for Injunctive Relief, and Petition for Writ of Certiorari;

2.     That this Court grant a restraining order/temporary injunction pursuant to Rule 65 of the Tennessee Rules of Civil Procedure, requiring the RCSB and/or Dr. Causey to return to the pre-investigation status quo by returning Buck Davis to his normal class schedule and status at Greenbrier High School immediately, and enjoining the Defendants from taking any action against Buck Davis as a result of RCBS's flawed zero-tolerance policy, as the Plaintiffs have demonstrated, through this First Amended Verified Complaint, Motion for Injunctive Relief, and Petition for Writ of Certiorari, that they will suffer immediate and irreparable harm, loss or damage if the Court does not grant the requested relief;

3.     That Defendants be held jointly and severally liable for depriving Plaintiffs of their procedural due process rights and substantive due process rights secured by the United States Constitution and Constitution of the State of Tennessee;

4.     That this Court enter a declaratory judgment exonerating Buck Davis and clearing his student record of the charge of possession of alcohol on school property of which he was arbitrarily, capriciously, and illegally convicted;

5.     That this Court enter a judgment in favor of Plaintiffs in a sum sufficient to compensate them for the damages they have suffered as a result of Defendants' violations of Buck's constitutional rights;

6.     That Plaintiffs be awarded their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, jointly and severally against the Defendants;

7.     That the costs of this action be awarded to Plaintiffs;

8.     That a jury be impaneled to try all legal issues presented in this lawsuit; and

9.     Plaintiffs be provided leave to subsequently amend this First Amended Verified Complaint, Motion for Injunctive Relief, and Petition for Writ of Certiorari to allow the pleading to conform to the facts and evidence as such may develop during discovery and at the trial of this cause.

Respectfully Submitted,

SHUTTLEWORTH PLLC

Robert W. Briley, BPR #18560
rbriley@swlawpllc.com
Mathew K. Eggleston, BPR #18641
meggleston@swlawpllc.com
7984 Coley Davis Road, Suite 101
Nashville, Tennessee 37221
(615) 833-3390
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document has been served upon the following by U.S. Mail and/or electronic mail if agreed to by counsel for the parties, on this the 5th day of May, 2022:

Mr. Sam Jackson
Spencer Fane Bone McAllester
511 Union Street, Suite 1000
Nashville, TN 37219

Robert W. Briley



**TENNESSEE COURTS**
UNIFORM FACSIMILE FILING COVER SHEET

TO (COURT CLERK): Rosemary T. Sprague

WITH (COURT): Robertson County Chancery Court

CLERK'S FAX NUMBER: (615) 382-2128

CASE NAME: Melissa Davis, et al v. Robertson County School Board of Education et al

DOCKET NUMBER: CH22-CV-220

TITLE OF DOCUMENT: Notice of Appearance and Request to be Heard

FROM (SENDER): Samuel L. Jackson

SENDER'S ADDRESS: Spencer Fane Bone McAllester

_____

SENDER'S VOICE TELEPHONE NUMBER: (615) 238-6312

SENDER'S FAX TELEPHONE NUMBER: (615) 238-6301

DATE: 5/5/2022         TOTAL PAGES, INCLUDING COVER PAGE: 4

FILING INSTRUCTIONS/COMMENTS (attach additional sheet if necessary):

Unless authorized by the Court, a facsimile transmission exceeding fifty (50) pages,
including the cover page, shall not be filed by the clerk.

**IN THE CHANCERY COURT OF ROBERTSON COUNTY, TENNESSEE**

| | | |
|---|---|---|
| MELISSA DAVIS and CHRIS DAVIS | ) | |
| Individually and as Next Friend of their | ) | |
| minor son, ARLIS "BUCK" DAVIS, | ) | No. CH22-CV-220 |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERTSON COUNTY SCHOOL | ) | |
| BOARD OF EDUCATION, and CHRIS | ) | |
| CAUSEY, Individually, and in his | ) | |
| capacity as Director of Schools for | ) | |
| Robertson County Schools, | ) | |
| | | |
|     Defendant. | | |

---

## NOTICE OF APPEARANCE AND REQUEST TO BE HEARD

Samuel L. Jackson, Sara Naylor, and Bethany M. Vanhooser hereby give notice of their appearance on behalf of Defendants Robertson County School Board of Education and Chris Causey in the above-styled cause of action. Additionally, Defendants received notice for the first time of the Verified Complaint and Motion for Injunctive Relief and First Amended Verified Complaint, Motion for Injunctive Relief, and Petition for Writ of Certiorari in this matter on May 5, 2022. The Defendants see there has been a request for injunctive relief in this case and would like the opportunity to be heard before any such injunctive relief, if any, should be granted by the court.

**DATED** May 5, 2022.

Respectfully submitted,

*/s/ Samuel L. Jackson*

Samuel L. Jackson (021541)
Sara Naylor (037533)
Bethany M. Vanhooser (038594)
SPENCER FANE BONE MCALLESTER
511 Union Street, Suite 1000
Nashville, TN 37219
Phone & Facsimile (615) 238-6312
sjackson@spencerfane.com
snaylor@spencerfane.com
bvanhooser@spencerfane.com
*Attorney for Defendants*

2

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2022, a true and correct copy of the foregoing was served by e-mail on:

Robert W. Briley
SHUTTLEWORTH PLLC
7984 Coley Davis Road, Suite 101
Nashville, Tennessee 37221
rbriley@swlawpllc.com
*Counsel for Plaintiffs*

Mathew K Eggleston
SHUTTLEWORTH PLLC
7984 Coley Davis Road, Suite 101
Nashville, Tennessee 37221
meggleston@swlawpllc.com
*Counsel for Plaintiffs*

*/s/ Samuel L. Jackson*

_____

Samuel L. Jackson

# FIAT

TO THE CLERK OF THIS COURT:

Issue the Temporary Restraining Order as prayed for in this Complaint upon bond being given in the amount of $_____ and issue Notice setting this matter for hearing on _____, the _____ day of _____, _____ at _____ o'clock _____.m.

_____
CHANCELLOR

Date: _____



The ex parte TRO's denied as impermissible Mandatory relief under Rule 65. Set for hearing on application for Temp Injunction @ 5-5-22

18

# IN THE CHANCERY COURT OF ROBERTSON COUNTY, TENNESSEE

MELISSA DAVIS and CHRIS DAVIS,
Individually and as Next Friend of their minor son,
ARLIS "BUCK" DAVIS,

     Plaintiffs,

v.                                  NO. **CH22-CV-220**

ROBERTSON COUNTY SCHOOL BOARD
OF EDUCATION, and CHRIS CAUSEY, Individually,
and in his capacity as Director of Schools for
Robertson County Schools,

     Defendants.

## NOTICE OF HEARING

COME NOW Melissa Davis and Chris Davis, Individually and as Next Friend of their minor son, Arlis "Buck" Davis, and give notice that their Motion for Temporary Injunction has been set for hearing on May 19, 2022 at 9:00 a.m. before the Robertson County Chancery Court.

Respectfully Submitted,
SHUTTLEWORTH PLLC

Robert W. Briley, BPR #18560
Mathew K. Eggleston, BPR #18641
7984 Coley Davis Road, Suite 101
Nashville, Tennessee 37221
(615) 833-3390
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document has been served upon the following by U.S. Mail and/or electronic mail if agreed to by counsel for the parties, on this the 9th day of May, 2022:

Mr. Sam Jackson
Spencer Fane Bone McAllester
511 Union Street, Suite 1000
Nashville, TN 37219

_____
Robert W. Briley

# IN THE CHANCERY COURT OF ROBERTSON COUNTY, TENNESSEE

MELISSA DAVIS and CHRIS DAVIS,
Individually and as Next Friend of their minor son,
ARLIS "BUCK" DAVIS,

**FILED**
CLERK & MASTER ROBERTSON CO. TN

MAY 18 2022

AT 4:30 O'CLOCK __ P __ M.
ROSEMARY T. SPRAGUE

BY_____

      Plaintiffs,

v.

                            NO.  **CH22-CV-220**

ROBERTSON COUNTY SCHOOL BOARD
OF EDUCATION, and CHRIS CAUSEY, Individually,
and in his capacity as Director of Schools for
Robertson County Schools,

      Defendants.

## AMENDED NOTICE OF HEARING

        COME NOW Melissa Davis and Chris Davis, Individually and as Next Friend of their

minor son, Arlis "Buck" Davis, and give notice that their Motion for Temporary Injunction has

been re-set for hearing on June 20, 2022 at 9:00 a.m. before the Robertson County Chancery Court.

                                Respectfully Submitted,
                                SHUTTLEWORTH PLLC

                                _____
                                Robert W. Briley, BPR #18560
                                Mathew K. Eggleston, BPR #18641
                                7984 Coley Davis Road, Suite 101
                                Nashville, Tennessee 37221
                                (615) 833-3390
                                *Attorneys for Plaintiffs*

1

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document has been served upon the following by U.S. Mail and/or electronic mail if agreed to by counsel for the parties, on this the 18th day of May, 2022:

Anthony Noel
Laura Bassett
201 4th Avenue North, Suite 1100
4th & Church Building
Nashville, TN 37219

Robert W. Briley

2



**TENNESSEE COURTS**
**UNIFORM FACSIMILE FILING COVER SHEET**

**TO (COURT CLERK):** Robertson County Chancery Court Clerk and Master

**WITH (COURT):** Robertson County Chancery Court

**CLERK'S FAX NUMBER:** (615) 382-3128

**CASE NAME:** Melissa Davis and Chris Davis Individually and as Next Friend of their minor son, Arlo "Buck" Davis   V.   Robertson County School Board of Education, and Chris Causey, Individually, and in his capacity as Director of Schools for Robertson County Schools,

**DOCKET NUMBER:** CH22-CV-220

**TITLE OF DOCUMENT:** Amended Notice of Hearing

**FROM (SENDER):** Robert Briley and Matthew Eggleston, Shuttleworth PLLC

**SENDER'S ADDRESS:** Shuttleworth PLLC, 7984 Coley Davis Rd, Suite 101, Nashville, TN 37221

**SENDER'S VOICE TELEPHONE NUMBER:** (615) 833-3390

**SENDER'S FAX TELEPHONE NUMBER:** (615) 902-3094

**DATE:** 5/18/22      **TOTAL PAGES, INCLUDING COVER PAGE:** 3

**FILING INSTRUCTIONS/COMMENTS** (attach additional sheet if necessary):

Unless authorized by the Court, a facsimile transmission exceeding fifty (50) pages, including the cover page, shall not be filed by the clerk.